David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

*Proposed Counsel for the Official
 Committee of Former Partners*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
In re                                                             :   Chapter 11
                                                                  :
DEWEY & LEBOEUF LLP,                                              :   Case No. 12-12321 (MG)
                                                                  :
                     Debtor.                                      :
                                                                  :
------------------------------------------------------------------X

**OFFICIAL COMMITTEE OF FORMER PARTNERS' OBJECTION TO
ENTRY OF FINAL ORDER (1) AUTHORIZING THE USE OF CASH
COLLATERAL, (2) GRANTING ADEQUATE PROTECTION,
AND (3) MODIFYING THE AUTOMATIC STAY**

The Official Committee of Former Partners (the "Former Partners Committee"),[1] by and

through its undersigned proposed counsel, hereby files this objection (the "Objection") to the

motion of Dewey & LeBoeuf LLP's (the "Debtor") for entry of its proposed *Final Order (1)*

*Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, and (3) Modifying the*

---

[1]   The creditors represented by the Former Partners Committee are former partners (or their surviving spouses) of LeBoeuf, Lamb, Greene & MacRae ("LeBoeuf") receiving payments under the nonqualified, unfunded LeBoeuf, Lamb, Leiby & MacRae Partners' Retirement Plan, as amended and restated effective as of November 15, 1990 (the "LeBoeuf 1990 Plan").  The LeBoeuf 1990 Plan applies only to persons who were LeBoeuf partners prior to the end of 2002.  LeBoeuf was the surviving entity under the merger, effective January 1, 2008, of the Dewey Ballantine firm and the LeBoeuf firm, and changed its name to Dewey & LeBoeuf LLP.  Upon information and belief, the unfunded obligation under the LeBoeuf 1990 Plan was valued at approximately $90 million at the time of the merger.

*Automatic Stay* (the "Cash Collateral Order" or "Final Order"),[2] and in support hereof the Former Partners Committee represents as follows:

## PRELIMINARY STATEMENT

The Cash Collateral Order is a bad deal for the estate and should not be approved in its present form. In particular, the proposed lien and superpriority claim to be granted to the Prepetition Agents, the Revolver Lenders and the Noteholders (collectively, the "Secured Lenders") with respect to chapter 5 claims (the "Avoidance Actions") results in unsecured creditors, consisting primarily of former partners, involuntarily funding this estate for the Secured Lenders' benefit.

The Former Partners Committee recognizes that many, if not most, of the provisions of the Cash Collateral Order are often approved in other cases. But this case is different in the following critical respects:

a. This case is a pure liquidation and there is neither operational upside for unsecured creditors nor any likelihood of surplus value to the recovery of billed accounts receivable. While creditors might ordinarily consider overcompensating secured lenders in the hope of realizing a recovery based upon a debtor's going concern value, the Debtor cannot provide that opportunity here.

b. In the same vein, because the Debtor is liquidating and generating no new collateral as a replacement lien, the use of cash collateral is likely to result (and the Secured Lenders certainly will so claim) in a dollar-for-dollar diminution of the Secured Lenders' lien. Therefore, under the Cash Collateral Order, every dollar of cash collateral spent will create a first priority claim against the Avoidance Actions – the primary assets from which former partners hope to recover.

c. The beneficiaries of the Avoidance Actions thus are the true parties funding this estate, not the Secured Lenders. But those beneficiaries receive little, if anything, for their incremental risk. And, even if one were to view the Cash Collateral

---

[2] Capitalized terms used but not defined in this Objection have the meanings assigned to such terms in the Interim Order (as defined herein). At the time of filing this Objection, the Former Partners Committee had not received the proposed form of Final Order. All paragraph references in this Objection, unless otherwise stated, correspond to the numbered paragraphs of the Interim Order.

2

>Order as an advance by the Secured Lenders of funds to the estate, the permitted use of cash collateral is almost exclusively targeted towards funding the billing and collection of accounts receivable – that is, the realization by the Secured Lenders upon their collateral. The amount permitted for funding the operations of statutory committees or other uses that might benefit retired partners is not meaningful.

The Secured Lenders' exploitation of estate resources to liquidate their collateral will no doubt result in an enhanced recovery for the Secured Lenders, which will in turn reduce their deficiency claim against the estate.  But that is not an adequate justification to approve the Cash Collateral Order.  In the first instance, as the Court has recognized, the Secured Lenders are not charitable institutions.  They are funding the Debtor's operations for their singular benefit and would have every reason to continue to do so without encumbering the Avoidance Actions. Stated differently, if the estate simply abandoned the Debtor's accounts receivable to the Secured Lenders, those Secured Lenders would receive an inferior recovery *and would receive no lien on Avoidance Actions*.  It is thus entirely counter-intuitive to conclude that such a lien is necessary under the current circumstances.  Moreover, for the estate to trade "hundred cent dollars" today in exchange for a reduced deficiency claim tomorrow that may be paid at a substantial discount, if at all, is a terrible business deal.

The Cash Collateral Order is thus the wrong arrangement for this case.  Apart from the lien on and superpriority claim with respect to Avoidance Actions, the order requires the estate to waive its claims against the Secured Lenders under section 506(c) even though the estate plainly is funding the preservation of the Secured Lenders 'collateral.  The Cash Collateral Order also provides for the unlimited payment of the fees and expenses of the Secured Lenders' professionals, even though the Secured Lenders have not, and cannot, meet their burden under section 506(b) that they are oversecured.  There is no other statutory basis for payment of such

3

fees and expenses. And, the impediments placed upon the estate to challenge the liens and claims of the Secured Lenders are entirely inappropriate.

The Debtor's concession in the Cash Collateral Order that the Secured Lenders' liens and claims are "valid, perfected and enforceable" raises serious concerns about the Debtor's administration of this case. While such a concession might not be controversial in other cases, here it has been acknowledged that just weeks before the chapter 11 filing, the Debtor granted the Secured Lenders new perfected liens on cash and tort claims for little or no consideration. One would have expected the Debtor itself, as a fiduciary for the estate, to have preserved the estate's interest in this plainly preferential transfer, rather than imposing upon unfunded statutory committees the enormous burden to investigate the facts, draft and file a complaint and prevail upon a motion for derivative standing, all within 60 days.

Finally, the Cash Collateral Order contains other impermissible provisions that must be stricken or modified, including (i) broad authority to write-down the Debtor's accounts receivable; (ii) an event of default based upon the commencement of a Challenge; (iii) an inordinately low Carve-Out; and (iv) a section 552(b) waiver.

The foregoing objections are discussed in greater detail below.

## FACTUAL BACKGROUND

1. On May 29, 2012 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On the Petition Date, the Debtor filed the *Debtor's Corrected Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 507, Rules 2002,*

4

*4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing* [Docket No. 16] (the "Cash Collateral Motion").

3.     On May 30, 2012, this Court entered the *Interim Order (1) Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Scheduling a Final Hearing* [Docket No. 36] (the "Interim Order"). Pursuant to the Interim Order, this Court scheduled a hearing on entry of the Final Order approving the Cash Collateral Motion for June 13, 2012 at 1:30 p.m. (Eastern Time).

4.     On May 31, 2012, the Office of the United States Trustee appointed (i) the Former Partners Committee and (ii) the official committee of unsecured creditors (the "Creditors Committee" and together with the Former Partners Committee, the "Committees"). The members of the Former Partners Committee hold vested pension and other retirement benefits owed to them by the Debtor. Many of the former partners are individuals who gave their entire professional lives to the Debtor and received a binding commitment for retirement benefits for themselves and, upon their demise, their spouses.

## EVENTS IMMEDIATELY PRECEDING THE FILING

5.     As a result of various alleged defaults and the maturity of the Debtor's Revolver Agreement, the Debtor entered into certain amendments and waivers agreeing to concentrate its daily cash receipts with the Prepetition Agent and to operate pursuant to an agreed upon budget. In addition, pursuant to additional amendments and waivers, the Debtor agreed to hire a chief restructuring officer. Further, during the first two weeks of May 2012, pursuant to several amendments to the Prepetition Credit Documents and a separate security agreement, the Debtor granted the Secured Lenders a lien on and security interest in its cash, all deposit accounts, all

5

securities accounts, and their proceeds as well as its equipment, inventory, goods, equity interests in subsidiaries and affiliates, certificated and uncertificated securities, investment property, security entitlements, trademarks, copyrights and other intellectual property, and, importantly commercial tort claims – including causes of action against any present and former partners or employees of the Debtor or its affiliates to recover any payments made by the Debtor or any of its subsidiaries or affiliates to such persons with respect to distributions, return of capital or any other payment and all causes of action against any present or former partners or employees of the Debtor or any of its affiliates arising out of or resulting from their respective departures from the Debtor or such affiliate.  *See Declaration of Jonathan A. Mitchell Pursuant to Local Bankruptcy Rule 1007-2 and In Support of Chapter 11 Petition and First Day Motions*, dated May 28, 2012 [Docket No. 2], ¶¶ 35-42.

6.      Thus, immediately prior to the commencement of this case, and in anticipation of the impending filing, the Secured Lenders took a lien on some of the most valuable assets of the estate.

**OBJECTION**

7.      The Cash Collateral Order should be denied and/or modified because the Debtor and the Secured Lenders have failed to meet their burdens for approval of the more onerous terms.

8.      Adequate protection is determined on a case-by-case basis.  *See In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).  In seeking to obtain credit or consent to use cash collateral, debtors are required to act in a fiduciary capacity on behalf of the creditors of the estate.  A debtor in possession's primary duty is to protect and preserve assets of the debtor's estate.  *See*, *e.g.*, *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988) (noting that

6

debtor's fiduciary duties include a "duty to protect and to conserve property in his possession for the benefit of creditors" and to refrain "from acting in a manner which could damage the estate, or hinder a successful reorganization of the business.").

9. As such, a debtor is required to balance its need for funds with its duty to preserve the estate for the benefit of its creditors. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990) (noting in the context of debtor in possession financing, "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

**A.    The Proposed Lien and Superpriority Claim on
        Avoidance Actions Must Be Denied.**

10. The instant case serves as a prime example of when liens and superpriority claims on avoidance actions must be denied. These Avoidance Actions are significant assets of the estate and are not the Debtor's assets to pledge to the Secured Lenders. They represent the unsecured creditors' main source of recovery from the estate. Here, there is no business to reorganize or going concern value to preserve that might justify encumbering assets ordinarily reserved for unsecured creditors.

11. As courts have repeatedly held, if a party wants the benefits of chapter 11, it must live with its burdens. *See, e.g.*, *In re M.J.H. Leasing*, 328 B.R. 363, 366 (Bankr. D. Mass. 2005) (in denying proposed releases of the debtors' principals, the court stated that "to enjoy the benefits of bankruptcy a recipient needs to suffer the burdens and that 'to rule otherwise is simply to invite a wholesale restructuring of the expectations of those involved in commercial transactions without any indication from Congress that such profound change was intended'")

(citing *In re Venture Properties, Inc.*, 37 B.R. 175, 177 (Bankr. D.N.H. 1984)); *In re Juneau's Builders Ctr.*, 57 B.R. 254, 259 (Bankr. M.D. La. 1986) (privileges afforded debtors by the Bankruptcy Code, such as "[t]he privilege of a stay against creditor action should carry with it the burden of debtor regulation; one without the other is inappropriate").

12. The same principle should apply to the Secured Lenders. The Secured Lenders will reap significant benefits from the Debtor conducting its liquidation in this Court. The cost of these benefits must be borne by the Secured Lenders, and not entirely by former partners and other unsecured creditors. While it is true that unsecured creditors may benefit from a reduced deficiency claim, it would be a poor exercise of business judgment for the estate to trade whole dollars today for a potentially reduced deficiency claim at a later date. The Secured Lenders are the parties receiving the greatest benefit from this case. The Cash Collateral Order should recognize this fact.

**B.    The Section 506(c) Waiver Should Be Stricken.**

13. If the Final Order is entered, this case will be run almost entirely for the benefit of the Secured Lenders. For this reason alone, the section 506(c) waiver must be denied. *See Hartford Fire Ins. Co. v. Norwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. BAP 1998) (provision in financing order purporting to immunize postpetition lender from section 506(c) surcharge was unenforceable); *In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing agreement prohibiting surcharge on collateral under section 506(c)); *see also In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's work, it should be the one to bear the expense. It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors.").

14. Here, it would be inappropriate to prevent the estate from surcharging the Secured

Lenders in connection with the liquidation of the Secured Lenders' collateral, when such liquidation will occur solely for the Secured Lenders' benefit. The section 506(c) waiver should be stricken.

C. **The Secured Lenders Are Not Entitled to the Payment of Professional Fees Because They Have Failed to Establish That They Are Oversecured.**

15. The Secured Lenders are seeking approval of the reimbursement of the Prepetition Agent's, the Noteholders' and the Collateral Agents' professionals' expenses. Interim Order ¶ 7(a). While the payment of such fees, costs and expenses may be appropriate where a secured lender is oversecured, that is not the case here. *See* 11 U.S.C. § 506(b) ("To the extent an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim . . . any reasonable fees, costs, or charges provided under the agreement[.]"); *In re Amron Techs., Inc.*, 376 B.R. 49, 54 (Bankr. M.D. Ga. 2007) ("a secured creditor is entitled to add post-petition attorney fees to its secured claim if (1) the creditor is oversecured; (2) the fees are reasonable; and (3) the fees are provided for in the agreement or state statute under which the claim arose. Furthermore, the creditor may *only* receive fees to the extent it is *oversecured*") (emphasis added); *Mann v. Chase Manhattan Mortg. Corp.*, 316 F.3d 1, 5 (1st Cir. 2003) ("As a 'significant exception' to the general rule that creditors cannot recover postpetition fees in bankruptcy proceedings, Bankruptcy Code § 506(b) permits an *oversecured* creditor to request that the bankruptcy court permit postpetition fees to be included in its *oversecured* claim, provided that the postpetition fees were (i) contemplated by the underlying contract; and (ii) reasonable in amount") (emphasis added).

16. This issue was litigated in *In re TCI 2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. 2009) (herein, "*TCI 2*"), where a group of undersecured noteholders sought

9

payment of their professional fees under the guise of adequate protection. Donald Trump, a creditor in *TCI 2*, objected to the request, and the *TCI 2* court denied the request for payment of the noteholders' professional fees on a final basis on March 17, 2009. *See TCI 2* Hr'g Tr. March 17, 2009, at 76:18-19. The court held that the payment of professional fees under section 506(b) of the Bankruptcy Code was unavailable to the noteholders as undersecured creditors. *See TCI 2* Hr'g Tr. March 17, 2009, at 71:1-76:19. Further, the court held that the payment of professional fees was not a proper form of adequate protection, stating that although adequate protection is a flexible term, it cannot take on a form that violates the provisions of the Bankruptcy Code. *See TCI 2* Hr'g Tr. March 17, 2009, at 74:4-8. The *TCI 2* court based its decision in part on the holding of the United States Supreme Court in *United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988) (herein, "*Timbers*"). In *Timbers*, the Supreme Court denied post-petition interest sought as adequate protection by an undersecured creditor. *Id*. at 382. It observed that allowing post-petition interest to undersecured creditors, under the guise of adequate protection, would render section 506(b) meaningless, which could not have been Congressional intent. *Id.* at 372-73. The court in *TCI 2* determined that, in the same manner that allowing payment of post-petition interest to undersecured creditors would violate section 506(b), allowing payment of professional fees to undersecured creditors would contravene Congressional intent. *See TCI 2* Hr'g Tr. March 17, 2009, at 73:24-74:2. Copies of the relevant pages of the *TCI 2* hearing transcript (including the argument of counsel) are attached hereto as <u>Exhibit A</u>.

17. The record here is devoid of any evidence to conclude that the Secured Lenders are oversecured. The Secured Lenders have the burden of establishing collateral value in support of their request for the payment of professional fees. *See* 11 U.S.C. § 363(p) ("the entity

asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest"). Without any evidence, it is inappropriate — indeed, violative of the Bankruptcy Code — for this Court to authorize the Debtor to pay the Secured Lenders' professional fees.

**D.    Other Provisions of the Cash Collateral Order Must Be Modified or Stricken.**

18.    The Cash Collateral Order contains various other improper provisions, which the Former Partners Committee proposes should be revised as follows:

- Compromise of Receivables (Interim Order ¶ 7(b)). The Cash Collateral Order permits the Debtor to write-down receivables upon one business day's notice. The Former Partners Committee objects to this provision as affording too much unfettered discretion to the Debtor. Both Committees should receive three business days' notice of any proposed write-down, along with appropriate detail supporting such action, prior to any write-down of receivables.

- Event of Default Based Upon the Institution of a Challenge (Interim Order ¶ 14(c)). The provision providing for an event of default based on the commencement of a Challenge constitutes an improper attempt to strip the Committees of their fundamental right to investigate the liens and conduct of a prepetition secured lender (particularly where, as here, the lender received significant concessions from the Debtor on the eve of a bankruptcy filing). For this reason, the provision must be deleted from the Cash Collateral Order.

- Carve-Out and Budget (Interim Order ¶¶ 16(a) & 3). As raised by the United States Trustee at the first day hearing, the proposed Carve-Out of $250,000 is insufficient for a case of this size. The Carve-Out Cap should be increased to not less than $1,000,000 and should not be reduced by fees paid or accrued prior to a default. Moreover, it is the province of the Court, not the Secured Lenders, to determine the appropriate incurrence of fees and expenses by the Committees in the discharge of their statutory duties. Any "budget" which seeks to control the Committee's efforts should not be permitted.

- Challenge Period (Interim Order ¶ 18). The proposed Challenge Period of 60 days is insufficient. The Challenge Period should be increased to 90 days in order to provide the Committees with sufficient time to evaluate the Secured Lenders' liens and claims, including all actions by the Secured Lenders that took place since January 2012. An increase of time is especially important in this case where waivers and amendments were executed on the eve of bankruptcy. In addition, the Former Partners Committee should be afforded rights under Bankruptcy Rule 2004 to conduct the investigation necessary to meet this deadline. It should be emphasized that this investigation is not simply a lien and document review. The

11

    Secured Lenders intend to bind the estate to the Debtor's concession that there are no claims, offsets or counter-claims against them – an extremely broad waiver of rights.

- <u>Standing to Commence a Challenge (Interim Order ¶ 18)</u>.  The Cash Collateral Order should provide that both Committees have standing to commence a lawsuit against the Secured Lenders.  Where, as here, the Debtor has abdicated its responsibility, the Committees should not be required to file standing motions first.  The requirement that such motions be filed prior to the Committees commencing a Challenge would unnecessarily curtail the investigation period and increase the amount of professional expenses to the estate where such costs could easily be avoided.

- <u>The Debtor's Section 552(b) Waiver (Interim Order ¶ 22)</u>.  The Cash Collateral Order should be modified to make clear that the Debtor's section 552(b) waiver does not bar other parties in interest, including the Committees, from asserting "equities of the case" claims under section 552(b).

- <u>Indemnification (Interim Order ¶ 27)</u>.  The Interim Order improperly indemnifies the Secured Lenders against the highly probable event that this Court, or a court on appeal, will find that the Cash Collateral Order exceeds the bounds of legality.  The Secured Lenders cannot create through an indemnity claim a right to which they otherwise would not be entitled.

    [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

19. For all of the foregoing reasons, the Former Partners Committee respectfully requests that the Court either (i) modify the proposed Final Order in the manner described herein or (ii) deny entry of the Final Order in its entirety.

Dated: June 7, 2012
      New York, New York

                                By: __/s/ David M. Friedman__
                                  David M. Friedman (DFriedman@kasowitz.com)
                                  Andrew K. Glenn (AGlenn@kasowitz.com)
                                  KASOWITZ, BENSON, TORRES
                                   & FRIEDMAN LLP
                                  1633 Broadway
                                  New York, New York 10019
                                  Telephone: (212) 506-1700
                                  Facsimile:  (212) 506-1800


                                  *Proposed Counsel for the Official*
                                  *Committee of Former Partners*