## EXHIBIT A

## TCI 2 TRANSCRIPT

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: | ) | Bankruptcy Action |
|  | ) | Case No.: 09-13654(JHW) |
|  | ) |  |
| TCI 2 HOLDINGS, LLC., | ) | Volume I |
| et al., | ) |  |
|  | ) | Chapter 11 |
| Debtors, | ) | Camden, New Jersey |
|  | ) | March 17, 2009 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              CHARLES A. STANZIALE, JR., ESQUIRE
                             JOSEPH LUBERTAZZI, JR., ESQUIRE
                             McCarter & English, LLP
                             Four Gateway Center
                             100 Mulberry Street
                             Newark, New Jersey 07102

For Ad Hoc Committee:        KRISTOPHER M. HANSEN, ESQUIRE
                             Stroock & Stroock & Lavan, LLP
                             180 Maiden Lane
                             New York, New York 10038

For Former Shareholders:     JERRY KULBACK, ESQUIRE
                             Archer & Greiner
                             One Centennial Square
                             Haddonfield, New Jersey 08033

For Donald Trump:            PAUL MAINARDI, ESQUIRE
                             DONALD LUDMAN, ESQUIRE
                             Brown & Connery
                             6 N. Broad Street
                             Woodbury, New Jersey 08096

                             DAVID FRIEDMAN, ESQUIRE
                             Kasowitz, Benson, Torres & Friedman
                             1633 Broadway
                             New York, New York 10019

For Beal Bank:               CHARLES GIBBS, ESQUIRE
                             Akin, Gump, Strauss, Hauer & Feld
                             1700 Pacific Avenue
                             Dallas, Texas

1   aren't taking an interest in this case, and are not interested

2   parties, is not correct at all.  We intend to be very active in

3   this case, and as we move on in the agenda, and get to items

4   later, I think Your Honor will be aware of what we intend to do

5   in this case.  Thank you, Judge.

6   　　　　THE COURT:  Thank you.  Is there anyone else who

7   wants to be heard, who desires to be heard on the cash

8   collateral arrangements, except for the professional fees to

9   the note holders?

10  　　　　All right.  Then, thank you, Mr. Lubertazzi, you have

11  answered my questions.  And we're prepared to focus on the --

12  　　　　MR. LUBERTAZZI:  Thank you, Your Honor.  And just for

13  the record, I didn't say the unsecured creditors weren't

14  important.  So to the extent that I inferred that, that was not

15  intentional.

16  　　　　I know that Your Honor set up a briefing schedule.

17  And I believe that Mr. Trump filed his objections.  And then

18  Mr. Hansen's clients filed their objections.  So depending on

19  how Your Honor wants to proceed.

20  　　　　THE COURT:  Yes, I think that I would like to start

21  with the note holders, if I may, because there has been

22  opportunity by Mr. Trump's counsel to reply.  And perhaps we

23  should take up the response to the reply.

24  　　　　Let me focus on a couple of matters.  You

25  highlighted, counsel, the opportunity of the debtor to exercise

Hansen - Argument                          Page 16

1    -- or the debtors to exercise their business judgment to enter

2    into what is couched as an agreement for adequate protection of

3    the note holders, i.e., payment of professional fees during the

4    course of the reorganization process.

5         How do you -- you do acknowledge, do you not, that

6    the O'Brien reference in the objector's reply is correct.  That

7    the so-called Business Judgment Rule cannot overcome specific

8    appellate provisions.

9         MR. HANSEN:  Absolutely, Your Honor.  There's no

10   question that, to the extent that a debtor exercises his

11   business judgment, it needs to do so within the legal rubric of

12   the Bankruptcy Code and the Bankruptcy Rules, and other

13   applicable law that it stands before in connection with its

14   case.

15        And we think that the debtor is squarely within those

16   legal precedents.  If you look -- the main thrust of the

17   objection from Mr. Trump is that 506(b) really acts as a

18   preclusionary statute, which precludes someone who is an under-

19   secured creditor from obtaining adequate protection.

20        It's just -- their view is, if you combine that with

21   the decision from the Supreme Court in Timbers and you look at

22   Justice Scalia's writings, therein you see that, if you're

23   under secured, you can't get adequate protection in the form of

24   -- in the form of something that may otherwise be delineated in

25   506(b).

1    So that if 506(b) says, you're entitled to interest,

2    fees, costs and other charges, to the extent of your over

3    security, and to the extent that it's provided in your

4    contract, then, therefore, you have a statute that states very

5    clearly what you're entitled to.

6    And when you look across and you say, well, now

7    you're asking for adequate protection, and one of the forms of

8    adequate protection that you're asking for happens to be

9    delineated in 506(b), and as we stand here today, we don't know

10   whether you're over secured, whether you're under secured, or

11   whether you're unsecured.

12   And so, therefore, if adequate protection that you've

13   agreed with, with the debtors and with Beal Bank, in the form

14   of this business judgment that the debtors exercised, at arms

15   length negotiations to come up with this agreement, then you

16   simply -- you run afoul of 506(b), and, therefore, you can't do

17   it.

18   And we can take a step back and we say, hold on a

19   minute, because if the jurisprudence that you're citing for

20   that proposition is <u>Timbers</u>, which it is, you've got to read

21   <u>Timbers</u> and you got to understand what it says.

22   And Justice Scalia in <u>Timbers</u> started out the

23   discussion by saying, that the U.S. Bank, I'll call them that,

24   it's U.S. Savings and Loan Association of Texas, let's call

25   them U.S. Savings, for purposes of discussion.

1   What the Court said was, U.S. Savings made about a

2   4.1 million dollar loan to Inwood on Timbers, and, basically,

3   by the time that Timbers filed for bankruptcy, it was about a

4   4.4 million dollar loan.

5   And there was evidence or testimony that the value of

6   the collateral that secured that claim was somewhere between,

7   you know, 3, and 4.2 million dollars.

8   So it fell somewhere in the range below the total

9   amount.  Timbers had a lien, they had an assignment of rents,

10  and they were receiving those rents during the course of the

11  case.

12  There was also testimony and evidence presented that

13  the collateral value was rising, during the course of the case.

14  Incrementally, but rising.

15  So you have to look at that factual predicate.  And

16  right at the beginning of the case, Justice Scalia says,

17  barring everything else, there's no dispute, and it is black

18  letter law, that if the collateral was diminishing in value,

19  U.S. Savings would be entitled to adequate protection.

20  But that's not the case.  And here there is no

21  testimony, there's actually evidence that the collateral is

22  increasing in value.

23  And as a result of the testimony that it's increasing

24  in value, we now need to look and see, what's the request that

25  Timbers has made?  So Timbers, who's receiving rents is also

1   asked to receive interest.

2           Not adequate protection.  They asked for interest in

3   the form of adequate protection.  And the Court went to great

4   lengths to say, hold on a minute, first of all, we're out

5   really of the concept of 363 and 361, where we're talking about

6   a diminution in value.  Okay?

7           We're away from the diminution in value, and what you

8   need to do to protect, and we're clearly just within the

9   request for interest.

10          And interest is one of the issues here that says,

11  under 506(b) you're not entitled to it.

12          THE COURT:  Didn't they say -- didn't Justice Scalia

13  say, in the context of 362(d)(1), which specifies, of course,

14  that relief from the stay may be granted if there is lack of

15  adequate protection.

16          MR. HANSEN:  Sure.

17          THE COURT:  Was reading that phrase.

18          MR. HANSEN:  Absolutely.

19          THE COURT:  And he was then looking to 506(b) to say,

20  -- 506(b) says that, an over secured creditor can obtain

21  interest and attorney's fees, and it cannot achieve those

22  things, including particularly interest in the Timbers case, if

23  it is not over secured.  That you cannot then impose upon

24  adequate protection under 361, things that are not provided for

25  in 506(b).  Isn't that what the Court said?

1     MR. HANSEN:  I would take exception with, you cannot

2     impose as adequate protection things that are in 506(b).

3     THE COURT:  I mean, there's no question that the

4     Court stated unequivocally that adequate protection is

5     available to an under secured creditor whose collateral is

6     diminishing in value.  That statement is clear.

7     There are a couple of questions to be asked right up

8     front here, to understand how this situation applies to that

9     statement.

10    Number one, what is the acknowledgment of the ad hoc

11    committee, in terms of its status?  Do they say, we don't know,

12    we could be over secured, we could be under secured, we could

13    be wholly -- what is the position of the committee?

14    MR. HANSEN:  Well, Your Honor, let's look at the

15    capital structure of the company.  Beal has a first lien, about

16    488 million dollars of first lien debt on the company.

17    The note holders have 1.25 billion in notes that come

18    behind that.  And then behind that are assuming that they are

19    secured, you have your unsecured creditor body, which we heard

20    testimony a couple of weeks ago was somewhere in the nature, it

21    could be around 30 million dollars.

22    And then behind that you might have limited

23    partnership interests, and behind that you might have equity.

24    So in the range of value, and we don't have any

25    witnesses here today, the debtor hasn't brought any witnesses,

Hansen - Argument                                    Page 21

1    and nor, to our knowledge, has Mr. Trump.  So there's not going

2    to be anybody to take the stand and provide testimony to say,

3    what is the value that we have to establish right now to

4    determine who's secured and who's unsecured.

5         One thing that we feel incredibly certain of, is that

6    we are not unsecured.  Are we over secured, as we stand here

7    today?  I think that's a pretty tough argument to make, Your

8    Honor, if you think about 1.75 billion dollars of value.  If we

9    were over secured, because there was that much value, you would

10   assume that the debtor would have been able to make its

11   interest payment to us in December, rather than not make it,

12   file for bankruptcy, and utilize that 53 million dollars, in

13   large measure, to run these proceedings.

14        So I think that you're probably in the world of under

15   security.  But, again, we have no testimony at that point.  But

16   to be, you know, honest with Your Honor, we don't really feel

17   that we're unsecured.  But of course Mr. Trump makes the

18   allegation that, they're probably unsecured, maybe under

19   secured, but probably unsecured.

20        You know, and if that's true, then Mr. Trump also

21   needs to be objecting to Beal, if you apply the same 506(b)

22   logic, which is, if we're unsecured, then that means Beal is

23   also similarly impaired, and cannot receive under 506(b), not

24   only fees, but also interest, which is being paid at the

25   default rate.

1        So you have to take a step back, and you have to say,

2   okay, if we are in the case law and we're in the statutes, and

3   the Court is clear that, where there is a diminution in value

4   that might occur, you can grant adequate protection.

5        You have to look at the thousands and thousands of

6   cases that pass through bankruptcy in the kind of complex

7   Chapter 11 process, every time we come.

8        Cash collateral orders and DIP financing orders that

9   include a provision for the use of cash collateral, often

10   provide for, before there's been any determination by a witness

11   that takes the stand and provides testimony at the inception of

12   the case, what the relative values of everything is, the debtor

13   says I acknowledge that you have these liens, and I acknowledge

14   that you have this debt, and we're going to provide for

15   adequate protection to you, because we anticipate that your

16   collateral will diminish in value.

17        And the way we protect everybody else in the estate,

18   is to provide reasonable claw back provisions in the document,

19   which says if you get to a point in the case where you have

20   testimony, where you are unsecured, under secured, or whatever

21   that might be, we'll either apply it to your principal, or it

22   can be disgorged.

23        But to --

24        THE COURT:  Well let me -- indeed there is provision

25   that, if the note holders are wholly unsecured, that there

1    would be disgorgement.  The provision regarding claw back

2    otherwise, offers an opportunity, an option to apply to

3    principal, it doesn't mandate it, does it?

4           MR. HANSEN:  No, Your Honor, it wouldn't be mandated,

5    because it's -- I guess, you have to step back and you say, how

6    do these cases -- how do these things usually go?  Do you want

7    to walk in is -- the debtor, in its business judgment says, do

8    I want to walk into Court, putting a witness on, having note

9    holders put a witness on, having Mr. Trump put a witness on and

10   have a valuation fight on day one in the case, and spend the

11   number of weeks that will be necessary to take the discovery,

12   because everybody will have to depose each other's expert.

13          The management of the company will have to be

14   deposed, and their projections, everyone will have to look

15   into, trading multiples and everything else, with which to come

16   up with value.

17          Do we want to enter the case in that fashion,

18   fighting on all fronts, so that we can then determine where

19   we're going to be, so that when we get to the -- at that point

20   we can say, well, you're not entitled to get paid, and you are.

21          No.  The debtor made the choice here to say, I'm

22   going to negotiate with my major creditors in this case -- and

23   we have to, it bears, and I'm going to remark on it in a few

24   minutes -- we have to actually look at Mr. Trump's status in

25   the case, when we get to there.

1    But I just want to mention that, and we'll get to

2    that in a sec.  Is that the debtor makes that choice.  And it

3    says, we're going to come in and we're going to ask for this

4    approval.  Rather than walk into this case with a trial, in the

5    first month of the case, to have a full blown trial and a

6    hearing on valuation.  The claw back provisions, to get back to

7    your question, when you say those are optional.

8    Because as you move through the case, as we all know,

9    most often as you migrate through the end of the case, there's

10   a deal that gets cut, and a plan gets proposed, and the Court

11   approves the plan and everybody leaves.

12   And in the context of that, to say, if there's a

13   finding today that you're under secured by X, Y or Z, and it's

14   not technically under secured by X, Y, or Z, it's also the

15   level of diminishment from the starting point to the finish

16   point, because the adequate protection is supposed to provide

17   for, in essence, that depreciation in value.

18   And so if you say, well, you've been paid a million

19   dollars in fees over the course of a year, and your collateral

20   diminished by 3 million dollars, okay, then can you be clawed

21   back?

22   I don't know, that's a question for the Court to

23   answer.  But if you're still secured at the end of the day and

24   you've had that situation, then maybe you can't.  So it becomes

25   very difficult to establish that, here and now, at the

1    inception of the case.

2          Now Mr. Trump makes the point in his papers, look,

3    there's, you know, it's up to the note holders, they have to

4    make the motion under 362(d)(1) to say, look, we want to lift

5    the stay, and if you're going to reject that, it needs to be

6    conditioned upon the provision of appropriate adequate

7    protection, it's our burden, we have to put witnesses on, we

8    have to go through that whole trial, it's our hearing,

9    etcetera.

10         We're perfectly fine to adjourn today's hearing, or

11   continue today's hearing for another month.  Go out, take the

12   discovery that's necessary, come back here and have everybody

13   put their witnesses on, and have that for you, so that you have

14   the factual record to satisfy the questions that you're raising

15   Judge.

16         We on the note holder side, and I believe the debtor,

17   they can speak for themselves, and I believe Beal Bank, as

18   well, we all made the conscious decision not to do that.  We

19   negotiated before we came in here to come up with a form of

20   adequate protection that we believed was fair.

21         Now Mr. Trump says, well, no, you're not, you're just

22   saying you want your fees paid.  And that's -- you didn't come

23   up with some contract for adequate protection.

24         Well that's not true.  What we said was, living

25   within the law, which if you go to 363(e), for example, it says

Hansen - Argument                          Page 26

1   if you're going to -- it's not only 362, I think that's another

2   confusion, that's where <u>Timbers</u> is.  But if you go to 363(e),

3   it says, if you're going use somebody's collateral, that use is

4   going to be conditioned upon the provision of adequate

5   protection.

6          And then you go to 361, and 361 says, sure adequate

7   protection's available for diminution of value.

8          THE COURT:  How do you correlate the amount of

9   professional fees, the fact that the payment professional fees

10  with the -- any prospective diminution of value?  Your formula

11  contemplates doing that after the fact, and adjusting backwards

12  by way of claw back or disgorgement, to accommodate one with

13  the other.

14         At this point, what correlation is there to any

15  adequate protection situation?

16         MR. HANSEN:  It's a correlation of convenience, Your

17  Honor.  It's -- as every -- you know, what correlation is there

18  to diminution in value to Beal's default interest in their

19  fees.

20         I mean, it's a correlation of convenience.  The

21  parties get together and they say, how do we come up with an

22  appropriate adequate protection package.  And we say, well,

23  it's pretty clear that month, after month, after month, the

24  revenues in Atlantic City have been declining, and declining,

25  and declining.

1    And in February, they were down 19.2 percent on the

2    whole of Atlantic City, I can't remember the number

3    specifically for the Trump assets, but they've been either

4    correlative, or out in front of those.

5    And we say, okay, if we're sitting here today and

6    we'd rather not go through the process of saying, let's get an

7    expert, let's figure out what we think the collateral value's

8    going to come down to, and let's fashion the exact amount of

9    adequate protection to correlate to that.

10    It's pretty much similar to almost every case that

11    passes through bankruptcy at the inception with a DIP or a cash

12    collateral.  People say, well, what can we do to adequately

13    protect you?

14    We can provide you with periodic cash payments, we

15    can provide you with replacement liens, we can provide you with

16    super priority claims.  And we can do anything else,

17    essentially, that, you know, we feel is appropriate, because

18    the Code says it's a non exhausted list of factors.  And so we

19    sit down as a group and Beal says, I'd like to get interest and

20    I'd like to get it at the default rate.

21    And I'd like to get my fees paid, and I'd like to

22    have, in addition to that, replacement liens, and super

23    priority claims, and all the rest of that.

24    And we say, we'd sure like to get our interest paid,

25    too, and we sure would like to get our fees paid, and we'd like

1     to get super priority claims and liens, too, but we recognize

2     that you didn't pay us the interest payment, because you

3     couldn't, you needed the money in the business.

4             So as part of the compromise, keep the money in the

5     business, keep it running, and out of convenience, we'll use

6     the legal fees as a proxy, and we'll provide protection for

7     that via the claw back provisions.  It's -- they're -- I can --

8     I can't really think of a case that I've been involved in where

9     we've had either where I was on the debtor's side, where I was

10    a note holder side, where I was equity side, or where I was on

11    an official committee side, where we actually sat down at the

12    inception of the case and kind of timed out the approximation,

13    the diminution, and everybody's collateral, and tried to tie

14    them back to a specific number.

15            Generally what you do, in the arms length

16    negotiations, is everybody sits down and says, this is kind of

17    the way we have to solve for this, and the way we protect

18    everyone, is to put the claw backs back in.

19            And when you look back, oftentimes you do have a

20    official committee.  And an official committee participates in

21    that process, and they say, okay, you know, now we've had time

22    to look at this and, you know, I would say the vast majority of

23    the times, the committee agrees, and they think that it's

24    appropriate, too.  Because if we're unsecured, in Mr. Trump's

25    world, or, you know, and Beal might be impaired, or could be on

1    the cusp of being impaired, okay, and, granted, we have

2    slightly different form of collateral between the two parties,

3    you know, Beal has a lien on everything, we have a lien

4    essentially on the real estate assets and the fixtures and

5    things that are pertinent thereto, and we also have an

6    assignment of rents.

7         So there are different collateral packages.  But if

8    you start to talk about unsecurity in the bonds, you know,

9    you're talking about, well, what else is there left for anybody

10   else in the case.  And so, you know, when you get into that

11   range, when you're standing there saying okay, who is Mr. Trump

12   let's talk about him for a second.

13        He was just prior to the bankruptcy filing, the

14   chairman of the board of directors of the company.  He was just

15   prior to the filing a limited partner in the partnership entity

16   that's a debtor before you, which is in the middle of the

17   corporate structure.  He was a shareholder at the public

18   company level, and he was a contract counter party in at least

19   two contracts.

20        Prior to the bankruptcy filing, he resigned as

21   chairman of the board, he abandoned his partnership interests

22   in the partnership, and the contracts, they're, as far as we

23   know, have not been noticed to the debtors that they are in any

24   form of default or non-payment.

25        THE COURT:  Do you contend that there is no standing

1  to assert an objection to this arrangement by Mr. Trump?

2        MR. HANSEN:  Your Honor, I think it's questionable,

3  at this point, whether he has standing to assert this

4  objection.  I think that the word party in interest in the Code

5  is designed to be broad and inclusive, and I think the debate

6  before you today is a healthy one.

7        But I want the Court to be -- recognize that the

8  committee views the objection with a healthy dose of

9  skepticism.

10       Mr. Trump was very public in his resignations and his

11  abandonment of his partnership interests.  And the public

12  statements that he made to many places, including television

13  shows and newspapers were, that his interests in the case were

14  worth significantly less than one percent of his total net

15  worth, and that he made an offer to buy the company, but the

16  bond holders rejected him.

17       And so --

18       THE COURT:  But you do understand that if a

19  shareholder with a single share comes forward --

20       MR. HANSEN:  Oh, under -- no, understood, Your Honor.

21  No, my argument -- what my argument is saying to Your Honor is,

22  you have to be a little skeptical of the argument of why Mr.

23  Trump is pinpointing to the bond holders and saying, well their

24  adequate protection is the straw that breaks the camel's back

25  in this case.

Hansen - Argument                    Page 31

1     And their adequate protection is untoward, and

2     illegal, and shouldn't be granted.

3          THE COURT:  I'm not sure I could begin to embark on

4     motivations on the part of anyone --

5          MR. HANSEN:  It's for leverage, Your Honor.  It's

6     obvious.  I mean, everybody in every case tries to jockey for

7     leverage.  But I guess the question that we're saying is, you

8     can't be as sanctimonious as saying that, they may be

9     unsecured, and, therefore, they're not entitled to this.  But,

10    by the way, you know, Beal Bank's fine.

11         And so if the bond holders are unsecured, it's fine.

12    We'll make the 506(b) argument against the note holders, but

13    we're not going to make the 506(b) argument against anybody

14    else.

15         THE COURT:  You keep referring to the argument of

16    Trump, and, indeed, it's perhaps mentioned here or there that

17    the note holders might even be totally wholly unsecured.  But

18    the thrust of the argument, is it not, is there most probably

19    under secured, and, therefore, not entitled in the first

20    instance under 506(b) to payment of attorney's fees, at least

21    up front.

22         MR. HANSEN:  Well, Your Honor, I think, if the

23    language in the briefs that they've submitted has said

24    unsecured and possibly under secured.  I think they've said

25    more likely unsecured and possibly under secured.  I don't have

1  the brief in front of me, but I think that was the language.

2          Either way, yes, the argument that they're making is,

3  either way you slice it, 506(b) stands as a prohibition on

4  receiving attorney's fees.  And we say, wait a minute, if

5  that's based purely on <u>Timbers</u> and the reading of 506(b) and

6  361, you got it wrong.  <u>Timber</u> says you can fashion adequate

7  protection for the diminution in value, hands down.  Whether

8  you're under secured or over secured.  And if we're --

9          THE COURT:  There -- excuse me for interrupting.  The

10  agreement provides for replacement liens and super priority

11  administrative claim on behalf of the note holders for the

12  diminution in value, any prospective diminution, does it not?

13          MR. HANSEN:  That's one of the components of the

14  order, yes, Your Honor.

15          THE COURT:  Would that not offer, by itself, adequate

16  protection, and precisely so directed at reflecting the -- any

17  potential lawsuits?

18          MR. HANSEN:  We don't believe so, Your Honor,

19  because, again, we're behind Beal.  Beal's getting paid

20  interest at the default rate plus all of their fees, and we're

21  sitting behind them.  So it is a replacement lien.  But to the

22  extent that it's adequately protecting us, we don't feel that

23  it is protecting us.

24          We feel that, if as the collateral diminishes, which

25  is in large measure going to be a diminishment, in some

1     respect, as payment of all of this amount to Beal, that we look

2     at it and we say, well, it's not enough, from our perspective,

3     of adequate protection to protect us for the diminution in

4     value.

5              And that that's the position that the note holders

6     have.

7              THE COURT:  What impact is it that the note holders

8     did not hold a secured position regarding cash collateral?

9              MR. HANSEN:  Well, Your Honor, the note holders have

10    an assignment of rents.  It's debatable whether that is a lien

11    on cash.  So I think that that's a debatable issue.  But I

12    would say, yeah, I mean, Beal has a lien on the debtor's cash

13    collateral.  And the note holders -- as we say we have an

14    assignment of rents.

15             So I don't think that that is material with respect

16    to 363(e), saying, if you're going to use our collateral, which

17    they clearly are, we have a lien on the buildings, we have a

18    lien on the properties, we have a lien on everything that's in

19    them.

20             We have liens on these things, and they're using

21    them.  So if they're using them, they need to condition that

22    use on our adequate protection.

23             So our view is, it would be better if we had a lien

24    on cash.  I would be lying to you if I said that it wouldn't be

25    nice if I had a lien on cash.  But I think helpful to this

1    argument, and that's for the case, generally.  I think helpful

2    to this argument, it's somewhat helpful, but I don't thing it's

3    preclusive in anyway for the provision of adequate protection,

4    in a cash form.

5         Again, we were collecting interest semi-annually

6    throughout the case.  We have liens on these properties.  These

7    properties generate cash.  But these properties are also worth

8    something.  And these properties are being used.  And, in

9    essence, if they're going to be using our property, the Code's

10   pretty clear, that it needs to be conditioned on adequate

11   protection.

12        THE COURT:  And what about the argument that the

13   arrangements with Beal actually enhanced the value of your

14   collateral?  Your shared collateral, if you will.

15        MR. HANSEN:  I'm still trying to figure that one out,

16   Judge.  The arrangements with Beal and with us, enhance the

17   value of the collateral, because neither one of us are

18   foreclosing on our collateral.  So we've all agreed to enter

19   into a cash collateral order.

20        I will tell you, Your Honor, if the debtor had come

21   to us pre-petition and said, we're not going to give you

22   adequate protection.  Maybe we'll give you a replacement lien,

23   but we're not going to give you any adequate protection.

24        We would have probably, and we have an inter creditor

25   agreement with Beal, so we need to work through that, and, you

1    know, Beal and the note holders stand arm-in-arm on these

2    points, as we stand here today.

3          And I don't mean to sound like I'm picking on them,

4    in any fashion, I'm just pointing out that there's the economy.

5          So if we knew that the debtors, which they haven't,

6    were going to say, look, we're not adequately protecting you,

7    we would have objected to the cash collateral, or we would have

8    tried to.  And we would have asked for a lot of different

9    things.

10          And we probably would have come in and said, look,

11    within the confines of our inter creditor, which lets us act as

12    unsecured creditors, to the extent that we have a component

13    that's in that fashion, and maybe there are other components in

14    the inter creditor that would let us do that, we probably would

15    have objected.  And we would have -- this would have been a

16    very different hearing.

17          So I think the argument that, the arrangements with

18    Beal enhance the value of the collateral, works for both of us.

19    The arrangements with us enhance the value of the collateral.

20    And let's take a look at that for a sec.

21          Because we had an agreement, you talk about the

22    genesis of how we got here, and the genesis of the deal, the

23    interest payment was missed in early December, the bonds formed

24    shortly thereafter.

25          They hired Stroock, and they hired Houlihan, Lokey.

1    We then reached out to the company and said, we've been engaged

2    and the company's professionals said, we'd like to work with

3    you to try and find a way to, you know, get a deal here, for

4    lack of a getter term.

5           And we've been working with them.  We entered into

6    four forbearance agreements, our clients signed confidentiality

7    agreements, so that they could get information that was non-

8    public, which was then later released.  And we worked very hard

9    with the company.  We also worked with Mr. Trump.

10          We met with him a number to times.  And his

11   professionals.  And we kept trying, and we continue to try to

12   date.  And when you talk about hurting the value of the assets

13   and hurting the value of that, one of the ways that you can

14   hurt the value of the assets is to have the case turn into

15   essentially a very litigious process, right at the beginning,

16   as you make a transition from pre-bankruptcy into bankruptcy.

17          We heard Mr. Burke testify on the critical vendor

18   side, it's a hospitality business, and it's a very high profile

19   hospitality business.

20          And there are reporters in the Court every time we're

21   here.  And everybody reports on these things.  So if you wind

22   up with a lot of litigation, right at the inception in the

23   case, over a lot of different things, that's going to hurt the

24   value of the business, or could potentially wind up hurting the

25   value of the business.

Hansen - Argument                                    Page 37

1        THE COURT:  I can certainly agree that agreement and

2    resolution is far preferable to intense litigation.  How do you

3    respond to the issue of the status of the ad hoc committee?  I

4    did see the 2019 statement that was filed, perhaps this

5    morning.

6        MR. HANSEN:  This morning, Your Honor.

7        THE COURT:  Indicating, I think, that the committee

8    represents 74 percent of the note holders as a class.  Even so,

9    an argument is made that it is ad hoc, after all.  The Code

10   provides a mechanism for binding a class, the formation of a

11   formal committee.  The formal professional's retained, in the

12   way that the Code prescribes.  This is not that, and it is a

13   opportunity, even for 74 percent -- this is not a situation

14   where the class comes in with a clear arranged agreement for

15   reorganization, and can commit that class, by its numbers, to

16   vote in favor of prepackaged plan, let's say.

17       This is a case where that negotiating by that ad hoc

18   committee seeks to negotiate on behalf of the entire class, and

19   to bind where it cannot yet before voting the entire class, how

20   do you deal with that?

21       MR. HANSEN:  A couple of things, Your Honor.  There

22   is -- there clearly are precedents for this, there have been

23   other cash collateral orders, including those in this case,

24   which differ a little factually.

25       Where ad hoc committees have been provided with

Hansen - Argument                                    Page 38

1    adequate protection, beyond interest paid to the whole class,

2    professional fees paid to the professionals who represented

3    those individual committees.

4         But here, 74 percent's a significant number, it's

5    925.76 million dollars of the total billion and a quarter.  And

6    it is past the thresholds for the two-thirds in dollar amount,

7    certainly, with which that class could vote to approve a plan.

8    They have been negotiating as a group since early December.

9         We have had no turnover in the membership in the

10   group since that point in time.  And, you know, we entered

11   into, as I said, four forbearance agreements with this

12   percentage of holders, which as the company announced in it's

13   AK's, was over 70 percent, which it was.

14        And I think the view here is that, you have a

15   indentured trustee who represents everybody.  And their

16   professional fees are being paid in connection with the order,

17   as well.  The indentured trustee, as often is the case in these

18   types of situations, is not the party who's out negotiating the

19   terms of arrangements with the debtors.

20        When we called the debtors in early December, one of

21   the things we said was, we'd like you to pay for the

22   professionals.  And they said, we will.  And they signed an

23   engagement letter.  We have one with the debtors.

24        As we move through that process, and where we are

25   now, we're still trying to work very hard with the debtors.  We

1  sent them a term sheet last week.

2       They called us back and said, okay, thank you for

3  sending that.  We have some questions, we have some thoughts,

4  we have some comments, but we're pleased that you sent it to

5  us.

6       We're continuing to work with them.  And we'd like to

7  continue to work with Mr. Trump, and Beal Bank, too.  We flew

8  down to Dallas, Texas a couple of weeks ago to meet with Beal

9  Bank to try and continue to push this process.  So I think that

10 at 74 percent, you're over the two thirds threshold.  You are,

11 clearly, the actions that those parties are taking, will have a

12 benefit for the full class.  They can certainly bind the full

13 class, because, you know, again, 74 percent, even if it was --

14 if it was 34 percent, they'd have the ability to block whatever

15 anybody else was doing.

16      At 74 percent, they have within the class -- at 74

17 percent they have the ability to bind that class.

18      And so I understand your concern.  And the concern, I

19 think, is probably taken up a level, you know, what Mr. Trump

20 says, well what happens if people trade out of their positions,

21 and you find out, you know, next week you file a 2019, and you

22 represent, you know, 28 percent of the bonds, or whatever the

23 number might be.

24      Fifty percent, whatever it is, at that point, should

25 you expect that, you know, you're still going to get paid in a

1    final order all of these adequate protection fees.  And that's

2    the way it would go.

3            And, you know, speaking fairly, if I was on the

4    debtor's side, no, I would want to condition that.  I would

5    say, well, wait a minute, if your membership has dropped so

6    tremendously, that you guys are really an ad hoc committee that

7    really it doesn't even represent a blocking position, or it

8    doesn't even represent a material amount of your class, then I

9    think that, as a debtor, they'd want to revisit the issue of

10   whether or not as adequate protection they wanted to pay those

11   fees.

12           But, realistically, here, this group has stuck

13   together for the past number of months, and I think it's hard

14   for -- and we, as a firm, obviously, have an obligation to file

15   subsequent 2019's, to the extent that the membership changes.

16           We have an obligation to do that, and we take that

17   seriously.  And we will.  But I think, as we stand here today

18   before you, that 74 percent of the class, they can bind the

19   whole class of notes, at their size, when they get to voting in

20   a plan.

21           They are the block that has been negotiating this

22   case for the past 3 months, probably more, almost 4 months now.

23           And they really are intent on continuing to do so.

24   And the question of, are you helping the bond class by

25   approving adequate protection to them in the form of paying

1    their professionals to promote a way to get to a deal in the

2    case?  Or are you hurting them by taking it away and having, in

3    essence, that 74 percent front the fees themselves, where

4    they're probably going to act, you know, in perhaps a more self

5    interested fashion.

6         Which one do you go?  And I think that's a judgment

7    call.  And I think, when we look at it, we believe from the

8    bond holder's perspective, again, that there's precedent for

9    it.  Now when you look back in the past case, I agree, there

10   were pre-pack issues and pre-arranged issues, and there were

11   questions, but there were two ad hoc committees.

12        There was, I guess the TAC committee and the TCH

13   committee, and they both asked for that relief, and they were

14   both provided for it.

15        And Mr. Trump says, well, that was because at the

16   outset of that case everybody thought they were over secured,

17   so it was fine, you didn't run afoul of anything.  Well, in

18   fact, they weren't over secured.  And you, Your Honor, raised

19   those points at the beginning of -- you raised them both at the

20   interim hearing and the final hearing.

21        And I think at the interim hearing, you recognized

22   that when you have a group, and, clearly, the TCH group and the

23   TAC group were not a hundred percent of either one of either

24   one of those classes.

25        I can't remember the specific percentages that they

1    were, but they were clearly smaller than the full class.

2         THE COURT:  The number that you cited in your brief,

3    34 percent, surprised me.  Because that didn't comport with my

4    memory at all.  But -- and I don't know if you've picked a

5    point in the process that was at its lowest.  I don't know.  I

6    don't argue with it, because I don't have any facts to refute

7    it.

8         MR. HANSEN:  My colleague says it was the first 2019

9    that was filed in the case on behalf of the note holders.

10        THE COURT:  But it's changed I guess, at --

11        MR. GILAD:  That may very well have proven to be the

12   case.  But that's where the number's based off of.

13        MR. HANSEN:  So, again, Your Honor, I come back to

14   it, and I say, so, there is precedent, even in the prior Trump

15   case for this.  And there are precedents in others.  I mean,

16   I'm involved in a number of cases in Delaware right now, where

17   you have ad hoc committees that are receiving adequate

18   protection in the form of the payment of their professional

19   fees.

20        No hearing --

21        THE COURT:  I love that argument best.  It's done

22   elsewhere, so therefore --

23        MR. HANSEN:  No, I know, it's -- I'm happy -- Your

24   Honor, I'm happy, actually, again, if we were going to have a

25   full blown evidentiary hearing, I'd actually, I'd, you know, we

1    could submit all the orders from those cases signed by the

2    judge, demonstrate them as a precedent, etcetera.  And perhaps

3    that's something that you would like.

4         But we can do that, those are a number of different

5    courts in Delaware that we're currently involved in.  So I

6    think, though, when you step back, you have to say, how have

7    you guys together, the debtors, and Beal, and you narrowly

8    tailored this, so that people don't get hurt?  Because that is

9    Mr. Trump, I mean, he makes the argument, but it's clearly

10   unsecured creditors as a whole.

11        It could be the former shareholders, it could be

12   other parties, and they also, in a letter, have raised, you

13   know, that they disagree with the payment of these fees on

14   behalf of the ad hocs.

15        And, you know, the narrow tailoring of the order, it

16   does include pretty aggressive claw back provisions, Your

17   Honor.  I would say that these are more aggressive than I'm

18   usually inclined to agree to.  But we agreed to them, because,

19   again, it was an arms length that was a give and take process

20   that brought us here.

21        And I think that they do -- Mr. Trump says, look, why

22   should I have to, at the end of the case, come back and make an

23   application to take away your fees?

24        Why shouldn't we just not pay them to you, and at the

25   end of the case, you make an application to get them paid to

1    you, because that's, you know, an easier way to calculate it.

2    And you kind of referred to that earlier.

3          And our view is, look, that's just not the way we do

4    it in these cases.  We understand that there could be a ruling

5    from the Court that says otherwise, but the vast majority of

6    precedent for these cases says, you don't do it that way.

7          You start out form the premise that, you are

8    potentially secured here, so is Beal, we're going to provide

9    you guys with adequate protection payments.

10         Everybody has a right to claw those back in pretty

11   aggressive and hard core claw back provisions.  And if you get

12   to the end of the case, where nobody has come together for an

13   agreement on a plan, and you guys all haven't, you know, kind

14   of locked up and gotten yourselves out of bankruptcy where no

15   one's objecting, if people raise objections, you have the

16   ability to have that, not only apply to principal, potentially

17   disgorged.

18         I'm representing the official creditors committee in

19   Tropicana, and we did that at the inception of the case, with

20   respect to the secured banks there, as well.

21         I'm happy to answer any other questions you have,

22   Your Honor.  But I think we briefed these a lot.

23         THE COURT:  Indeed.

24         MR. HANSEN:  So I don't need to go through all the

25   points with you.  You've got a lot of information.  I'd just

Friedman - Argument                    Page 45

1    happily ask you if I could have a moment at the end, perhaps if

2    you have any other questions, to make sure that I'd answer

3    those for you.  Thank you, Your Honor.

4          THE COURT:  Thank you, sir.  Counsel for Mr. Trump?

5          MR. FRIEDMAN:  Your Honor, good morning.  David

6    Friedman, Kasowitz, Benson, Torres & Friedman.

7          MR. MAINARDI:  Your Honor, Paul Mainardi of Brown,

8    Connery law firm.  Good morning.  I just wanted to introduce

9    Mr. Friedman, who has been admitted pro hac vice in this

10   matter, by order of the Court.

11         THE COURT:  Thank you.

12         MR. MAINARDI:  He will present the argument.

13         MR. FRIEDMAN:  Your Honor, can I keep a bottle of

14   water handy?

15         THE COURT:  Of course.

16         MR. FRIEDMAN:  Thank you.  Well, Your Honor, as you

17   clearly are familiar with our papers, and we do make a number

18   of arguments, but I think we all, on our side, think that

19   Section 506(b) really is the showstopper.

20         And I would take a step back, before I get into the

21   text of Section 506(b).  The Bankruptcy Code, and I'm -- I

22   regret that I'm old enough to recall the enactment of the

23   Bankruptcy Code.  Its creation, among other things, established

24   a fairly regulated system for paying attorneys in bankruptcy.

25         It happened to be that, under the Bankruptcy Act,

Friedman - Argument                    Page 46

1    there were horror stories of how fees were abused in

2    bankruptcy, and Congress really made a real effort to come up

3    with a comprehensive structure for the means by which one could

4    obtain the payment of professional fees from a bankruptcy

5    estate.

6              And, really, for purposes of what we deal with

7    generally in Chapter 11, there's really 3 ways to do it.

8    There's Section 330, which deals with estate professionals.

9    There's section 503(b)(3) and (b)(4), which ultimately I think

10   is where Mr. Hansen's clients belong.

11             Which is at the end of the case, if you've acted on

12   behalf of a group and you can show that you've made a

13   substantial contribution, you're free to apply and be paid on

14   that basis.

15             And that, finally, there's a carve out for secured

16   creditors, who can get paid under 506(b).  And as far as I

17   know, for all practical purposes, that's really it.  I mean,

18   there may be isolated other circumstances, but in the

19   day-to-day world of Chapter 11, those are really the ways that

20   professionals get paid.

21             And I think we all agree that for today, Section 330

22   and Section 503(b) don't apply.  Really it's a 506(b) issue.

23   And I think you heard Mr. Hansen say that he is -- he says he's

24   not unsecured, and I don't think that matters at all today.

25             I think he does concede that he's under secured, and

Friedman - Argument                    Page 47

1    that's all we need to do for today.  I mean, it just doesn't

2    matter whether he's under secured or unsecured.  And so we

3    really start first with the case, I think we both agreed

4    applies, which is the Timbers case.

5         And Timbers was a case where, I think, you know, very

6    simply, an under secured creditor argues that section 506(b),

7    that those are not words of limitation.

8         That Section 506(b) is simply one thing that a

9    secured creditor can have in its basket of rights in connection

10   with getting adequate protection.  The language that the

11   Supreme Court used, I'll just read it briefly.

12        "Petitioner seeks to avoid this conclusion by

13   characterizing Section 506(b) as merely an alternative method

14   for compensating over secured creditors, which does not imply

15   that no compensation is available to under secured creditors.

16   This theory of duplicate protection for over secured creditors

17   is implausible, even in the abstract, but even more so in light

18   of the historical principles of bankruptcy law."

19        THE COURT:  Well what do you make of the 363(e)

20   argument that the collateral of the note holders is being used,

21   and that they're entitled to adequate protection, adequate

22   protection, by their assessment, a very flexible concept, we

23   understand that it is, and could take the form, especially at

24   the outset, by agreement with the debtors, to shortcut these

25   difficult issues, the form that's proposed.  Payment of

1    professional fees.

2            MR. FRIEDMAN:  Well there's two answers to that.  The

3    first of which is, I think _Timbers_ makes clear that you don't

4    get through adequate protection what you can't get under the

5    statute.  Adequate protection is flexible, and I think we all

6    agree it can take many forms.

7            But what it can't take is something which violates

8    the Bankruptcy Code.  And _Timbers_ is not the only court that

9    says that.  But I think there's some other cases, which I'll

10    discuss, which say that as well.

11            So I think you know under adequate protection

12    generally, you can get a number of forms of compensation, but

13    you can't get something which the Code otherwise prohibits.

14            Now on top of that, I think Section 363 is important

15    here.  Because that is the section that they are speaking

16    about, Section 363.

17            If you look at adequate protection, and the way it's

18    constructed in the Bankruptcy Code, Section 361 defines it, and

19    then 362 -- it's dealt with only in 4 sections of the

20    Bankruptcy Code, the term adequate protection.

21            It's defined in Section 361.  362 raises it as a

22    defense to a motion to lift the stay.  Section 363 allows the

23    Court to condition, use, sale, or lease a property on providing

24    adequate protection.

25            And 364 provides that you have a right to get it, if

Friedman - Argument                    Page 49

1    you're primed.  Okay.  The only section that could be

2    applicable today is Section 363.  What's important about

3    Section 363, is that the protection that they want is

4    protection for a speculated market value decline of this

5    property that could occur at some point in the future.

6           Which, again, I'm sorry to say, is backwards.

7    Because nobody, you know, the notion that collateral can

8    always, you know, that collateral's subject to decline, is

9    something that we prove in hindsight, we don't prove it in

10   foresight.

11          Because all collateral, of any kind, is subject to

12   decline.

13          THE COURT:  Of course.  But of course adequate

14   protection arrangements can be established in the beginning,

15   and most all decline, do they not, or the actual decline, or

16   increasing.

17          MR. FRIEDMAN:  When they're established in the

18   beginning, they're established in a non-compensatory manner.

19   In other words, you give somebody, as you said, a replacement

20   lien.

21          You give somebody a super priority claim.  So down

22   the road, they have a place mark, so if down the road there is

23   decline, there is a remedy for them.  But if you pay them

24   money, if you actually write a check for them every month, that

25   has to correlate to something.

Friedman - Argument                    Page 50

1    It's not a correlation of convenience.  I mean,

2  paying money is different than giving somebody a replacement

3  lien.  But more importantly, Section 363, and this is in a

4  number of cases, I think most notably in Judge Balick's

5  decision in <u>Continental Airlines</u> when she confirmed the plan in

6  1993.  Section 363 provides adequate protection for the use,

7  sale, or lease of property.

8    That, by definition, has nothing to do with market

9  value decline.  Market value decline is something that you

10  suffer if you are not allowed to lift the stay, take back your

11  collateral and sell it to somebody else.

12    Okay.  Use, sale or lease of property.  I'll give you

13  an example.  I mean, cash collateral is the obvious example.

14  Whenever you use cash collateral, by definition, arithmetically

15  you're causing it to diminish.  If you don't give someone a

16  replacement lien, he's out of luck.

17    If you have a piece of equipment that can be used,

18  you know, 20 times.  It has a useful life of 20, whatever it

19  does.  Okay.  If you use it 5 times  you've now taken away 25

20  percent of its useful life.  So the use causes a decline.

21  Okay.  There is no loss caused by the use of a hotel.

22    The debtor's use of these hotels, frankly, and this

23  is my point, it enhances the value.  Let's consider the two

24  options here.  Use the hotels, don't use the hotels.

25    Okay.  Don't use the hotels, means you turn off the

1   lights.  You send the employees home, and you tell the

2   customers to go down the street to someplace else.

3          You use it, that means that you pay the employees,

4   you pay the vendors, you bring in the provisions, you open up

5   the restaurant, you open up the casinos.  Now in that context,

6   how does the use of the casino possibly provide a risk of

7   collateral decline?

8          It's the exact opposite.  The use of the collateral

9   is what enhances and preserves, not only the use of it, by

10  paying insurance, paying maintenance, I mean, all that stuff.

11         THE COURT:  It seems the argument is the broader

12  picture.  If the note holders were permitted to foreclose, to

13  achieve the value of their collateral as of the date of the

14  petition, that they would receive X amount in exchange for

15  their position.

16         That if, because of the market forces, and the dire

17  economic straits Atlantic City, let's say, finds itself in on

18  commercial real estate numbers, or the like, that there would

19  be a diminution in that value six months from now or a year

20  from now.

21         MR. FRIEDMAN:  That is a highly technical evidentiary

22  issue, that is not appropriate for a stipulation on the first

23  day.

24         I mean, that is -- we're now talking about, you know,

25  (a) trying to predict the future, which I think inherently is

1   impossible.  I think that's why, typically, somebody will make

2   a motion for adequate protection, and then, you know, have that

3   motion heard sometime, you know, a month or two months later,

4   and then take a snap -- take a look back at what's happened

5   since the motion has been made.

6        I mean, the argument that your collateral is at risk

7   of decline, I mean, let's face it, would you rather hold, you

8   know, the Dow at 14,000 when it was high, or hold it at 6,000

9   now.

10       I mean, it may still go lower, but it's got a less --

11  lot less lower to go right now than it had 2 years ago.  The --

12  but the issue is -- it's not -- when you start paying money to

13  someone, as opposed to the normal form of adequate protection,

14  which is a replacement lien or a super priority, when you start

15  paying money, what you're doing is, you're doing something

16  which requires an evidentiary support.

17       Again, all of this presumes that you can do it at

18  all, which we don't think you can.  I mean, all this presumes

19  that you can call legal fees adequate protection, which I think

20  the law is pretty clear you can't.  But if you could, if you

21  could call this adequate protection, you have to take this

22  money and correlate it to something.

23       You can't just say, well, we all got together and

24  agreed upon it.  Because let's talk about who's agreeing to it.

25  I mean the debtor's agreeing to it, you know, because they're

Friedman - Argument                    Page 53

1    about to go into bankruptcy, they want a soft landing in

2    bankruptcy, and they're not in a position to start creating

3    these types of issues.  It's ultimately the judge's provenance

4    to save the debtor from itself when it's trying to keep its

5    ducks in a row on the first day.

6         Beal Bank has an inter creditor agreement with the

7    note holders.  It can't oppose their adequate protection,

8    reciprocally, by the way, both sides.

9         So, you know, all that arms length stuff that Mr.

10   Hansen talked about, ultimately it's, you know, in the heat of

11   trying to get into Court, people slip things in, and it's

12   sometimes the path of least resistance.

13        It's not an excuse for violating the law.  And,

14   ultimately, that's where Your Honor steps in and says, okay, we

15   understand why you did it, but this is not a extra judicial

16   process.

17        This is a process which ultimately the Court has to

18   be satisfied that this is legal, it's appropriate.  That there

19   is some benefit to the estate, you know.  I mean, I'm jumping

20   all over the place here, but, you know, we haven't even talked

21   about benefit to the estate yet.

22        I think that, you know, it's important to, you know,

23   just I would point out, you know, Timbers, I think, I really

24   think it is the important case, and it's a classic Scalia

25   opinion, insofar as it really, I mean, Judge Scalia is

Friedman - Argument                              Page 54

1    particularly hostile to attempts to look at the Bankruptcy Code

2    beyond its plain meaning.  And I think he correctly looked at

3    506(b) as -- and said, you know, if 506(b) was an option, was

4    something for creditors to consider, but if they didn't like

5    it, they could always go to Section 361 to get something

6    different.

7              I mean, then Congress is just -- it's wasting its

8    time writing the Bankruptcy Code.  I mean, we might as well

9    just call it, go back to the old days where it was it was a

10   quarterback goody, and, you know, people just did what was

11   fair.

12             And you know the very same phrase that -- and Your

13   Honor pointed this out earlier, the very same phrase that

14   Justice Scalia found to be words of limitation that did not

15   permit a secured creditor in the form of adequate protection to

16   get post petition interest, that very same phrase is a phrase

17   that permits the payment of fees.

18             And so, you know, if 506(b) is a statute that does

19   not permit, under the guise of adequate protection, a creditor

20   to get post petition interest, afore-certiorari doesn't permit

21   a creditor to get post-petition fees.

22             Another way of saying it, is that 506(b) is not just

23   one way.  506(b) is not one way for a secured creditor to get

24   fees.  It's not one way, it is the only way.

25             And I think that is what <u>Timbers</u> says.  Now, you

Friedman - Argument                    Page 55

1   know, I would direct the Court also to the <u>Nair</u> decision, which

2   is, you know, far from the Supreme Court in it's importance.

3   But it was decided in 2004 in the Southern District of Texas.

4   And the Court there says something, which I think was

5   important, and, frankly, probably should have been said sooner.

6            There the question was, can you get -- can a secured

7   creditor, I mean, this was a case where, and I'll get into a

8   little bit more detail, but that was a case where a lawyer for

9   a secured creditor was being sanctioned for trying to slip in a

10  provision for the payment of fees, while his client was under

11  secured.

12           The Court said, that when a secured creditor asks for

13  the payment of fees, what he's really asking for ultimately is

14  the payment of an administrative claim.  Respectfully saying,

15  look, I want to get paid something from the estate, which is

16  all payments from the estate post petition are administrative

17  expenses.

18           What the Court said, is that, that is the only thing

19  you can't get, is adequate protection.  In other words,

20  adequate protection's a flexible statute, it's got all kinds of

21  things you can give.

22           The one thing it says, and the Court says, Section

23  361.3 specifically prohibits awarding a creditor fees under

24  Section 503 as a form of adequate protection.

25           The one thing that is not adequate protection, many

1    things are, but one thing that is not, under the statute, is an

2    administrative claim.

3          That's the one thing Congress says you cannot give as

4    adequate protection.  So I thought the Court was -- it was, it

5    was quite perceptive in understanding.  I mean, I think that's

6    what <u>Timber</u> says implicitly, but this Court said, that's

7    exactly what the statute says.

8          You cannot give under adequate protection an

9    administrative claim, which is what fees would be.

10          Now I think that, you know,  we -- if you go back to

11    the briefing, this is very much a question of law.  I know Mr.

12    Hansen talked about coming back with all kinds of evidentiary

13    showings.  This is a question of law.  And the only authority

14    that is cited for the proposition that this group can get paid

15    its fees, is really the honor Your Honor entered in 2004.  And

16    I'm not going to go into it in detail, but I think, you know --

17          THE COURT:  I think you made the point well in your

18    submission pointing out to me differences.  The one thing that

19    you didn't point out, and that I remember so vividly, is the

20    argument that the payment of professional fees for the two

21    groups of note holders was very much a part of a global

22    resolution of all issues between the parties.

23          There was a tweaking of those arrangements, as the

24    case went on, but, basically, there was global resolution of

25    all issues.  And the idea of disturbing that global resolution

1     was argued and, frankly, accepted by me in the context of

2     approving what was also a priming situation and so forth.

3             So there was a substantial difference in the context.

4             MR. FRIEDMAN:  One thing I would point out, though,

5     just maybe this is the right time to mention it.  As I said,

6     one of the distinctions was that, in that case, the note

7     holders did have an interest in cash collateral.

8             With that -- that translates here in an important

9     respect, which is that, even though we're here on a final

10    hearing on a cash collateral order, this provision can be

11    toggled in or out, it has no effect on the debtor's financing.

12    I mean, the bank will accept the outcome of the Court.  The

13    bank's not going to alter their view on cash collateral.  The

14    debtor's prepared to accept the outcome, either way.

15            So, you know, a lot of times when somebody had, you

16    know, a debtor by -- you know, has strong leverage over a

17    debtor, and having a lien on cash collateral, obviously, is

18    tremendous leverage, you get things that you might not

19    otherwise get.

20            But I just don't think this -- this is just not a

21    case where the company's financing in anyway depends one way or

22    the other on the outcome of this particular issue.

23            Your Honor, I think -- I don't think we have an -- I

24    don't think we need to spend time talking about the Business

25    Judgment Rule, because although that was a fairly large part of

Friedman - Argument                    Page 58

1    the note holders' submission, they seem to concede that the

2    Business Judgment Rule can't override the Bankruptcy Code.

3         One thing, though, about O'Brien, which I think,

4    obviously, is dispositive on the issue, not only did O'Brien

5    affirm Judge Gambardella when she held that you have to go

6    through the statutory jurisprudence to get your fees paid, the

7    Court said something today, which I think is important.

8         The Court said the structure of the Bankruptcy Code

9    further counsels against judicial expansion of the potential

10   for recovery from the debtor's estate.  And I think what that

11   tells us, ultimately, I don't think this is -- I don't think

12   this is a close call, but I think if it were, I mean, the Court

13   ought not to be looking for new ways to pay legal fees to

14   people who don't have an obvious right to them.

15        The Business Judgment Rule, though, it does -- it is

16   important to understand it only in the following context.  We

17   all agree in this room, it's not a test, but even O'Brien said,

18   you know, that might be interesting color the Court would want

19   to understand whether, within the statutory rubric it makes

20   sense to grant or deny a motion.

21        And I would just point out that, you know, there is

22   nothing in this record that in anyway explains how it is good

23   for the estate to pay 2.2 million dollars a quarter.

24        I mean, there's just nothing that suggests what's

25   good about that.  The -- to the extent that the point that

Friedman - Argument                              Page 59

1    someone would make is, well, by paying that money it encourages

2    bond holder participation.

3           Now well we -- you know, we saw this morning the

4    2019, which, you know, I have a few things to say about --

5           THE COURT:  Well let's talk about that.  Because

6    there is, after all, a 74 percent representation.  Of course,

7    it could change tomorrow.  That is though a sizable -- of

8    course, it's routine, and I think we understand that, pre-

9    petition to work with an ad hoc committee like this.

10          And to achieve, as they did in this case, forbearance

11   agreements and attempts to look at the bigger picture, albeit

12   unsuccessful, in this case.

13          What is the opportunity post-petition to recognize ad

14   hoc committees, especially when they represent the voting

15   block, if you will?

16          MR. FRIEDMAN:  Your Honor, I think you know, ad hoc

17   committees will continue to exist in bankruptcy.  They play, in

18   some cases, potentially in many cases, important functions.

19   But, you know, these holders are multi, multi billion dollar

20   institutions.

21          I mean, you know, I don't want to -- I mean, I know a

22   lot of them, so I don't want to, you know, give up their own

23   secrets, because I know that -- I know things about them from,

24   you know, from other cases and it's not fair to, you know,

25   especially -- but I can tell you, for example, one, I mean,

Friedman - Argument                    Page 60

1    Franklin Mutual is a public company.

2         Franklin Mutual manages, you know, 40 billion

3    dollars.  I mean, the notion that they need this Court or this

4    debtor to pay Mr. Hansen's legal fees, or they won't

5    participate, is nonsense.

6         THE COURT:  It's not a question of worrying about

7    them participating or not, it's a question of what their role

8    is and what their entitlement is.

9         MR. FRIEDMAN:  Right.

10        THE COURT:  In the context of representing nearly a

11   billion dollars worth of note holders in this case.

12        MR. FRIEDMAN:  Your Honor, there's no -- there's no

13   notion in the Bankruptcy Code that, you know, that size

14   matters, in terms of your entitlement to get paid.  That's -- I

15   mean, people who have large positions tend to congregate, pool

16   their resources and find their way into the Bankruptcy Court.

17        And, of course, they're entitled to participate and I

18   have every reason to expect that they'll participate.

19        What is -- what is Mr. Trump's entitlement?  He has

20   his name on the door.  He spent the better part of the last,

21   you know 10, 15 years, you know, giving -- putting a tremendous

22   effort into this company.  He has a license agreement, he has a

23   services agreement.

24        He has indemnities.  He wants very much to save this

25   thing.  He feels more personally aligned with these properties

1    than probably anybody else in the world.

2         You know what, is his entitlement?  We're not asking

3    to have, for the Court to pay our fees.  I mean, we have an

4    interest, and when people have an interest in a case, all

5    throughout this country, in all types of cases, they hire

6    lawyers and they appear, and they make their interests known.

7         And I think that's what the bond holders have done

8    and should continue to do.  It's not a function of how big they

9    are.  But, you know, what I was just getting at, though, is

10   that this is -- it's lost upon me how this is a good thing for

11   the estate.

12        If it's a question of their entitlement, they're

13   entitlement is derived from 506(b).  If it's a question of

14   what's good for the estate, I don't think there's anything in

15   the record which would explain why it's good for the estate.

16        Now, look, we have a 2019 statement which is on file.

17   It was filed this morning.  That's obviously later than we

18   would have hoped to have seen it.  It was promised on February

19   19th to have been filed shortly.  I'm not suggesting this was

20   tactical in nature, but we haven't gotten it until this

21   morning.  It is not verified by the holders.

22        It does not indicate what the holders own.  It's just

23   aggregates everybody in particular.  It doesn't say what

24   they've held in the past, it doesn't say, as 2019 requires,

25   when do they acquire their claims, how much they pay for their

1    claims.  We don't know whether they're -- they accept any

2    fiduciary obligations to anybody else.

3         We don't know if they're restricted, we don't know if

4    they're trading.  We know that efforts were undertaken at the

5    time of the bankruptcy filing to un-restrict them so that they

6    could trade.

7         I don't know what they're trading, I doubt Mr. Hansen

8    knows whether they're trading or not.  But it raises another

9    question, which is, you know, when you have a lawyer who

10   represents a group of people, and the group of people don't

11   really know what's going on, because they intentionally do not

12   avail themselves of the opportunity to obtain confidential

13   information, so, what kind of instructions are the business

14   people really able to give their professionals, when they don't

15   have access to the kind of information that one would need to

16   make an informed choice?

17        I mean, these are just, you know, issues that suggest

18   to me that we don't just start writing checks to, what's

19   essentially checks to a law firm -- to two law firms and an

20   investment bank.  We're really not paying an ad hoc group.

21   We're paying, you know, as the order provides, two law firms

22   and an investment bank, which the relationship with its clients

23   still is, at least to me, a mystery.

24        And it is not a small amount of money.  I mean, I

25   know it's one percent of the disbursements, as Mr. Hansen

1   points out.

2          But with all due respect to Mr. Hansen's clients, the

3   disbursement's are being used to pay the employees, to pay the

4   vendors, to pay the people who keep the properties up and

5   running.  Those people, of course, have to get paid.  But, you

6   know, for a company that's hovering around, and I have no

7   knowledge specifically as to what the number is now, but if

8   you're hovering around a hundred million dollars of EBITDA down

9   from 300 million dollars, you know, a few years ago, you've

10  lost two-thirds of your EBITDA.  You know, you're talking

11  about, you know, 9 million dollars a year, it's just about 10

12  percent of the company's cash flow, without even getting into

13  capital expenditures.

14         And so it's not about leverage, I mean, we, and, you

15  know, this is not the time to get into, you know, people's

16  interests, and, what, you know, what their motivations are.

17  These are legal issues about what people's entitlements are.

18         But the point is that, we know that those 10 million

19  dollars could be used much more profitably for everybody, right

20  now, if they could be kept within the company, if they could be

21  used to revitalize properties that really des -- really need

22  the cash.  And there's no source of that cash.  There's no DIP

23  in this case.  Okay.  We're using cash collateral.  Money is

24  dried up everywhere.

25         You don't give away 10 million dollars, you know, up

Friedman - Argument                    Page 64

1    front, if you don't have to.  And there's no reason to do that

2    here.

3          Now this notion about paying 70 percent or 74 percent

4    now of the class.  I think Your Honor hit the nail on the head.

5    We're not at a confirmation hearing, we don't have a

6    prepackaged plan.  We don't know what the deal's going to look

7    like.  We don't know what anybody's entitlements are.  There's

8    a lot of evidence that will need to get into the record, one

9    day, to establish entitlements, if things are not able to be

10   worked out.

11         But what we're doing right now, is we're paying the

12   legal fees of 74 percent of the holders, that's what we're

13   doing.  Now we don't know anything about the other 26 percent

14   of the holders.  We don't know if they think that's a good

15   idea, or a bad idea.

16         We don't know --we certainly don't know that the 74

17   percent have accepted upon themselves any fiduciary obligation

18   to the other 26 percent.  Like with a creditors committee.  A

19   creditors committee could consist of, you know, 10 percent of

20   the debt, but they're statutory fiduciaries.  And they're

21   vetted by the Department of Justice.

22         These are hand-picked, you know, holders who don't

23   accept any obligation to anybody.  And, you know, the notion

24   that we're going to pay 74 percent of the fees, or pay the fees

25   to 74 percent of the holders, because you can't -- I think the

1    argument was, well, we can't discriminate against the 26

2    percent under a plan, because of unfair discrimination.

3         Completely, you know, turns everything on its head.

4    If you don't want to discriminate, either pay everybody's fees,

5    or pay nobody's fees.  But to pay 100 percent of the fees to 74

6    percent of the holders and zero percent of the fees to the

7    other 26 percent, sounds like the height of unfair

8    discrimination.

9         So --

10        THE COURT:  If you would wrap up, I do appreciate

11   these arguments, and you've laid them out very, very well in

12   the submissions, as well.

13        MR. FRIEDMAN:  I thank you, Your Honor.  I won't

14   belabor the point.  I think Your Honor knows, fundamentally, I

15   think these are illegal payments.

16        They don't come through the back door under adequate

17   protection.  And it's not permitted by the Code, and it's also

18   a bad idea because we think the company needs the money.  Thank

19   you.

20        THE COURT:  Thank you.  Is there any other, before I

21   hear from Mr. Hansen.  Yes, Mr. Kulback.

22        MR. KULBACK:  Thank you, Judge.  Just briefly.  The

23   17 shareholders join in Mr. Friedman's comments.  And I just

24   want to point out a couple matters.

25        What is clear, is that, as of right now, the value of

1    these debtors is questionable, whether there's any equity for

2    unsecured creditors whatsoever.  And Mr. Hansen apparently

3    wants to avoid an evidentiary hearing, which could be time

4    consuming and expensive to conduct those valuation hearings.

5         But perhaps that's what's needed before these cases

6    move forward, at this point.  We already have a critical vendor

7    motion that's -- order that's been entered, authorizing 18

8    million dollars out to unsecured creditors.

9         The debtor now wants to pay the ad hoc note holders

10   committees counsel fees, and spend more money.  And what's left

11   is the unsecured creditors at the end of the day that are going

12   to be holding the bag when this case ultimately fails.

13        Now Mr. Friedman posited that the money could be used

14   better, instead of paying the note holders counsel fees.  And I

15   agree.  I think that perhaps the money could be used to pay the

16   rest of the unsecured creditors, or create escrows for the

17   unsecured creditors.  Ultimately, this proceeding is to move

18   forward for the benefit of creditors.

19        It's not being done for the benefit necessarily of

20   the debtor, or the note holders committee, the two large

21   constituents, obviously.

22        But there are other constituents that are completely

23   being ignored in this proceeding, and those are the rest of the

24   unsecured creditors.  And so, Your Honor, everything that Mr.

25   Friedman said, at this point, there's no legal basis for the

1    attorney's fees to be granted to the ad hoc committee.

2         It doesn't fit within any of the parameters of

3    adequate protection.  In fact, as I understand the motion was a

4    motion to use cash collateral.  There's nothing here, the note

5    holder hasn't come forward with an application to demand

6    adequate protection for use of the real estate, or any other

7    collateral that they may have.

8         And it's not -- I don't know that it's actually on or

9    before the Court today as to whether the note holder committee

10   is entitled to anything, other than it being trying to slip it

11   into the first interim cash collateral order.  Thank you, Your

12   Honor.

13        THE COURT:  Thank you.  Mr. Gibbs.

14        MR. GIBBS:  Good morning Your Honor, Chuck Gibbs,

15   with me my co-counsel.  We are here on behalf of the senior

16   secured lenders.

17        The arguments were eloquent, and the arguments were

18   persuasive.  Both sides, the arguments were well taken.  I'm

19   here to tell the Court that we support the motion, the request

20   of the bond holders for the payment of their legal fees as

21   adequate protection, as negotiated and contemplated in the

22   order.

23        I disagree with counsel for Mr. Trump that 506(b) is

24   the showstopper.  I don't think the Court needs to hear me spin

25   the same arguments that you've just heard from the other

Gibbs - Argument                          Page 68

1    parties.

2          I do want the Court to know that we agree with and

3    adopt the arguments Mr. Hansen made on behalf of his clients.

4    We think that is the appropriate legal basis upon which this

5    Court can consider this issue.

6          And I think the Court shouldn't lose sight of the

7    fact that the major economic constituencies in this case

8    heavily negotiated the terms of the interim cash collateral

9    order, and the proposed final cash collateral order, and we

10   think they're appropriate.

11         They were properly noticed, and I think that the

12   proffer of testimony, the evidence that you heard from the

13   witness at the interim hearing and the arguments of counsel

14   form a sufficient record for the Court to enter the order,

15   which includes the payment of those fees.

16         There's one thing that there's no dispute on, and

17   that is that my client has a lien, has the only lien on the

18   "cash."  And it's my client's cash that they have a secured

19   interest in.  It's going to be spent on a monthly basis to pay

20   the fees of the note holders.

21         To say that this was done with, you know, a hand in

22   each other's pockets, or a wink, or anything else, is just

23   incorrect.  These were heavily negotiated, arms length

24   discussions, including the debtor, that arrived at this draft

25   order.

Page - Argument                                    Page 69

1        We will, as I mentioned to the Court at the first

2    hearing, there will be a number of times, I am confident, that

3    the interests of my client and the interests of Mr. Hansen's

4    clients diverge.

5        I do think, however, that the accommodations that we

6    made that allowed for the consensual use of our client's cash

7    collateral to pay the expenses that are set forth in the

8    budget, including the costs and expenses incurred by the bond

9    holders, is an appropriate negotiated compromise.

10       It's supported by the Code, that I think they are

11   entitled to adequate protection as an under secured creditor

12   for the diminution in the value of their collateral that might

13   occur during the course of the case.  And I don't think it's a

14   requirement that they have to prove that at the end of the

15   case, rather then have it paid on an interim basis.

16       I think that the provisions that we negotiated for

17   regarding claw backs and disgorgement, are appropriate

18   safeguards in this case.

19       So we would ask Your Honor to enter the order that

20   we've negotiated, with the modifications that we made to

21   address the U.S. Trustee's concerns.

22       THE COURT:  Thank you, sir.  Is there any other

23   position before, Mr. Hansen?

24       MR. PAGE:  Your Honor, Mark Page.  Can I speak?

25       THE COURT:  Yes, Mr. Page.  Who do you represent?

1    MR. PAGE:  U.S. Bank National Association as

2    indentured trustee in respect of the senior secured note.

3    THE COURT:  All right.  What's your position?

4    MR. PAGE:  As the indentured trustee, U.S. Bank

5    represents all of the note holders, including the note holders

6    that aren't members of the ad hoc committee.

7    In that capacity, U.S. Bank believes that all of the

8    note holders are benefitted by the participation of the ad hoc

9    group in the case.  And that to fully realize that benefit, the

10   ad hoc group needs the advice and help of its professionals,

11   and that all parties are benefitted when those professionals

12   are paid current and in the ordinary course.

13   And I'd also add that, each note holder, in its own

14   capacity, is a secured party that's entitled to request

15   adequate protection.  And, again, these -- all the fees are

16   being paid subject to the claw back, so everyone will be

17   protected at the end of the case.

18   And then, finally, I'll just add that U.S. Bank and

19   the ad hoc group will coordinate their efforts to avoid, as

20   much as possible, any duplication.  Thank you, Your Honor.

21   THE COURT:  Thank you.  Mr. Hansen, brief reply?

22   MR. HANSEN:  Only if you have questions, Your Honor.

23   We've been at it for quite a while.

24   THE COURT:  We have.

25   MR. HANSEN:  I think we all know the cases.

Ruling                                          Page 71

1        THE COURT:  And I appreciate the arguments very much

2    and I am prepared to rule.  I do think this has been an

3    excellent discussion of a difficult issue.

4            And, indeed, I recognize, at the outset, that this is

5    a negotiated proposal to pay for professional fees.  A proposal

6    that was negotiated between the debtor, Beal Bank, whose cash

7    collateral is being used, and the note holders.  That it has

8    been properly noticed.

9            I take note of the 4001 alliance by the note holders

10   to suggest that it is not a procedural hurdle that I'm

11   concerned with, as I approach this issue and feel compelled to

12   deny the opportunity of the note holders to achieve this

13   payment, at this point in the case, in this record.

14           Indeed, it is certainly preferable, Mr. Hansen is

15   certainly correct, to have a negotiation, an active

16   participation, a focus on the major issues, an active

17   involvement on behalf of the note holders, certainly as with

18   all parties, and everything that the parties can do and the

19   Court can do to facilitate that negotiated process, is to be

20   done.

21           And that is clear, and it would certainly be my

22   intent to have that approach, as we take on each issue that is

23   presented.  But that does not permit me to ignore the clear

24   mandate of the Bankruptcy Code.

25           And I start, of course, with 506(b).  I think that

1    Mr. Trump is correct to assert that 506(b), if I may borrow Mr.

2    Friedman's language, is the showstopper.  From the standpoint

3    that it lays out very clearly, very directly, and in a way that

4    was clearly recognized, as well, by Justice Scalia in the

5    Timbers case, the opportunity only of over secured creditors to

6    achieve post-petition interest, as was the case in the Timbers

7    case.  And within the same clause of 506(b), attorney's fees,

8    as are contemplated here.

9         We don't have a definitive evidential record of what

10   the status of the note holders are in this case.  But suffice

11   it to say that, we can whittle -- we can glean from the

12   comments of Mr. Hansen, and assume for these purposes that we

13   are dealing with a set of creditors, the note holders, who have

14   under secured status.  That means that they are secured to some

15   extent, beyond the secured position of Beal Bank.

16        But that the value of the collateral they hold, may

17   not extend fully to support their entire 1.2 billion dollar

18   claim.

19        If that's the case, then the 506(b) opportunity would

20   not be available to them.  And by the same token, it is clear

21   that the burden to establish over secured status would be on

22   the note holders, and that burden has not been met here.

23        The Timbers case is critical in this analysis.  The

24   Timbers case offered -- understood, let me say, that under

25   secured creditors may be entitled to adequate protection.  And

Ruling                                              Page 73

1    Mr. Hansen is certainly correct in his recitation of the

2    context in which the Court was speaking, the fact that the

3    collateral in <u>Timbers</u> was rising in value and there is, at

4    least argument advanced, that that might be the opposite in

5    this case, that there may be a diminution in value.

6            But I agree with Mr. Trump, that payment of

7    professional fees does not correlate here to adequate

8    protection.  There is adequate protection, which may be

9    approved in this case for the note holders, in terms of

10   replacement liens and super priority administrative claim, in

11   the event that there is established a diminution.

12           But if we understand that 361, which defines adequate

13   protection allows for cash payments or additional security, to

14   the extent of any decline in value, we don't have a record to

15   support the proposition that the payment of professional fees

16   in this case, in the amounts that are contemplated, would

17   comport with, correlate with the potential decline in value of

18   the collateral supporting the note holders position.

19           363(e) does not provide a sufficient basis to allow

20   this provision of the cash collateral order to go forward.

21   Indeed, 363(e) may -- permits a Court to prohibit, or condition

22   the use, sale or lease of property, as is necessary, and I'm

23   quoting "to provide adequate protection of the interest."

24           But this -- in evaluating what this means, it's

25   really the same analysis that the <u>Timbers</u> court used to look at

Ruling                                    Page 74

1    the adequate protection language of 362(d)(1), that there is

2    opportunity only within the context of the Bankruptcy Code.

3         And the context, the particular Bankruptcy Code

4    provision that controls here is 506(b).  There cannot be,

5    notwithstanding the flexibility of the term, that is adequate

6    protection, there cannot be use of that term no matter how

7    flexible, in violation of other Code provisions.  In

8    particular, 506(b).

9         503(b) does not apply here.  It may apply, indeed, if

10   the note holders ad hoc committee continues their active

11   participation, succeeds in achieving a resolution, it is easy

12   to see that they might very well be entitled to a substantial

13   contribution award under 503(b).

14        But that showing has to be made after the fact, not

15   before.  Their role pre-petition was perfectly acceptable.

16   Their arrangements with the debtors understandable and

17   necessary, from the standpoint of the need for the debtors to

18   achieve forbearance agreements and to attempt to negotiate a

19   reorganization resolution before the fact.  And it is quite

20   common, as Mr. Hansen suggests, to have ad hoc committee

21   participation that has been shown, now, today, by the 2019

22   statement filed.

23        That, indeed, a substantial percentage of the note

24   holders is represented by this set of professionals.  And,

25   frankly, that's very helpful to the case.  But that does not

Ruling                                    Page 75

1    offer that set of professionals the opportunity to be afforded

2    payment for their professional fees, at this stage.

3         There is -- we didn't discuss it, but I noted in

4    passing, a citation to Section 1109 in the note holder's

5    submission, to support their contention that professional fees

6    are appropriate.

7         Of course, that gives them standing to appear and to

8    be heard on all issues, and we welcome and encourage their

9    continued appearance and participation.  But that does not

10   support the payment, either.  And, indeed, Mr. Friedman

11   correctly recites that the provisions for counsel fees are well

12   set out and limited in the structure of the Code.

13        We've dealt with the Business Judgment Rule.  Indeed,

14   that is very persuasive in many instances.  It is not a blank

15   check to overcome specific proposals.  The so called precedent

16   for the 2004 case, must be rejected as well.  Indeed, I did

17   approve professional fees paid ongoing to ad hoc committees in

18   that case early on, in the context, if I'm not mistaken, of

19   cash collateral arrangements.

20        But there was significant difference.  Number one, by

21   reason of the global resolution, which was maintained pretty

22   much intact throughout the case, on total reorganization.

23        The case came in with those major blocks of bond

24   holders agreed to specific provisions.  They did -- they, the

25   bond holders in that situation, had a security interest in the

1  debtor's cash collateral, and there was a priming issue in that

2  case, a hundred million dollars of VIP financing, as well an

3  uncertain status about whether they were over secured.

4       The claw back and disgorgement provisions don't say

5  this, indeed, it could be undone.  All they do is provide the

6  opportunity to undo what is not authorized to be done in the

7  first place.  And so that is not an appropriate way to look at

8  it.  Nor is it that, in other places with this exact scenario,

9  this would be approved.

10      Certainly, it's hard to say, but I'd pass that

11 argument and must reject it.  The support of Beal Bank is

12 understood, but it does not offer the authoritative basis for

13 approving this payment, nor does the position of the U.S. Bank.

14 Indeed, if all are benefitted, as U.S. Bank suggests, again,

15 there is entitlement, there will be entitlement to 503(b)

16 payment for professional fees, and I look forward to that

17 result.

18      So I will decline to approve that aspect of the cash

19 collateral arrangement.  Mr. Lubertazzi?

20      MR. LUBERTAZZI:  Yes, Your Honor.  If I can speak to

21 the form of the final order.  And I know we have to submit a

22 revised order.

23      Your Honor, we will submit a revised order which

24 addresses Mr. Sponder's concern that he receive the forecasts.

25      When I was here the first time, earlier this morning,

Colloquy                                    Page 77

1    Your Honor mentioned about the releases of officers and

2    employees, and we placed on the record that that's solely to

3    the extent in their capacity as agents for the pre-petition

4    secured creditors.  We can put that language in the order, Your

5    Honor.

6          And Your Honor mentioned a moment ago, and I just

7    want to get clarity.  There are three types of protection that

8    are being given to Beal Bank and to the note holders.  One was

9    the payment of fees, and Your Honor just addressed that.  And I

10   went back and I looked at the order, also, Your Honor.  It is

11   very specific for, if Beal Bank submits its application to the

12   U.S. Trustee and time to object.  But there's also protection

13   for the pre-petition secured creditors, which is the note

14   holders, as well as Beal Bank, for replacement liens and super

15   priority claims.  I didn't understand anything Your Honor just

16   said now to alter what's in that form of order.

17         THE COURT:  No, I don't mean to alter that aspect of

18   the arrangement.

19         MR. LUBERTAZZI:  Okay.  So what we will do is, we

20   will take the final order and we will circulate it.  And we'll

21   eliminate -- we'll make the two modifications that I mentioned

22   a moment ago.  And we'll eliminate the provision of fees for

23   the note holder -- the ad hoc committee.

24         I don't know if Your Honor wants a separate order

25   having to deal with that.  And I understand Your Honor's ruling

Colloquy                                    Page 78

1    right now to essentially be to be without prejudice.

2           So I don't know if you want a separate order for that

3    also, Your Honor.

4           THE COURT:  Perhaps that's helpful.  In case it's

5    challenged it might clarify the scenario.

6           MR. LUBERTAZZI:  Okay.  Thank you, Your Honor.

7       (End of requested portion 11:54:00)

8       (Court adjourned)

9                            *  *  *  *  *

10                   C E R T I F I C A T I O N

11   I, Josette Jones, court approved transcriber, certify that the

12   foregoing is a correct transcript from the official electronic

13   sound recording of the proceedings in the above-entitled

14   matter.

15

16   /s/Josette Jones                        04/29/09

17   JOSETTE JONES                                DATE

18   DIANA DOMAN TRANSCRIBING