| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **SOUTHERN DISTRICT OF NEW YORK** <br><br> In re: <br><br>     DEWEY & LEBOEUF LLP, <br><br>                             Debtor. | **NOT FOR PUBLICATION** <br><br> Case No. 12-12321 (MG) <br><br> Chapter 11 |

# MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEBTOR'S MOTION TO IMPLEMENT EMPLOYEE INCENTIVE AND RETENTION PLANS

*A P P E A R A N C E S:*

TOGUT, SEGAL & SEGAL LLP
*Counsel to the Debtor*
One Penn Plaza, Suite 3335
New York, New York 10119
By:    Albert Togut, Esq.
          Scott E. Ratner, Esq.
          James J. Lee, Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
33 Whitehall Street, 21st Floor
New York, New York 10004
By:    Brian S. Masumoto, Esq.
          Michael Driscoll, Esq.

BROWN RUDNICK LLP
*Counsel to the Official Committee of Unsecured Creditors*
7 Times Square
New York, New York 10036
By:    Howard S. Steel, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel to the Official Committee of Former Partners*
1633 Broadway
New York, New York 10019
By:    Adam L. Shiff, Esq.

KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
*Counsel to JPMorgan Chase Bank, N.A. as Collateral Agent*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Debtor's motion (the "Motion") for authorization to implement an employee incentive plan (the "Incentive Plan") and an employee retention plan (the "Retention Plan" and, together with the Incentive Plan, the "Plans"). (ECF Doc. # 172.) In support of the Motion, the Debtor submits the Declarations of Jonathan A. Mitchell. (ECF Doc. # 172, Ex. 2; ECF Doc. # 261, Ex. 1; ECF Doc. # 291.) Additionally, the Debtors have provided a list of the Employees eligible under the Plans with the salary of each Employee, as well as the maximum retention and incentive payment for which they would be eligible.

The United States Trustee (the "UST") objects to the Motion. (ECF Doc. # 248.) The UST argues that (i) it does not provide sufficient information to allow the Court to determine whether the payments under the Incentive Plan are more costly than the alternative of only retaining a collection agent; (ii) it is unclear whether the Plans are economically feasible, in light of the upcoming expiration of the cash collateral order; and (iii) the Incentive Plan is not justified under the facts and circumstances of this case.

In reply, the Debtor argues that in addition to being permissible under applicable law, the "need to stem further employee attrition is greater now than ever." (ECF Doc. # 261.) With certain exceptions identified below as to which approval is denied without prejudice, the Court concludes that both the Retention Plan and the Incentive Plan are justified under the circumstances and they are accordingly approved.

## I.   BACKGROUND

Prior to the commencement of this case, the Debtor operated as a prestigious, New York City-based law firm that traced its roots to the 2007 merger of Dewey Ballantine LLP—originally founded in 1909 as Root, Clark & Bird—and LeBoeuf, Lamb, Green & MacCrae

2

LLP—originally founded in 1929. In recent years, more than 1400 lawyers worked at the firm in numerous domestic and foreign offices. The Debtor's decline and collapse has remained front-page news in legal and general publications for many months; there is no need here to recount the firm's unfortunate recent history.

The firm is currently operating in chapter 11 in a "wind-down" mode. The ability of the Debtor to remain in chapter 11 and avoid conversion of its case to a case under chapter 7 is in doubt. On the Petition Date, the Debtor anticipated asking approximately ninety employees to remain on staff to assist in the wind down of its operations.[1] By the time the Debtor filed this Motion, it employed fifty-two individuals, exclusive of senior management (the "Employees"). (ECF Doc. # 172, Ex. 2, Mitchell Decl. ¶ 6.) But by the time the Motion was heard by the Court, that number had been further reduced to forty-eight. The Employees consist of six members of the Debtor's billing and collection staff (the "Collection Staff") and forty-two members of the operational staff that includes human resources, finance, and IT personnel (the "Operational Staff"). *See* Mot. ¶ 5; Second Suppl. Mitchell Decl. Ex. 1. The Plans that the Debtor seeks to implement are being proposed for the specific purpose of encouraging those employees that the Debtor has left to remain with the business to assist in the wind down process.

The Debtor's remaining employees are engaged in efforts such as the collection of receivables, coordinating the disposition of hundreds of thousands of boxes of former client files, working with former landlords to obtain property of the Debtor from its former premises, and evaluating potential causes of action in conjunction with the Debtor's counsel. The Plans are narrowly designed to retain and incentivize the remaining employees who are vital to these

---

[1] *See* Press Release, Dewey & LeBoeuf LLP, Dewey & LeBoeuf LLP Files for Chapter 11 Protection; Seeks Orderly Wind-Down of Business (May 28, 2012), http://www.deweyleboeuf.com/documents/DLPressRelease.pdf.

efforts to remain with the Debtor and diligently work, even though they know that the Debtor will employ them for, at most, a short time period.

### A. The Retention Plan

The Retention Plan applies to both the Debtor's Collection Staff and Operational Staff. The Retention Plan provides that: (i) sixteen Employees would be eligible for an extra two weeks' pay if they are employed by the Debtor through August 31, 2012; (ii) seven Employees would be eligible for an additional three weeks' pay if they are employed by the Debtor through September 30, 2012; and (iii) eighteen Employees would be eligible for an additional eight weeks' pay if they are employed by the Debtor through November 30, 2012. (*See* ECF Doc. # 291, Ex. 1.)

In addition to these amounts, the Debtor would have access under the Retention Plan to $100,000 of discretionary funds to pay Employees (the "Discretionary Funds"). That amount includes $10,000 reserved to pay any short-term billing and collection staff and $51,400 reserved to pay any employee who agrees to remain with the Debtor past their designated "stay date." *See* Mot. Ex. 3. Additionally, forfeited Retention Plan payments (i.e., additional payments not earned by eligible Employees due to their premature departure and/or inadequate job performance), not to exceed $51,400, may be redistributed to the Employees in the Debtor's sole discretion.[2]

### B. The Incentive Plan

The Incentive Plan as proposed would apply to three of Debtor's employees that it considers necessary (the "Key Employees") for maximizing the collection of accounts receivable (the "Receivables"). Two are the Debtor's director of billing and the Debtor's collections

---

[2] The Debtor proposes that use of the Discretionary Funds will be determined in consultation with the Debtor's lenders and Statutory Committees. (ECF Doc. # 292, July 25, 2012 Hr'g Tr. at 17:22-25.)

4

manager. The remaining Employee is a collections and billing analyst (the "Key Staff Employee").

Because the Debtor believes that the Key Employees are necessary to maximize the collection of Receivables, On-Site Associates, LLC ("On-Site")—the outside firm retained to assist in collecting receivables—will share with the Key Employees its earned fees from Receivables collection up to a maximum amount of $250,000 based on the following benchmarks:

| Category | Minimum Collection (millions) | Maximum Collection (millions) | Earning Rate | Maximum Pool |
|---|---|---|---|---|
| 1 | $0 | $25 | 0.00% | $0 |
| 2 | $25 | $50 | 0.33% | $82,500 |
| 3 | $50 | $75 | 0.33% | $82,500 |
| 4 | $75 | $125 | 0.34% | $82,500 |

Of the Key Employees, the director of billing and the collections manager are eligible for a maximum incentive payment of $110,000 each, and the Key Staff Employee is eligible for a maximum incentive payment of $30,000. If the Key Staff Employee leaves the Debtor before the requested stay date, the director of billing and the collections manager would be entitled to further payments in amounts to be determined by the Debtor.

### C.     The UST Objection

The UST Objection takes issue with the Motion on multiple levels. The UST asserts that (i) the Debtor's evidentiary showing is insufficient for the Court to determine that the Retention Plan is justified under section 503(c)(3); (ii) the Retention Plan is premature and does not disclose the actual cost of the employees apart from the extra payments that would be made to them; (iii) the Incentive Plan is not justified under section 503(c)(3) because it requires the Debtor to bear the cost of maintaining its Collections Employees, instead of On-Site; and (iv) the payment of the "Ordinary Course Bonuses should be prohibited because, as a chapter 11 debtor

5

in wind-down mode, it is no longer operating in the ordinary course.[3]

In part the UST Objection asserts that sufficient information about the Plans has not been disclosed. In light of supplemental disclosures made by the Debtor, the Court concludes (with the exceptions addressed below) that the Debtor has disclosed sufficient information about the Plans. The UST Objection in that regard is therefore overruled.

The UST argues that in light of the Debtor's uncertain situation if and when the existing Cash Collateral Budget expires at the end of this month, the Court should deny or defer a decision on this Motion. It is important to note that no creditor constituency in this case opposes the Motion; the sole objection comes from the UST. While cash collateral use (essential if the Debtor's case is going to avoid conversion to chapter 7) remains limited, at best, collection of outstanding receivables and disposition of client files remain critical components of the Debtor's wind down. Fundamentally, the issue here is whether the Debtor has exercised appropriate business judgment in deciding that this is the best way to proceed at this time. Therefore, the Court declines to defer decision on the Motion.

## II.    DISCUSSION

As an initial matter, the Court must determine whether each Employee is an "insider" within the meaning of section 101(31). Insider status is important because it may potentially bar an employee from participating in Plans (assuming the program is found to be primarily retentive). If the Court determines that an employee is an insider, then the Debtors must meet the strict requirements of section 503(c)(1). That section limits the ability of a debtor to make any transfer to or "for the benefit of, an insider of the debtor for the purpose of inducing such

---

[3] The UST objection that proposed bonuses are not "ordinary course" need not be resolved now as the Debtor has withdrawn the request to pay such bonuses at this time while it continues to discuss the matter with the UST. Debtor's Reply ¶ 23.

6

person to remain with the debtor's business . . . ." 11 U.S.C. § 503(c)(1).[4] Here, however, the Debtor argues—and the UST does not contest—that none of the Employees subject to either the Retention or Incentive Plans are insiders. *See* ECF Doc. # 292, July 25, 2012 Hr'g Tr. at 27:6-10.

Because no one argues that the payments under the Plans will be made to insiders, section 503(c)(3) of the Bankruptcy Code applies. It prohibits:

> other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3). "Section 503(c)(3) is a 'catch-all' provision but one that is a more limited restriction than would first appear." 4 COLLIER ON BANKRUPTCY ¶ 503.17[4]. Any transaction within the ordinary course is not prohibited by section 503(c)(3). A transaction outside of the ordinary course, but justified by the facts and circumstances of the case, is similarly permissible under section 503(c)(3). *See In re Borders Grp., Inc.*, 453 459, 473 (Bankr. S.D.N.Y. 2011).

The requirement that a transaction be "justified by the facts and circumstances of the case" is the same as the business judgment standard under section 363(b). *See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) ("*Dana II*") ("[S]ection 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in

---

4   Section 101(31)(B) defines "insider" in the context of a corporation. The term includes a

> (i) director of the debtor;
> (ii) officer of the debtor;
> (iii) person in control of the debtor;
> (iv) partnership in which the debtor is a general partner;
> (v) general partner of the debtor; or
> (vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

7

the nature of severance.") (citing *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *3 (Bankr. D. Del. 2006) (Walrath, J.) (concluding that sections 363 and 503(c)(3) articulated the same standard for approval of transactions outside of the ordinary course of business)).

In *Dana II*, Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?*
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576-77 (emphasis in original). *See also Global Home Prods.*, 369 B.R. at 786 (evaluating an incentive plan under the business judgment standard of section 363 by applying the factors listed above). The Declarations of Jonathan A. Mitchell assert that the success of these cases is dependent on the retention of the Debtor's remaining Employees. The uncontroverted evidence establishes that the collection of Receivables and the wind-down of the Debtor's business will be a much less achievable goal if the Debtor is unable to stem the tide of

8

employee departures. Accordingly, based on the *Dana II* factors, the Court has sufficient information to conclude that the Plans, in large part, are reasonably tailored to achieve their asserted goal of maintaining their remaining core group of Employees long enough to effectively wind down the Debtor's business and collect as much of the Receivables as possible within that period.

### A.     The Retention Plan is Justified by the Facts and Circumstances of the Case

To the extent applicable in the circumstances, almost all of the *Dana II* factors weigh in favor of approval of the Retention Plan. First, the evidence before the Court shows that the Retention Plan is calculated to achieve the desired performance. The rewards offered to the selected Employees are explicitly contingent upon them remaining with the Debtor for a fixed period of time. The stated goal of the Debtor being to stem the tide of Employee attrition, it is abundantly clear that these conditions are clearly tailored specifically to achieve this goal.

The evidence also shows that the cost of the Retention Plan is reasonable in light of the Debtor's assets, liabilities, and earning potential. More importantly, the cost of the Retention Plan is reasonable in light of the possible consequences the Debtor would face if it were unable to stop more Employees from leaving. Currently, Employees are engaged in a very wide range of tasks such as the collection of receivables, disposing of boxes of former client files, sorting through the Debtor's fixtures, furniture, and equipment located throughout the country and in various other countries throughout the world, mining financial data about the Debtor, complying with statutory reporting requirements, administering the Debtor's claims process, and identifying causes of action and claims that the estate may have against third parties. Accordingly, given the significant role that the Employees play in helping the Debtor to continue its wind down, the cost of the Retention Plan is reasonable and justifiable under the circumstances. Further, the scope of

9

the Retention Plan is fair and reasonable in nearly every respect. While the Motion initially failed to specify which Employees would be eligible for which bonuses at which dates, the Second Supplemental Mitchell Declaration has remedied this deficiency.

The one shortcoming with the proposed Plans arises from the request to use up to $100,000 as Discretionary Funds. Neither the Motion nor the evidence submitted in its support provides sufficient guidelines for the Debtor's proposed use of the Discretionary Funds. Without better-articulated qualitative or quantitative criteria for allocating Discretionary Funds, there is insufficient information for the Court to conclude that this aspect of the Plan does not discriminate unfairly. Therefore, the Debtor's request to use the Discretionary Funds is denied without prejudice.

The Mitchell Declarations set forth in sufficient detail the efforts that led to the structuring of the Retention Plans. *See* Mitchell Decl. ¶¶ 8-10; Suppl. Mitchell Decl. ¶¶ 6 & 9-10. The Debtor received independent advice in formulating and carefully considered the Plans before proposing them.

### B.    The Incentive Plan is Justified by the Facts and Circumstances of the Case

While the Retention Plan presents issues about the potential for unfair discrimination, the Incentive Plan, as proposed, is consistent with section 503(c)(3) of the Bankruptcy Code. Each of the *Dana II* factors, to the extent applicable, weighs in favor of approval of the Incentive Plan. The costs of the Incentive Plan are justified because they are essentially coming out of what might otherwise be On-Site's commissions.

First, the evidence establishes that the Incentive Plan is calculated precisely to achieve the desired performance. The payments to be made under the Incentive Plan will go entirely to the Debtor's director of billing and the collections manager, and the one remaining collections

and billing analyst. Further, the payments to be made to them are *directly* tied to the amount of Receivables that they actually collect. Under different circumstances, this Court recently found a similar plan to be permissible because it properly incentivized the debtors' employees. *See, e.g., In re Velo Holdings, Inc.*, 472 B.R. 201 (Bankr. S.D.N.Y. 2012) (concluding that the plan that utilized incentive-based cash awards was primarily incentivizing). In *Velo*, this Court approved a KEIP that proposed to compensate individuals who were insiders of the debtors, finding that the plan proposed was not retentive in nature. While the Key Employees eligible under the Incentive Plan in this case are not insiders, this Court in *Velo* stated that a plan encouraging individuals "to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements and financial targets" was narrowly calculated to achieve a stated goal. Here, the Incentive Plan's structure achieves a similar purpose by linking the bonuses that can be earned to the ability of the Debtor to successfully collect Receivables.

Second, the cost is plainly reasonable in the context of the Debtor's assets, liabilities, and earning potential. One of the Debtor's principal assets in this case is its Receivables, and this case hinges upon the Debtor's ability to maximize collection of its Receivables. Further, the Debtor has already retained an outside collections firm, On-Site Associates, to assist its Employees subject to this Plan in the collection of its Receivables. (*See* ECF Doc. # 230.) The money the Debtor proposes to pay to its Employees under the Incentive Plan will come directly from the commissions that would otherwise be paid to On-Site. July 25, 2012 Hr'g Tr. at 22:19-24.

The UST in its Objection takes issue with the Incentive Plan for this reason. Specifically, the UST insists that, in order for the Court to make a determination as to the reasonableness of the Incentive Plan, the Court must know "whether the actual cost (including bonuses) of

11

retaining the Employees together with On-Site's fee is less than the cost of retaining a collection agent who would provide all collection personnel without any reliance on any of the Debtor's Employees." UST Obj. at 13.

Ultimately, the UST appears to object to the decisions made by the Debtor, rather than the process the Debtor utilized in coming to its decision.[5] The UST may not substitute its business judgment for that of the Debtor's. Based on the evidence before the Court, it was reasonable for the Debtor to conclude that it would be in a better position to maximize its collections by retaining a core group of Employees with greater knowledge of the Debtor's clients and Receivables, as well as retaining On-Site to provide assistance to that core group. Whether the actual cost of this path is indeed greater than simply relying on On-Site is not dispositive to the matter at hand. Indeed, it may have cost less (or more) to rely solely on On-Site to perform this task, but the Debtor is the entity in the best position to make that determination and it has properly done so. Accordingly, the UST Objection as to this point is overruled.

Additionally, the scope of the Incentive Plan is fair and reasonable, and it does not discriminate unfairly. The Motion makes clear that the two most senior employees eligible under the Incentive Plan are eligible for the largest share of the pool available under the Incentive Plan, with the one more junior employee eligible for the rest. The evidence provided

---

[5] At the hearing the UST questioned the necessity of the Employees the Debtor is seeking to retain:

> MR. MASUMOTO: . . . But amongst the fort-eight people, they have a director of secretarial and support service and director of managing attorneys and people that—a director of procurement, positions that raise questions as to whether or not these are quite necessary at this point given their particular job categories as well as the compensation that these people are receiving. . . .

See July 25, 2012 Hr'g Tr. at 27:21-28:2.

to the Court provides sufficient information for the Court to conclude that the Incentive Plan does not discriminate unfairly.

The Mitchell Declarations also show that the Debtors performed sufficient diligence in constructing the Incentive Plan. *See* Suppl. Mitchell Decl. ¶¶ 7-10. Jonathan A. Mitchell, the Debtor's Chief Restructuring Officer, worked to specifically tailor the Incentive Plan to maximize an "efficient arrangement currently in place whereby the Key Employees assist On-Site with converting [Work in Progress] into accounts receivable, as well as collection of such receivables." *Id.* ¶ 7. The Incentive Plan is tailored to those Employees who actually work on converting WIP into accounts receivable and then collecting the receivables. Accordingly, the Court concludes that the Debtor provided sufficient information for the Court to conclude that the fifth *Dana II* factor is satisfied.

Finally, it is uncontroverted that the Debtor received independent advice in formulating the Incentive Plan. The Debtor's counsel and Mr. Mitchell, the Debtor's CRO, were chiefly responsible for formulating this Plan, and no insiders of the Debtor will be compensated under the Plan.

### III. CONCLUSION

For the foregoing reasons, the Debtor's Incentive Plan is approved; and the Debtor's Retention Plan is approved, except for that part of the Retention Plan that requests authority to use the Discretionary Funds as to which the Motion is denied without prejudice.

**IT IS SO ORDERED.**

Dated:   July 30, 2012
         New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge