**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FOR PUBLICATION

In re:

      DEWEY & LEBOEUF LLP,

                    Debtor.

Case No. 12-12321 (MG)

Chapter 11

**MEMORANDUM OPINION AND ORDER GRANTING DEBTOR'S MOTION FOR AN ORDER APPROVING PARTNER CONTRIBUTION SETTLEMENT AGREEMENTS AND MUTUAL RELEASES FOR PARTICIPATING PARTNERS AND DENYING AD HOC COMMITTEE OF RETIRED PARTNERS OF LEBOEUF, LAMB, LEIBY & MACRAE'S MOTION TO APPOINT AN EXAMINER**

*A P P E A R A N C E S :*

TOGUT, SEGAL & SEGAL LLP
*Counsel to the Debtor*
One Penn Plaza, Suite 3335
New York, New York 10119
By:    Albert Togut, Esq.
        Scott E. Ratner, Esq.
        Steven S. Flores, Esq.

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
*Counsel to the Official Committee of Former Partners*
1633 Broadway
New York, New York 10019
By:    David M. Friedman, Esq.
        Adam L. Shiff, Esq.
        Jeffrey R. Gleit, Esq.

DORSEY & WHITNEY LLP
*Counsel to Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & MacRae*
51 West52nd Street
New York, New York 10019
By:    Eric Lopez Schnabel, Esq.
        Annette Jarvis, Esq.

KRAMER, LEVIN, NAFTALIS &
FRANKEL, LLP
*Counsel to JPMorgan Chase Bank, N.A. as Collateral Agent*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
        Robert T. Schmidt, Esq.
        Daniel M. Eggermann, Esq.
        Matthew C. Ziegler, Esq.

BROWN RUDNICK LLP
*Counsel to the Official Committee of Unsecured Creditors*
7 Times Square
New York, New York 10036
By:    Edward Weisfelner, Esq.
        Howard S. Steel, Esq.

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP
*Attorneys for 1301 Properties Owner LP*
101 Park Avenue
New York, New York 10178
By:    Gabriel Hertzberg, Esq.

SULLIVAN & WORCESTER LLP
*Attorneys for UniCredit Bank AG*
One Post Office Square
Boston, MA 02109
By:    Pamela Smith Holleman, Esq.
        Franklin B. Velie, Esq.
        Jonathan G. Kortmansky, Esq.

KLEE, TUCHIN, BOGDANOFF & STERN
LLP
*Attorneys for Group of Thirty-Seven Former
Partners*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
By:    David M. Stern, Esq.
        Lee R. Bogdanoff, Esq.
        Thomas E. Patterson, Esq.
        Martin R. Barash, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for Kenneth A. Freeling*
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
By:    Michael S. Etkin, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for Steven H. Davis, Stephen
DiCarmine, and Joel Sanders*
One Battery Park Plaza
New York, New York 10004
By:    Ned H. Bassen, Esq.
        Kathryn A. Coleman, Esq.

BLANK ROME LLP
*Co-Counsel to Informal Group of Certain
Former Partners of Dewey & LeBoeuf LLP*
405 Lexington Avenue
New York, New York 10174
By:    Andrew B. Eckstein, Esq.

FLEMMING ZULACK WILLIAMSON &
ZAUDERER LLP
*Co-Counsel to Informal Group of Certain
Former Partners of Dewey & LeBoeuf LLP*
One Liberty Plaza
New York, New York 10006
By:    Mark C. Zauderer, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

     There are two pending interrelated motions that the Court will consider together. The

first is the Debtor's motion for approval of partner contribution settlement agreements and

mutual releases ("PCP Plans" or "PCPs") for participating partners. ("9019 Motion," ECF Doc.

# 399.) Four statements in support of the 9019 Motion were filed by JPMorgan Chase Bank,

N.A., as the Administrative Agent for the secured lenders ("Secured Lenders"), the Official

Committee of Unsecured Creditors ("Unsecured Creditors Committee"), the Informal Group of

Certain Former Partners ("IGCFP"), and the Informal Group of Thirty-Seven Former Partners ("IGTSFP"). (ECF Doc. ## 468, 441, 443 and 469, respectively.) Two objections to the 9019 Motion were filed by the Ad Hoc Committee of Retired Partners of LeBoeuf, Lamb, Leiby & Macrae ("Ad Hoc Committee") and the Official Committee of Former Partners ("FPC"). (ECF Doc. ## 439 and 464, respectively.) Six limited objections to the 9019 Motion were filed by UniCredit Bank AG ("UniCredit"), Kenneth A. Freeling (Freeling), 1301 Properties Owner LP ("1301 Properties"), Steven H. Davis ("Davis"), Stephen DiCarmine ("DiCarmine"), and Joel Sanders ("Sanders"). (ECF Doc. ## 436, 440, 463 and 516, 450, 451 and 452, respectively.) In response to the 9019 objections, Debtor filed an omnibus reply to support its motion. ("9019 Reply," ECF Doc. # 482.)

The second motion is the Ad Hoc Committee's motion for the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code. ("Examiner Motion," ECF Doc. # 329.) The FPC filed a statement in support of the Examiner Motion. (ECF Doc. # 348.) The Debtor, Secured Lenders, and Unsecured Creditors Committee each filed objections. (ECF Doc. ## 393, 403 and 392, respectively.)

In support of the 9019 Motion, the Debtor filed four declarations by Jonathan A. Mitchell ("Mitchell," "Chief Restructuring Officer Mitchell," or "CRO Mitchell"), David Pauker of Goldin Associates LLC ("Pauker," "Goldin," or "Financial Analyst"), Paul Gendler ("Gendler"), and Scott E. Ratner. (ECF Doc. ## 400 and 483, 401, 442, 402 and 484, respectively.) In opposition to the Examiner Motion, the Debtor filed five declarations by Stephen J. Horvath ("Horvath"), Janis M. Meyer ("Meyer"), Mitchell, Pauker, and Gendler. (ECF Doc. ## 394, 395, 397, 398 and 442, respectively.) In opposition to the 9019 Motion and in support of the Examiner Motion, the FPC submitted three exhibits (FPC-1 through FPC-3), and the Ad Hoc

3

Committee submitted thirty-six exhibits (AHC-1 through AHC-36), and a separate list of 18

admissions.  Both motions present contested matters; therefore, the Court held an evidentiary

hearing on September 20-21, 2012.  Gendler, Mitchell and Pauker testified during the hearing.

All parties agreed that the issues raised by the two motions substantially overlap so a single

evidentiary record was created for both motions.[1]

## I.    BACKGROUND

Before the commencement of this case on May 28, 2012 ("Petition Date"), the Debtor

operated as a prestigious, New York City-based, law firm that traced its roots to the 2007 merger

of Dewey Ballantine LLP—originally founded in 1909 as Root, Clark & Bird—and LeBoeuf,

Lamb, Green & MacCrae LLP—originally founded in 1929.  In recent years, more than 1,400

lawyers worked at the firm in numerous domestic and foreign offices.  The Debtor's public

decline and collapse was front-page news in legal and general publications for many months.

The firm is currently operating in a chapter 11 "wind-down" mode, essentially seeking to

recover as much as possible of its outstanding and substantial accounts receivable, as well as

seeking the return of a substantial amount of money either paid to or otherwise due from former

partners.  Throughout this case, the ability of the Debtor to remain in chapter 11 and avoid a

chapter 7 conversion has been critically in question.  As of the Petition Date, the Debtor has been

managed by Chief Restructuring Officer Mitchell and Wind-Down Committee members Horvath

and Meyer.  Mitchell 9019 Decl. ¶ 7.  In an effort to return value to the estate, Mitchell and the

Wind-Down Committee—in consultation with Debtor's counsel Togut, Segal & Segal ("Togut")

and Debtor's financial analyst Pauker—devised the Partnership Contribution Plans ("PCPs").  *Id*.

¶ 9.  From the outset of the case, the Debtor contemplated the PCPs.  The Debtor believed them

---

[1]    This Opinion contains the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52,
made applicable to this matter by FED. R. BANKR. P. 7052.

to be pivotal to the Debtor's success under chapter 11 because the PCPs would obviate the need for years of litigation and curb exorbitant administration expenses—as has historically been the case in law firm bankruptcies.  9019 Mot. ¶ 2.

### A.    The Partner Contribution Plans

The PCPs are a series of settlements with Debtor's former partners to maximize return of capital while minimizing future litigation costs. Generally, the partners who participate in the settlement ("Participating Partners") contribute an amount ("Partner Contribution Amount"), calculated on a sliding scale based on Participating Partners' liability exposure, in exchange for a general release from claims brought by the estate.  To develop the PCP proposals, the Debtor investigated, reviewed and analyzed potential claims that could be asserted against former partners.  Former partners' potential liability arose from receipt of an over-distribution of funds, fraudulent conveyance, preference payments, tax advance reimbursements, unpaid capital contributions, tort claims arising from potential mismanagement, and unfinished business or "Jewel" doctrine claims.  September 21, 2012 Hr'g. Tr. at 66:12-19; Pauker Examiner Decl. ¶ 13.

Partner Contribution Amounts were reached via the uniform application of a progressive payment table.  Pauker 9019 Decl. ¶ 14.  Partners with higher earnings were required to contribute a greater percentage.  *Id.*  Partners who received payments in excess of their draws during 2012 were subject to an additional 20% payment premium, and members of the firm's executive committee were subject to a payment premium of up to 20% based on their length of committee service—with a maximum payment per partner set at $3.5 million.  *Id.* ¶ 14 at 6 n.5. However, Participating Partners were eligible to receive a credit of up to 5% of their Partner

Contribution Amounts if they helped to collect outstanding account receivables or if the aggregate Partner Contribution Amount exceeded $70 million. *Id.*

In exchange for payment of settlement amount, each Participating Partner receives a broad release of any right or interest of the Debtor or its estate. 9019 Mot. ¶ 15. However, the PCPs do not resolve unfinished business claims or "Jewel" claims against some of Debtor's largest earners. Pauker 9019 Decl. ¶ 15. The Debtor is also obligated to obtain an injunction for the benefit of Participating Partners covering claims and derivative claims that could be asserted by the Debtor. 9019 Mot. ¶ 15. Participating Partners agree to release claims against other Participating Partners that are related to the Debtor, the predecessor entities, or a related entity. *Id.* Lastly, Participating Partners covenant that they will not file any claims, aside from proofs of claim, against the Debtor, and agree to assign to the Debtor any direct claims against non-settling partners.[2] *Id.*

The Debtor's professionals reviewed the Debtor's financial records from 2011 to the Petition Date. Pauker 9019 Decl. ¶¶ 12, 31. Debtor determined that approximately $400 million was paid to partners during that period that could be subject to various estate causes of action. *See id.* ¶¶ 16, 18, 31. The Debtor's professionals also performed a preliminary insolvency analysis, analyzed the probability of success of potential partner claims and defenses, and analyzed how best to preserve the value of the director and officer insurance policy for the estate. *See* September 21, 2012 Hr'g. Tr. 80:19-96:22. The Debtor concluded that the probability of recovery of the entire amount was unlikely because the date of the firm's insolvency was unclear, the partners would assert various defenses, and there was a practical likelihood that some partners no longer had the financial ability to return the funds. *Id.* at 33:7-33:24.

---

[2]     In a few special instances, the PCPs were modified or amended to account for unique considerations. *See* Mitchell 9019 Decl. ¶ 26 (describing modifications).

Due to limited resources, the Debtor's professionals chose a "top-down" approach in designing PCPs. *Id.* at 60:16-63:5. The Debtor selected an aggregate Partner Contribution Amount that fit within its projected range of reasonableness, and then sought to allocate that amount among the partners. *Id.* A "bottom-up" approach is one where each partner is investigated individually, which would have required an expensive yearlong review to reach the final contribution amount.[3] *Id.*

After nearly four weeks of discussions with advisors for the various groups impacted by the PCPs, the Debtor made the first version of the PCPs available to partners on August 1, 2012, with an acceptance deadline of August 7, 2012. *See* Mitchell 9019 Decl. ¶ 17. To facilitate broad partner participation in the settlement process and to incorporate comments from parties in interest, the forms of agreement were later revised and circulated for review multiple times. *See id*. The Debtor also extended the acceptance deadline for the PCPs, ultimately to August 16, 2012.

At the outset of negotiations the Debtor sought an aggregate Partner Contribution Amount of approximately $89 million, consisting of: PCPs totaling approximately $74.5 million; tax advance reimbursement amounts of $9.8 million; and unpaid capital contribution amounts of $4.8 million. *See* Pauker 9019 Decl. ¶ 12. Ultimately, 400 of roughly 670 partners agreed to participate and have committed approximately $71 million in aggregate settlement payments,

---

[3]     The yearlong investigation estimate was premised on Goldin Associates' role as examiner (led by David Pauker, who developed the PCPs here) in the bottom-up analysis of the Coudert Brothers LLP bankruptcy where there was adequate financing available for such an investigation. In *Coudert*, Goldin received $1,538,405.70 in fees as examiner to construct a PCP and investigate the debtor's date of insolvency. *See Order Granting Applications Pursuant to Bankruptcy Code Section 330(a) for Final Allowance of Compensation and Reimbursement of Expenses, In re Coudert Brothers LLP*, Case No. 06-12226 (Bankr. S.D.N.Y. Dec. 2, 2008) (ECF No. 1113).

constituting approximately 80% of the aggregate of all Partner Contribution Amounts sought from former partners under the PCPs.[4]  *Id.* ¶ 13.

The PCPs explicitly exclude three of the Debtor's former partners or senior managers—Davis, DiCarmine, and Sanders—because it is alleged that they had a more integral role in the Debtor's downfall.  Mitchell Decl. ¶ 14; September 21, 2012 Hr'g. Tr. at 30:3-31:2.  The PCPs preserve the Debtor's claims against Davis, DiCarmine and Sanders, and the Participating Partners are assigning to the Debtor any direct claims that they may have against Davis, DiCarmine and Sanders.  The Debtor intends to pursue claims against the three individuals; insurance may be available to satisfy at least some of any recovery against the three.

### B.    The Examiner Motion

From early on in this case, it has been clear that the Ad Hoc Committee intended to do whatever it could to scuttle any proposed PCP.  The Examiner Motion has been the main tactical choice of the Ad Hoc Committee to try to derail the PCPs.  The Ad Hoc Committee argues, pursuant to section 1104(c)(2), that the appointment of an examiner is mandatory to evaluate the merits of the PCPs, and, of course, that no approval can be given to the PCPs until the examiner completes an investigation and report.  The FPC, with support from the Ad Hoc Committee, argues, pursuant to section 1104(c)(1), that the appointment of an examiner to review the PCPs is in the best interest of all parties.

In opposition, the Debtor, the Secured Lenders, and the Unsecured Creditors Committee argue that an examiner is not mandatory, that an examiner is not in the best interest of all parties, and that the Examiner Motion was improperly timed to disrupt the approval of the 9019 Motion.

---

[4]    The Debtor filed a schedule of Participating Partners and Partner Contributions Amounts as of September 20, 2012.  (ECF Doc. # 497.)

The Ad Hoc Committee argues that the appointment of an examiner is mandatory under section 1104(c)(2) because the Debtor's fixed, liquidated, unsecured debts exceed $5 million. Alternatively, the Ad Hoc Committee argues that an examiner should, in any event, be appointed pursuant to section 1104(c)(1) because the appointment is in the best interests of creditors. While the FPC also believes that the Debtor's fixed, liquidated, unsecured debts *probably* exceed $5 million, it conceded that it is unsure whether it could carry its burden of proof on this issue. *See* September 21, 2012 Hr'g. Tr. at 163:19-165:11.  The FPC likewise argued for appointment of an examiner as in the best interest of creditors.  The Debtor and the Secured Lenders argue that the Debtor's unsecured debts— other than debts for goods, services or taxes—do not exceed $5 million because the unsecured debts are either contingent or unliquidated.  Debtor's Opposition to Examiner Mot. ¶ 43; Secured Lender's Obj. to Examiner Mot. ¶ 44.

Because the appointment of an examiner to investigate the proposed PCPs would, indeed, derail approval of the PCPs at this time, the Court will address the Examiner Motion first.  As explained below, the Court concludes that the appointment of an examiner is neither mandatory nor in the best interest of creditors or of the estate.  Therefore, the Examiner Motion is denied.

### C.       The 9019 Motion

After extensive investigation by the Debtor's professionals and tough negotiations with the Participating Partners, the Secured Lenders, and the Unsecured Creditors Committee, the Court is satisfied that the PCPs are well above the lowest point in the range of reasonableness, are fair, equitable, and in the best interests of creditors and the estate.  Debtor argues that the PCPs should be approved because they are the most efficient, desirable, intelligent way to resolve unpredictable claims against partners; if left unresolved, the issues would prolong uncertain litigation and increase professional expenses exponentially, as has historically occurred

9

in large law firm bankruptcies.  9019 Mot. at 2.  The Secured Lenders and the Unsecured

Creditors Committee also agree that the fully negotiated PCPs are in their best interest and in the

best interest of the estate.[5]  Statement of Secured Lenders ¶ 1; Statement of Unsecured Creditors

Comm. ¶ 1.  Both the IGCFP and the IGTSFP, groups consisting of former partners,

begrudgingly support the PCP because otherwise "it would leave them with lingering years of

uncertainty, fear and potential litigation and exposure."  Statement of IGCFP ¶¶ 4-5; Statement

of IGTSFP at 2.

In opposition, the FPC and the Ad Hoc Committee argue that the PCPs were negotiated

among insiders, the potential claims and circumstances on which the PCPs are premised were not

sufficiently investigated, and the PCPs are not in the best interest of creditors.  FPC Obj. to 9019

Mot. ("FCP 9019 Obj.") at 2-3; Ad Hoc Comm. Obj. to 9019 Mot. ("Ad Hoc 9019 Obj.") at 1-2.

While the opponents do not seem opposed to some version of a PCP, they believe that these

PCPs were unnecessarily rushed.  Ad Hoc 9019 Obj. at 22.

UniCredit, Freeling, and 1301 Properties all filed limited objections expressing concerns

whether the PCPs will interfere with third parties' and non-settling partners' rights to assert

claims against either settling partners or the estate.  The Court is satisfied that those limited

objections have been resolved because the Debtor has acknowledged on the record that the PCPs

do not release direct claims held by third parties or by any non-settling partner against

Participating Partners or the Debtor's insurance policies.  *See* September 21, 2012 Hr'g. Tr. at

122:23-123:13; 205:2-206:14; 211:16-212:7.  Similarly, the Court is satisfied that the Debtor

adequately addressed the limited objections filed by Davis, DiCarmine and Sanders, as their

rights are preserved with respect to the allocation of proportionate fault.  *See id.* at 206:16-

---

[5]     The Unsecured Creditors Committee objected to releases for Horvath and Meyer, but their objection is now
moot because approval of the PCPs with respect to Horvath and Meyer has been adjourned.  *See* 9019 Reply at 1
n.2.

210:18.  Therefore, as explained below, the 9019 Motion is granted any remaining objections are overruled.

## II.    DISCUSSION

### A.    The Moving Parties Have Failed to Carry Their Burden to Show that an Examiner Must Be Appointed Under Section 1104(c)(2)

Section 1104(c) of the Bankruptcy Code provides:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
> (1)    such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2)    the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c).

Section 1104(c)(2) only applies upon a request by a party in interest if three elements are satisfied: (1) a chapter 11 trustee has not been appointed; (2) a plan has not been confirmed; and (3) the debtor owes in excess of $5 million in fixed, liquidated, unsecured debts, excluding debts for goods, services, taxes, or transactions with insiders.  *Id.*  Only the third element is contested.

The moving party has the burden to prove that an examiner should be appointed.[6]   In this case, to the extent the moving parties rely on section 1104(c)(2), they must establish fixed, liquidated, unsecured debts of the type specified in order to meet their burden on this element of

---

[6]        The FPC and Ad Hoc Committee both concede that they have the burden of proof with regards to proving that the $5 million threshold is met.  September 21, 2012 Hr'g. Tr. at 163:19-164:8; 194:1-10.

the motion.  In many large cases, there is no dispute that the condition is satisfied; a review of

the debtor's schedules would be enough to satisfy the requirement.  That is not true here.  The

Debtor's schedules show it has substantial debts, but it is mostly secured debt, or unsecured trade

debts for goods or services.  During the evidentiary hearing, the FPC attempted to develop

evidence to show that the debt due to Winthrop Inc. was of the type and amount to satisfy the

section 1104(c)(2) requirements, but that effort failed.  Moreover, the Ad Hoc Committee rested

its case without offering any evidence on this issue.  *See* September 21, 2012 Hr'g. Tr. at 196:2-

22; 203:8-10.  During closing argument, the Ad Hoc Committee argued that proofs of claim filed

in this case by the Pension Benefit Guaranty Corporation ("PBGC") satisfy the requirements.

But argument is not evidence, and when pressed by the Court to show evidence in the record to

support its argument, counsel for the Ad Hoc Committee failed to do so.  September 21, 2012

Hr'g. Tr. at 191:24-196:21.  The Court will nevertheless review the arguments with respect to

both the Winthrop and PBGC claims, although neither set of claims satisfies the requirements of

section 1104(c)(2).

The $5 million requirement is typically satisfied "where there is outstanding unsecured

bank debt or outstanding publicly issued debentures in an aggregate sum in excess of

$5,000,000."  7 COLLIER ON BANKRUPTCY ¶ 1104.03[2] (Alan N. Resnick & Henry J. Sommer,

eds., 16th rev. ed. 2012).  While there is little case law on what constitutes a fixed and liquidated

debt for purposes of section 1104(c)(2), Black's Law Dictionary defines "fixed debt" as

"[g]enerally, a permanent form of a debt commonly evidenced by a bond or debenture; long-term

debt."  BLACK'S LAW DICTIONARY 463 (9th ed. 2009).  Conversely, it defines a contingent debt

as "[a] debt that is not presently fixed but that may become fixed in the future with the

occurrence of some event."  *Id*. at 462.  Lastly, it defines a liquidated debt as "[a] debt whose

amount has been determined by agreement of the parties or by operation of law." *Id*. at 463.  In other bankruptcy contexts, a contingent debt has been defined as "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger . . . liability"; and a debt is liquidated "where the claim is determinable by reference to an agreement or by a simple computation." *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303-05 (2d Cir. 1997) (internal quotations omitted).

    *1. Winthrop Claims*

While Debtor's top twenty unsecured creditors filed proofs of claim in excess of $90 million, movants only offer two possible sources of claims that would elevate the Debtor's fixed, liquidated, unsecured debts over the $5 million threshold.  The first creditor, Winthrop Resources Corporation ("Winthrop"), filed six proofs of claim asserting unsecured debts of $43,390,136.94 in the aggregate.  Gendler Decl. ¶ 6.  Winthrop's claims arise from purchase-leaseback agreements for equipment where Winthrop served as the lessor to the Debtor.  *See* September 20, 2012 Hr'g. Tr. at 39:3-40:15.

Winthrop's claims fail to satisfy section 1104(c)(2) for two reasons.  First, Winthrop's claims are not fixed, liquidated, unsecured claims—Winthrop has a security interest in the equipment, which it seeks to repossess and to re-let or sell, so the value of any unsecured claim is a deficiency claim in an uncertain amount subject to future events.  *Id*. at 78:9-16.  Second, the Winthrop claims arise from equipment leases; while these leases are clearly a method of financing equipment acquisitions, by their terms the leases require Winthrop to supply Dewey with "goods," which would exclude such debt from section 1104(c)(2).  Neither the parties nor the Court have found any legal authority determining whether equipment lease debt satisfies section 1104(c)(2).  September 21, 2012 Hr'g. Tr. at 192:12-19, 164:5-165:8.  But the plain

language of section 1104(c)(2) excludes "debt for goods" from consideration in calculating satisfaction of the $5 million threshold. Equipment lease financing is debt for goods. Therefore, for the two reasons discussed above, the Court concludes that the Winthrop claims cannot be considered under section 1104(c)(2).

2. *Even If the Ad Hoc Committee Had Offered Them In Evidence, The PBGC Claims Do Not Fall Within Section 1104(c)(2)*

The Ad Hoc Committee argued, but did not offer evidence to establish, that the PBGC claims—roughly $129.6 million in the aggregate—based on unfunded pension benefit liabilities under section 1362(a) and (b) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1362(a) and (b), satisfy the requirements of section 1104(c)(2). PBGC filed a total of twelve proofs of claim. Nine claims identify the amount of the claims as "unliquidated" (Claim Nos. 630, 631, 632, 633, 634, 638, 717, 718, 719), and three claims include specific dollar amounts on the front page of the claim (each in excess of $5 million), but the attachments to each of these proofs of claim state that the amount is "the estimated amount of the Plan's unfunded benefit liability . . . ." PBGC Proof of Claim Nos. 635, 636, 637; *see Statement of the Pension Benefit Guaranty Corporation in Support of its Claim for Unfunded Benefit Liabilities*, ¶ 8. While not offering any of these proofs of claim in evidence, or even pointing to the claim numbers, the Ad Hoc Committee argued that PBGC's claims are fixed and liquidated. Counsel for PBGC was present at the hearing and said that although PBGC took no position on the Examiner Motion, the PBGC claims are fixed in an amount that could be calculated pursuant to a statutory equation. *See* September 21, 2012 Hr'g. Tr. at 214:20-215:22. However, in a subsequent letter to the Court, PBGC withdrew its position that its claims satisfy section 1104(c)(2) because, as of now, PBGC cannot determine which portion of its claims are excludable as tax claims. (ECF Doc. # 508.) After PBGC's subsequent shift in position, the Ad

14

Hoc Committee conceded that a currently undeterminable portion of the PBGC claims are tax

claims, although it still believes that the claims satisfy section 1104(c)(2) because it is

"completely improbable" that PBGC's non-tax claims fail to exceed $5 million.  (ECF Doc. #

517.)

The Debtor argues that the PBGC claims are not liquidated because the proofs of claim

state that the amounts are only "estimated."  (ECF Doc. # 509.)  The Debtor argues that the

computation of its unfunded benefit liabilities requires a complex calculation that necessitates

actuarial experts qualified to apply mortality tables, discount rates, and valuations techniques to

an uncertain set of facts.  *See id* at 3.  In a footnote, the Debtor also disputes the extent that any

PBGC claims are for taxes and that PBGC should therefore receive a priority tax status upon

distribution.  *Id.* at 3 n.1.

While a determination whether PBGC's claims are fixed is complex due to the questions

of the entitlement the claims should receive under ERISA, the Court need not make such a

determination because the PBGC claims are not liquidated.  As stated above, a liquidated claim

is one where the amount is determinable; for example, there is no question about the amount of a

proof of claim seeking payment for an unsecured bank loan or an outstanding debenture, at least

with respect to the amount of the principal that is due.  The same cannot be said for a claim that

requires resolution of disputed issues about the amount of an unfunded pension liability, an

unknown portion of which may be a tax liability entitled to a priority.  Thus, the Court concludes

that the dollar amount of the PBGC claims should be excluded from consideration of the

Examiner Motion under section 1104(c)(2) because, in the first instance, the Ad Hoc Committee

did not offer evidence of these claims during the evidentiary hearing, and, second, the PBGC

claims filed in this case appear, at best, to be estimated, and not fixed, liquidated debts exceeding

$5 million, excluding liability for taxes.

The Ad Hoc Committee and the FPC have failed to meet their burden to prove that the

Debtor has fixed, liquidated, unsecured debts in excess of $5 million, other than debts for goods,

services or taxes.  Therefore, the moving parties have not shown that section 1104(c)(2) requires

appointment of an examiner.[7]

### 3.  In Any Event, Appointment of an Examiner Under Section 1104(c)(2) Is Not Mandatory In All Cases

Assuming *arguendo* that the Debtor had fixed, liquidated, unsecured debts in excess of

$5 million, this Court has already concluded and adheres to the view that it retains the discretion

to deny a motion for appointment of an examiner.  *See In re Residential Capital, LLC,* 474 B.R.

112, 121 (Bankr. S.D.N.Y 2012) (stating that "[w]hile section 1104(c) expresses a Congressional

preference for appointment of an independent examiner to conduct a necessary investigation, the

facts and circumstances of the case may permit a bankruptcy court to deny the request for

appointment of an examiner even in cases with more than $5 million in fixed debts").  Moreover,

"[t]he appointment of an examiner would be inappropriate if the motion was filed for an

improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to

conclude that an investigation needs to be conducted, or if an appropriate and thorough

investigation has already been conducted (or is nearly complete) by a creditors committee or a

governmental agency."  *Id.*  Having analyzed those issues recently in its *Residential Capital*

opinion, the Court will not repeat that analysis here.  Based on the facts and circumstances

---

[7]    After the hearing was closed and all parties rested—aside from the issue of the PBGC claims for which the Court requested a supplemental submission by the PBGC—the Ad Hoc Committee submitted a letter on October 1, 2012, raising a third group of claims on behalf of LeBoeuf Retirees that, the Ad Hoc Committee now asserts, could potentially meet the section 1104(c)(2) threshold.  (ECF Doc. # 517.)  The Court will not consider this timely and it is therefore an unauthorized submission.  All parties rested in offering evidence on both motions at the hearing on September 21, 2012.  *See* September 21, 2012 Hr'g. Tr. 105:19-107:13.  The Court will not reopen the record to consider the Ad Hoc Committee's late submission.

present in this case, the Court concludes that the Examiner Motion should be denied even if the debt threshold in section 1104(c)(2) is satisfied.

The Court concludes that the Examiner Motion was filed for an improper purpose as a litigation tactic to try to derail approval of the PCPs. The applicable facts and law that lead the Court to approve the PCPs, as explained below, establish that the Debtor and its professionals conducted an appropriate inquiry and analysis of the facts and circumstances of this case to support moving forward now with the PCPs. The concerns of the Ad Hoc Committee and the FPC about mismanagement or wrongdoing that may have led to the demise of this storied law firm were sufficiently taken into account by the Debtor and its professionals in setting the course for this case. The Debtor has preserved its own claims (and the claims of the Participating Partners) against the three principal managers of the firm and has indicated its intention to pursue the claims.[8] As explained below, the motion to approve the PCPs meets the Rule 9019 standards for approval of settlements; the motion is supported by a majority of the former partners of Dewey, as well as by the Secured Lenders and the Unsecured Creditors Committee; an appropriate and sufficient investigation has already been conducted supporting approval of the settlement; the expense of an examiner and the delay required to complete the examiner investigation and report, particularly in light of the precarious financial situation present in this case, would almost certainly result in conversion of this case to a case under chapter 7 and possible administrative insolvency. For all of these reasons, the Court finds and concludes that the appointment of an examiner would be highly detrimental to creditors and the estate.

---

[8]      The Court has no basis to conclude—and does not conclude—that there are any viable claims that can be pursued against Davis, DiCarmine and Sanders, or what defenses they may be able to assert.

**B.     The Moving Parties Have Failed to Establish that an Examiner Should Be
         Appointed Under Section 1104(c)(1)**

In light of the discussion above about why the appointment of an examiner is not

required, even assuming that the $5 million debt requirement is satisfied under section

1104(c)(2), very little more needs to be said about the alternative basis for appointment of an

examiner under section 1104(c)(1).

The Court has discretion to appoint an examiner if "such appointment is in the interest of

creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(c)(1).

"Mere allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or

irregularity in the management of the affairs of the debtor of or by current or former

management, are insufficient to justify the appointment of an examiner under section 1104(c).

Such allegations of misconduct must be supported by facts." *See* 7 COLLIER ON BANKRUPTCY ¶

1104.03[3].

The Ad Hoc Committee and the FPC have not met their burden because they failed to

offer evidence proving there was misconduct in the creation and negotiation of the PCPs.

Clearly, the Debtor, Secured Lenders, and Unsecured Creditors Committee do not believe the

appointment of an examiner is in their or the estate's best interest, as it would only add needless

expense and delays.  Furthermore, the appointment of an examiner is unnecessary because, as

discussed below, the Court is satisfied that the PCP settlement is fair and equitable.

**C.     In Light of the *Iridium* Factors, The PCPs Satisfy the Bankruptcy Rule 9019
         Standard and Are Approved**

Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR.

P. 9019(a).  As a general matter, "[s]ettlements and compromises are favored in bankruptcy as

they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012); *see Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate"); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 at 9019-2 (highlighting that "compromises are favored in bankruptcy").

A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate before it may approve it. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002); *MF Global Inc.*, 2012 WL 3242533, at *5. In so doing, the Court need not decide the numerous issues of law and fact raised by a compromise or settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir. 1983)). The Court need not "conduct a 'mini-trial'" but rather "only need be apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *Adelphia*, 327 B.R. at 159.

The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.),* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also*

*Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).   A court may exercise its discretion

"in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*,

217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citing cases).  In evaluating the necessary facts, a court

may rely on the opinion of the debtor, parties to the settlement, and the professionals. *See In re*

*Chemtura Corp.,* 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Purified Down Prods. Corp.,*

150 B.R. 519, 522-23 (Bankr. S.D.N.Y. 1993); *see also MF Global Inc.,* 2012 WL 3242533, at

*5 (recognizing that although courts have the discretion to approve settlements, the business

judgment of the debtor in recommending a settlement should be considered).   "While the

bankruptcy court may consider the objections lodged by parties in interest, such objections are

not controlling . . . the bankruptcy court must still make informed and independent judgment."

*In re WorldCom, Inc.,* 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

       In the Second Circuit, *Iridium* directs courts to balance seven interrelated factors in

determining whether a settlement is fair and equitable.  *See Iridium,* 478 F.3d at 462.  Those

factors are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;
>
> (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";
>
> (4) whether other parties in interest support the settlement;
>
> (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

>        (6) "the nature and breadth of releases to be obtained by officers
>        and directors"; and
>
>        (7) "the extent to which the settlement is the product of arm's
>        length bargaining."

*Id.*

The FPC argues that in conducting its Rule 9019 analysis the Court should apply the heightened scrutiny of the "entire fairness" doctrine—as opposed to the business judgment standard—because, it alleges, the Debtor is settling claims with insiders. FCP 9019 Obj. ¶ 18-23. For support, the FPC cites *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2012), where the court applied the entire fairness standard rather than the business judgment standard in denying the debtors' motion to assume a prepetition plan support agreement under section 1125(g). But the issues under Rule 9019 are different. Section 1125(g) directs bankruptcy courts to comply with nonbankruptcy law; under Rule 9019 a debtor's business judgment is only one factor in a bankruptcy court's determination. The bankruptcy court must exercise its own independent judgment in analyzing the *Iridium* factors. More importantly in this case, the evidence establishes, and the Court specifically finds, that Mitchell, Pauker and Togut negotiated the PCPs, with substantial input from counsel for the Unsecured Creditors Committee and the Secured Lenders, and without interference from the Wind-Down Committee, or any Dewey partners. Therefore, the PCPs are not related party transactions that, in other contexts, make application of the entire fairness doctrine appropriate.

The Ad Hoc Committee argues that the PCPs cannot be approved because they do not present a case or controversy, or, alternatively, it is an impermissible *sub rosa* plan. The Ad Hoc Committee's *sub rosa* argument is premised on the notion that the granting of the releases to partners is a distribution of value that violates the absolute priority rule. The Court finds these

arguments unpersuasive. The PCPs raise an actual controversy; the fact that the effectiveness of

the settlement includes a condition subsequent—that the plan be confirmed—does not alter this

conclusion.  While it is true that a *sub rosa* plan is impermissible because it allows a debtor to

circumvent the requirements of chapter 11 plan of reorganization, *Iridium,* 478 F.3d at 466-67,

such is not the case here.  The PCPs settle potential claims of the estate and Participating

Partners; they do not determine rules for distribution or alter any other requirements to confirm

the chapter 11 plan.  While the Court does not believe that the releases violate the absolute

priority rule, a court in its discretion can approve a settlement that does not comply strictly with

the absolute priority rule, as long as the settling parties can justify the divergence, and the court

can "clearly articulate the reasons for approving . . . a settlement that deviates from the priority

rule." *Iridium,* 478 F.3d at 465.  As shown below, the *Iridium* factors weigh strongly in favor of

approval of the PCPs.

With the above mentioned legal principles in mind, the Court will address the seven

*Iridium* factors in turn.

### 1.  *Likelihood of Success and the Likelihood of Complex and Protracted Litigation*

The Court must weigh the future benefits of the PCP settlement against the likelihood of

success of future litigation against the partners, while considering the complexity and protracted

nature of that potential litigation.  The benefits of the PCPs are incontrovertible.  Through the

PCP, Participating Partners pledge to bring roughly $70 million into the estate for the benefit of

creditors. The PCPs will also protect the estate from the extraordinary administrative expense of

litigating four hundred additional adversary proceedings (one per partner) over the course of an

undeterminable number of years.  As Mitchell testified, the Debtor's costs currently average $8-9

million a month, most of which is currently funded by a temporary agreement with the Secured

Lenders to use cash collateral.  September 21, 2012 Hr'g. Tr. at 26:18-27:1.  The PCPs will

permit the Debtor to focus its resources on the claims assigned to the estate by the Participating

Partners and the claims that the PCPs do not release.  Ultimately, the PCPs will lead to a quicker

wind-down in chapter 11, and—more importantly—a quicker and more certain distribution to

creditors.  *Id.*

Conversely, the success rate of complex and protracted future litigation against partners

is largely uncertain. While the Debtor estimates that partners received roughly $400 million in

distributions during periods subject to various estate causes of action, the results of what is likely

to be protracted litigation to recover more money would be uncertain—partners could and

certainly would assert numerous defenses.  The date of Debtor's insolvency and whether the

Debtor had sufficient capital to conduct its business—critical factors with respect to avoidance

claims—would be substantially controverted.  *See id.* at 27:9-28:12.  There could also be

practical difficulties in collecting judgments.

Based on investigations of the Debtor's finances by the Debtor's professionals, Pauker

and Mitchell testified that there was strong evidence to support the assertion that the Debtor was

insolvent in 2012, but insolvency would be more difficult to prove for 2011, and even harder for

2010.  *Id.* at 33:7-17; 81:8-19.  Determining the exact insolvency date is both difficult and

expensive because several complex tests are used, leading to extended expensive litigation as

those tests can produce contradictory results.  *Id*. at 81:20-85:14; 87:2-90:8.  Further

complicating the issue, the firm had a clean audit opinion issued in 2010 and was able to

refinance a significant portion of its debt, and in 2011 the average partner generated revenue of

$800,000.  *Id*. at 28:18-25; 88:24-25.

The Debtor's professionals also considered potential tort claims for breach of fiduciary duty and other misfeasance. After meeting with hundreds of partners, Debtor's professionals learned that most partners blamed several members of the firm's leadership team for the firm's demise. That is why Davis, DiCarmine and Sanders were excluded from the benefits of the PCP releases.[9] *Id.* at 91:9-92:10. Therefore, it was the Debtor's business judgment, based on input from its professionals, that the PCPs were in the best interests of the Debtor and the estate. *Id.* at 90:12-96:22. The PCPs would avoid the costs of expensive and time-consuming litigation, conserve the Debtor's resources to pursue claims against those most likely to have mismanaged the firm, and minimize the risk of expending the Debtor's liability insurance policy on unnecessary defense costs. *Id.*

### 2. The Paramount Interest of Creditors and Extent of Support from Parties-in-Interest

As already addressed, the economics of this case and the uncertainty of future litigation strongly counsel that the PCPs are in the best interests of creditors. Most telling is the fact that the Secured Lenders and the Unsecured Creditors Committee favor the settlements, despite the belief that this will only be a twenty cent plan for unsecured creditors, and despite the arguably low ratio between the aggregate partnership contributions compared to the gross possible recovery if all claims were fully and successfully litigated. *See id.* at 153:1-10; 171:21-172:5. Furthermore, excluding the limited objections that were resolved, the Ad Hoc Committee and the FPC are the only parties in interest who object to the PCPs, while other former partner groups

---

[9]      The exodus of numerous partners from the firm during 2012 may have been precipitated or hastened when partners learned that Davis had signed over 100 contracts with partners guaranteeing them substantial fixed minimum compensation. When firm revenues declined during the recession, the firm had insufficient income to pay the fixed guarantees and still compensate the remaining partners at targeted compensation levels. It is disputed whether the guaranteed contracts were disclosed to firm partners generally before 2012.

clearly approve of it, which includes the 400 partners that signed the PCPs and are contributing

capital.

### 3. Competency and Experience of Counsel

It appears clear from the record that the Debtor selected professionals that had been

actively engaged in prior large law firm bankruptcies who knew both the difficulties of

successfully concluding the PCPs and the potential consequences to creditors and the estate if the

PCPs failed.  *See id*. at 55:6-11; 39:19-40:3; 111:24-112:25.  Both the Debtor's legal counsel and

financial advisors had played integral roles in prior law firm bankruptcies, and the Debtor's

management was supervised by an outside chief restructuring officer.

### 4. Nature and Breadth of Releases Obtained

The only releases exchanged by the Debtor and the Participating Partners are of (1)

claims held by the estate against the Participating Partners (excluding the release of the

unfinished business or "Jewel" claims) and (2) claims held by Participating Partners against the

Debtor.  The Participating Partners are also assigning to the Debtor any *direct* claims the

Participating Partners have against the non-settling partners.  Any direct claims held by non-

settling partners or by any creditors are preserved.  Thus, the PCPs do not include any third-party

non-debtor releases.  The injunction in favor of Participating Partners only applies to claims and

derivative claims that could be asserted by the Debtor.  Nothing about this exchange of releases

in problematic.  The releases are reasonable and necessary to accomplish the purposes of the

PCPs, and will ultimately benefit creditors and the estate.  In addition, the Debtor excluded

Davis, DiCarmine, and Sanders from the PCPs.  Moreover, the PCPs will not prevent non-debtor

third parties or non-settling partners from asserting direct claims against any settling partner.  *Id*.

at 122:23-123:13.

5.   *Extent to Which the Settlement is a Product of Arm's Length Bargaining*

The Court is satisfied that the PCPs were developed by Debtor's independent

professionals and were negotiated with partners at arm's length.

Both the Ad Hoc Committee and the FPC argue that the PCP is the product of collusion

between interested parties.  *See* FPC 9019 Obj. ¶ 20; Ad Hoc 9019 Obj. at 18-20.  They allege

that Mitchell could not act as an independent fiduciary because he was tainted by the Wind-

Down Committee's influence, primarily because the CRO Services Agreement stated that the

CRO is subject to the corporate governance of the Wind-Down Committee.  Ad Hoc 9019 Obj.

at 18-20.  However, the evidence establishes that Mitchell, Pauker and Togut acted

independently and in the best interests of the estate in negotiating the PCPs.  While the Services

Agreement, pursuant to which Mitchell was retained, gave the Wind-Down Committee authority

to terminate Mitchell, the evidence established that the Wind-Down Committee never attempted

to limit or hinder Mitchell, Pauker or Togut, and it did not interfere with Mitchell or overrule any

of his decisions in operating the Debtor.  September 20, 2012 Hr'g. Tr. at 99:10-101:4;

September 21, 2012 Hr'g. Tr. at 24:5-26:17.

The FPC also argues that Pauker is interested because he was working on behalf of the

Debtor in analyzing the estate's potential claims and constructing the PCP.  September 21, 2012

Hr'g. Tr. at 145:9-147:9.  The Court finds that Pauker—an experienced professional with

substantial experience in law firm bankruptcies—at all times acted professionally and

independently in analyzing and developing the PCPs.

6.   *The Application of the Iridium Factors Demonstrates that the Settlement is Fair,
     Equitable, and in the Best Interest of the Estate*

The Court concludes that the PCPs are fair and equitable and in the best interest of the

estate.  The PCPs were the product of an arm's-length bargain, and the benefits of the PCPs

26

outweigh the attenuated possibility of a significantly increased net recovery after years of complex and protracted litigation.  The settlement will provide for quicker distributions to creditors, at lower risk, and with significantly less administrative expenses.  Furthermore, most constituencies, including the Debtor, Secured Lenders, Unsecured Creditors Committee, and a significant portion of the former partners, support the settlement.  Thus, funds that will generated from the PCPs are well above the lowest point of reasonableness, and the settlement conforms to the general principle that settlements are favored in bankruptcy.

### III.    CONCLUSION

For the foregoing reasons, the Ad Hoc Committee's Examiner Motion is **DENIED**, and the Debtor's 9019 Motion is **GRANTED**.

**IT IS SO ORDERED.**

Dated:    October 9, 2012
          New York, New York


                            *Martin Glenn*
                    _____
                           MARTIN GLENN
                    United States Bankruptcy Judge