UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

In re:

DEWEY & LEBOEUF LLP,

Debtor.

Chapter 11
Case No. 12-12321 (MG)

**MEMORANDUM OPINION AND ORDER GRANTING MOTION OF CREDITORS
COMMITTEE FOR STANDING TO PROSECUTE AND SETTLE CERTAIN CLAIMS
ON BEHALF OF THE ESTATE**

Pending before the Court is the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to §§ 1103(c) and 1109(b), Granting Leave, Standing and Authority to Prosecute and, if Appropriate, Settle Certain Claims on Behalf of the Debtors' Estates* (the "Motion") (ECF Doc. # 628).  Attached as exhibits to the Motion are the Dewey & LeBoeuf LLP Partnership Agreement (Ex. A), the XL Specialty Insurance Company Policy (Ex. B), and a Proposed Order (Ex. C).  The Official Committee of Unsecured Creditors (the "Unsecured Committee") appointed in the chapter 11 case of Dewey & LeBoeuf LLP (the "Debtor," or the "Firm") is seeking entry of an order granting the Unsecured Committee leave, standing and authority to prosecute or settle certain claims against the Debtor's former management team for, among other things, breaches of their fiduciary duties to the Firm and its creditors.  The Debtor has consented to the Unsecured Committee obtaining derivative standing to prosecute these claims on behalf of the Debtor's estate.

Two objections to the Motion have been filed.  Stephen DiCarmine ("DiCarmine") and Joel I. Sanders ("Sanders"), through their counsel, filed the *Reservation of Rights of Stephen DiCarmine and Joel I. Sanders to the Motion of the Official Committee of Unsecured Creditors*

1

*for Entry of an Order Pursuant to 11 U.S.C. §§ 1103(c) and 1109(b), Granting Leave, Standing and Authority to Prosecute and, if Appropriate, Settle Certain Claims on Behalf of the Debtors Estate and Objection to Same* (the "DiCarmine and Sanders Objection") (ECF Doc. # 648). Steven H. Davis ("Davis"), through his counsel, filed the *Limited Objection of Steven H. Davis to Motion of The Official Committee of Unsecured Creditors For Entry of An Order Pursuant To Section 1103(C) And 1109(B), Granting Leave, Standing And Authority To Prosecute And, If Appropriate, Settle Certain Claims On Behalf of The Debtor's Estate* (the "Davis Objection") (ECF Doc. # 654).

The Unsecured Committee filed an *Omnibus Reply of The Official Committee of Unsecured Creditors To Limited Objections To Its Motion For Entry of An Order Pursuant To Section 1103(C) And 1109(B), Granting Leave, Standing And Authority To Prosecute And, If Appropriate, Settle Certain Claims On Behalf of The Debtor's Estate* (the "Reply") (ECF Doc. # 659). A hearing (the "Hearing") on the Motion took place on November 29, 2012.

For the reasons explained below, the Unsecured Committee's Motion is **GRANTED.**

## I.    BACKGROUND

The claims against Davis, DiCarmine and Sanders (the "Defendants") arise out of the collapse of Dewey & LeBoeuf LLP, a prominent law firm that was created through the merger of two old-line New York firms: Dewey Ballantine LLP and LeBoeuf, Lamb, Greene & MacRae LLP. The Firm operated as a limited liability partnership with a thousand plus employees and twenty-six offices world-wide. Davis was formerly the Chairman of the Firm and a member of its Executive Committee, DiCarmine was formerly the Firm's Executive Director, and Sanders was formerly the Firm's Chief Financial Officer. *See* Motion ¶ 1.

**A. The Motion**

According to the Unsecured Committee, Davis was responsible for day-to-day management of the Firm as well as: (i) designating all of the Firm's non-legal executive and administrative positions; (ii) acting with the full authority of the Firm's Executive Committee; (iii) nominating candidates to serve as successors to members of the Executive Committee; and (iv) serving as Chairman of the Executive Committee. *See* Motion ¶ 4; Ex. A. Davis also had authority to borrow funds on behalf of the Firm, without additional consent, under any of the Firm's credit lines which were previously approved by the Executive Committee. *Id.* The Unsecured Committee alleges that from 2007-2010, Davis earned nearly $10.8 million in compensation from the Firm. *Id.*

Davis appointed DiCarmine and Sanders to their leadership positions in the Firm. The Unsecured Committee alleges that Davis granted DiCarmine and Sanders extremely generous compensation packages that included above-market compensation and incentive plans, along with non-market features such as six-year contracts, irrevocable grantor trusts established for their benefit, and generous signing bonuses, severance and change in control payments. *Id.* ¶ 5.

The Unsecured Committee argues that by virtue of the Defendants' management positions within the Firm, they each owed fiduciary duties of care, loyalty and candor to all partners and the Firm and its creditors. *Id.* ¶ 6. The Defendants allegedly failed to properly exercise these duties and instead grossly mismanaged the Firm and engaged in "rampant self-dealing that caused, ultimately, the Firm's demise." *Id.* For example, the Unsecured Committee alleges that the Defendants (i) over-distributed the Firm's available cash to select partners; (ii)

3

abusively relied on guarantee agreements that bore no economic rationality; and (iii) concealed the Firm's true financial condition from its partners, employees and creditors. *Id.*

The Unsecured Committee alleges that the Defendants' behavior was self-serving, motivated by greed, and undertaken in an effort to maintain their lucrative above-market compensation packages. *Id.* ¶ 7. The Defendants allegedly paid themselves over $7 million on an aggregated basis within one year of the Petition Date, despite the Firm's dire financial condition. *Id.* The Unsecured Committee asserts that the Firm's failure cannot be attributed solely to the legal industry's economic downturn; instead, the Firm's failure was caused by the Defendants' "secret and reckless campaign" of handing out above-market guarantee compensation packages to partners. *Id.* ¶ 8. The Unsecured Committee also alleges that the Defendants deceived several lateral partners about the Firm's financial performance to obtain fresh capital infusions to "continue their reign"—perhaps operating the Firm as a Ponzi scheme. *Id.* ¶¶ 8, 26.

According to the Unsecured Committee, profits of the Firm should have been shared in accordance with partners' respective interests in the Firm (the "Partnership Targets") as established each year by the Executive Committee. *Id.* ¶ 9. The Firm's economic performance was allegedly insufficient, beginning in 2008, to compensate partners according to their Partnership Targets, and although actual compensation was adjusted downward to reflect available net income, the Defendants awarded make-up bonuses to partners that were often equal to or greater than the shortfall to be paid out of future income. *Id.* This practice continued for three years. In addition, the Defendants retained existing partners and hired new lateral partners by agreeing to fixed compensation agreements, many of which did not have performance clauses or requirements. *Id.* ¶ 10. Approximately 130 partners had some form of guarantee in 2011

4

and/or 2012, and the number of guarantees allegedly accelerated as the Firm's financial performance declined. *Id.* The Unsecured Committee asserts that these guarantees were atypical for the industry based on their sheer number, the magnitude of the guarantees, their duration, and their lack of a relation to future performance. *Id.*

The Unsecured Committee argues that these undisclosed guarantees ultimately proved fatal to the Firm. The Firm consistently paid certain partners in excess of available income, the Defendants knew or should have known that the Firm was insolvent at this time, and the Defendants continued to incur even more debt on behalf of the Firm by drawing on secured bank and bond debt to finance operations. *Id.* ¶ 11. In particular, the Unsecured Committee alleges that during 2009 and 2010, the Defendants caused the Firm to distribute over $60 million in excess of net profits, depleted the Firm's capital to an amount almost equal to 50% of the minimum capital balance, and increased the Firm's debt in order to fund unwarranted distributions. *Id.* In 2011 and 2012 alone, over $188 million was paid to 119 active partners with guaranteed contracts, while the remaining 214 active partners received less than $153 million. *Id.* By the end of 2011, the Firm had only $34 million in cash on hand, reduced from $158 million at the start of 2008. *Id.*

Once the Firm's partners' learned the true state of the Firm at a January 2012 partnership meeting, they began to rapidly leave the Firm. *Id.* ¶ 12. On May 28, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Office of the United States Trustee appointed the Unsecured Committee on May 31, 2012 and it represents the interest of all unsecured creditors of the Debtor. *Id.* ¶¶ 14-15. The Unsecured Committee is expressly authorized by statute to investigate the assets and liabilities of the Debtor, and is empowered to perform such other services as are in the interests of unsecured creditors generally. *See* 11

5

U.S.C. § 1103(c). The Debtor has consented to the relief requested in the Motion. *See* Motion ¶ 16.

The Unsecured Committee argues that not granting the Motion could impair the estate's ability to maximize its recovery against $50 million of aggregate insurance coverage under the Debtor's Law Firm Management Liability and Company Reimbursement Insurance Policy (the "Primary Policy") and two related excess policies (collectively, the "Policies"). *Id.* This is because a complaint brought directly by the Debtor may be subject to the so-called "insured versus insured" exclusions set forth in the Policies. *Id.* According to the Motion, the Unsecured Committee would not be subject to such a defense of coverage. *Id.*

### B. The DiCarmine and Sanders Objection

DiCarmine and Sanders filed a reservation of rights and an objection to the Motion. First, with respect to their reservation of rights, they argue that, although the Motion may make out a colorable claim because its facts must be assumed as true, it fails to meet the standard of Rule 11 of the Federal Rules of Civil Procedure as made applicable by Federal Rule of Bankruptcy Procedure 9011. *See* DiCarmine and Sanders Objection at 2. DiCarmine and Sanders argue that at the evidentiary hearing regarding approval of the partner contribution plan ("PCP"), witnesses testified that allegations of wrongdoing against DiCarmine and Sanders were the reason they were excluded from the PCP, but the Court found that it had no basis to conclude, nor did it conclude, that there were any viable claims that could be asserted against these parties. *Id.* In the current Motion, the Unsecured Committee alleges wrongdoing by DiCarmine and Sanders, and these Defendants argue that discovery will show that the Motion's factual contentions lack evidentiary support. *Id.* In fact, DiCarmine and Sanders assert that they fully and responsibly performed their duties and reduced the Firm's expenses by over $1 million.

*Id.* DiCarmine and Sanders reserve their rights in these regards and also reserve their specific defenses.

Second, DiCarmine and Sanders object to the Motion, which asserts that the potential claims against these Defendants are covered by the Policies and that the Unsecured Committee is the proper party to bring the claims because it would not be subject to an "insured versus insured" exclusion from coverage. *Id.* DiCarmine and Sanders allege that counsel for the Insurer of the Policies advised them that based on the Unsecured Committee's Motion, it appears that claims brought against them by the Unsecured Committee would be asserted on behalf of or in the name or right of the Firm and, hence, excluded from coverage. *Id.* at 3. Although the Policies contain a carve-back to the "insured versus insured" exclusion for claims brought by a "Bankruptcy Trustee or Examiner or an assignee of such Trustee or Examiner or a Receiver, Conservator, Rehabilitator, Liquidator or comparable authority of the Firm," DiCarmine and Sanders assert that the Insurer's counsel appears to take the position that this carve-back would be inapplicable to claims brought by the Unsecured Committee. *Id.* DiCarmine and Sanders believe that the Unsecured Committee's claims could be excluded from coverage and the Second Circuit's three-part test (described below) may therefore not be met.

### C. The Davis Objection

Davis filed a limited objection to the Motion. He does not oppose the request of the Unsecured Committee for standing to bring suit against him relating to his alleged role in the Firm's failure, but he denies that he engaged in any wrongdoing and disputes the allegations described in the Motion. *See* Davis Objection ¶ 1. Davis asserts that the Unsecured Committee is targeting him as a scapegoat for one reason: he has up to $50 million in coverage under various management liability insurance policies. *Id.* Davis filed the Limited Objection to focus

"on the narrow procedural issue underlying" the Motion's request—the Unsecured Committee used the Motion as a platform for launching inappropriate personal attacks on Davis, some of which contradict the testimony from the hearing on the PCP. *Id.* ¶ 2. Although Davis does not oppose standing, he is not agreeing to any of the allegations contained in the Motion and he expressly reserves all of his rights in any action that the Unsecured Committee eventually brings. *Id.*

Davis' Objection delves into the factual allegations. He first argues that a full investigation of facts underlying a potential lawsuit and the assignment of responsibility has not yet occurred. *Id.* ¶ 3. He warns the Unsecured Committee that any litigation against the Defendants will be "far more costly and protracted than the Committee anticipates" and may result in "proceedings that will inevitably entangle many of the former Dewey partners who participated in the management of the Firm, had knowledge of and share responsibility for the actions the Committee seeks to attribute to Mr. Davis, and demanded and received much of the compensation the Committee contends should not have been paid." *Id.* ¶ 4.

With respect to the allegations against Davis included in the Motion, Davis argues that (i) he deferred the majority of his compensation from 2010-2012 to future years so others could be paid more; (ii) in the one-year period before the Petition Date, he only received about $1.2 million, which was a small fraction of the $234 million in total compensation paid to the partners that year; and (iii) for all of 2011 and 2012, he received a total of about $1.67 million, far below his annual compensation target of $5 million. *Id.* ¶ 6. He also disputes the Unsecured Committee's Ponzi-scheme allegation because lateral partners were merely compensated; they were not hired to obtain capital contributions that could be used to pay existing partners. *Id.* ¶ 7. He argues that the main trigger of the Firm's demise was the economic downturn followed by the

8

rapid departure of many of the Firm's partners, rather than any reckless management on the part of Davis or the other Defendants, and he disputes the insolvency allegations set forth in the Motion. *Id.* ¶ 8. Last, Davis refutes the allegations in the Motion that the compensation guarantee agreements were atypical and reckless—he argues that (i) they were not secret, but in fact known to the members of the Compensation Committee and Executive Committee; (ii) guarantees were not accelerated while the Firm's financial performance was declining; (iii) many of the guarantees were in fact tied to the partner's future performance; and (iv) overall, these guarantees did not cause the downfall of the Firm, as relatively few of the partners with guarantees were actually paid the full amount of their specified Participation Targets. *Id.* ¶ 9.

### D. The Reply

In its Reply, the Unsecured Committee argues that the Objections are more akin to reservations of rights or public relations advocacy than meaningful challenges to its standing Motion. *See* Reply ¶ 1. The Reply primarily repeats the allegations alleged in the Motion, notes that the Motion meets the requirements for standing, and refutes the argument in the DiCarmine and Sanders Objection regarding the "insured versus insured" exclusion. It also alleges that the claims against the Defendants have the potential to generate recoveries far in excess of the cost of litigating them. *Id.* ¶ 2.

## II. DISCUSSION

### A. Standing

Section 1109(b) of the Bankruptcy Code provides, in relevant part, that a committee "may raise and may appear and be heard on any issue" in a debtor's chapter 11 case. Moreover, pursuant to section 1103(c)(2), the committee may "investigate the acts, conduct, assets,

9

liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case or to the formulation of a plan."

The Second Circuit has recognized a "qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor-in-possession with the approval of the bankruptcy court." *In re Commodore Int'l Ltd.,* 262 F.3d 96, 99 (2d Cir. 2001) (quoting *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir. 1985)). Where a debtor consents to a committee bringing suit, the Court must decide (1) whether the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery, and (2) whether an action is (a) in the best interest of the bankruptcy estate and (b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. *See id.* at 100; *Adelphia Communs. Corp. v. Bank of Am. (In re Adelphia Comm'ns Corp.),* 330 B.R. 364, 374 (Bankr. S.D.N.Y. 2005).

When a court determines whether a colorable claim exists, the court should not conduct a mini-trial. *STN Enters.*, 779 F.2d at 905-06; *see also Adelphia,* 330 B.R. at 369. A committee seeking standing need not lay bare its complete proof, but rather is required only to describe a facially valid claim, which will be evaluated under a standard "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. (In re Am.'s Hobby Ctr., Inc.),* 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998). It involves the "weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and the 'terms relative to attorneys' fees on which suit might be brought.'" *Id.* (quoting *STN Enters.*, 779 F.2d at 905). The required showing that any claims be "colorable" is a "relatively easy one to make." *Adelphia*, 330 B.R. at 376.

10

As to the second part of the test for standing, the Court needs to find that prosecution of claims by the committee would be in the best interests of the estate and necessary and beneficial to the resolution of such claims. *See Commodore*, 262 F.3d at 100. A court should consider litigation costs when making this determination and it must be assured that prosecution of the claims represents a sensible expenditure of the estate's resources. *See Adelphia*, 330 B.R. at 386. It should engage in a limited merits assessment to ensure "that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that initiation and continuation of litigation will likely produce." *Id.* at 374 (quoting *STN Enters.*, 779 F.2d at 905). In other words, there must a "fair chance that the benefits to be obtained from the litigation will outweigh its costs." *Am.'s Hobby Ctr.,* 223 B.R. at 284.

Courts have found that a suit would be in the best interests of the estate and necessary and beneficial where, if successful, it would result in a money judgment for the estate. *See, e.g., In re Am. Paper Mills of Vt., Inc.,* 322 B.R. 84, 91 (Bankr. D. Vt. 2004) (suit in the best interest of the estate because "if successful, it would result in a money judgment in favor of the chapter 11 estate, against an apparently solvent party"); *In re Hydrogen L.L.C.,* No. 08-14139 (AJG), 2009 WL 2913448, at *2 (Bankr. S.D.N.Y. May 7, 2009) (finding that suit would be in the best interest of the estate "because its successful prosecution is consistent with maximization of the value of the estate"). In *Hydrogen*, the court approved a settlement pursuant to Bankruptcy Rule 9019 that included an assignment of certain estate claims to the Committee. The court held that the Committee had standing to pursue the claims under the *Commodore* test because the Debtor was prevented by a conflict of interest from bringing suit against its directors itself. 2009 WL 2913448, at *2.

*STN Enterprises* also indicates that "the terms relative to attorneys' fees on which suit might be brought," 779 F.2d at 905, are relevant to the evaluation of whether prosecution of the claims is in the best interests of the estate. *Id.* ("Hence fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes its determination."). The Court inquired about the issue during argument of the Motion. The answer given was that no arrangements have been made at this point about retention of counsel, but because of the lack of cash resources available to the Debtor (or to any future liquidation trust), in all likelihood counsel undertaking the case will be compensated on a contingency, or combined contingency-time charge basis, with oversight of retention of counsel and prosecution of claims by an oversight committee or board. Similar arrangements are common in other cases of this type. Therefore, the Court is satisfied that the cost of prosecuting the claims does not alter the determination whether the requested relief is in the best interests of the estate.

### B. Authority to Settle Claims

Bankruptcy Rule 9019(a) states:

> Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

"It is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate." *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 175 (2d Cir. 2005). That being said, several courts have entered orders providing a creditors' committee with standing to settle

certain claims on behalf of the estate. *See In re Majestic Capital, LTD.,* Case No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011) (ECF Doc. # 211); *In re Evergreen Solar, Inc.,* Case No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011) (ECF Doc. # 382 at ¶ 3); *In re Old CarCo LLC (f/k/a Chrysler LLC)*, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009) (ECF Doc. # 5151 at ¶ 2). In *Smart World*, the Second Circuit reversed a bankruptcy court order approving a settlement motion filed by a creditor's committee over the debtors' objections, finding that the power to settle claims belongs to the debtor. 423 F.3d at 175. However, the court also noted that the alleged claims lacked viability, the interests of the settling parties were in conflict with the interests of the estate, and that in certain circumstances, a creditors' committee may be granted the power to settle claims on behalf of the estate. *Id.* at 179-84.

Some courts have also held that a debtor has the authority to settle claims on behalf of its estate within a chapter 11 plan, even if derivative standing has been granted to a creditors' committee to prosecute such claims. *See, e.g., Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'n Corp.),* 371 B.R. 660, 670-71 (S.D.N.Y. 2007) ("[A] debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct."); *In re Centaur, LLC,* No. 10-10799, 2010 WL 4624910, at *7 (Bankr. D. Del. Nov. 5, 2010) ("The Committee's Standing Motion also seeks authority to settle its Claims on behalf of the Debtors' estates. While granting the Committee standing includes authority to settle its Claims, subject to Court approval, that authority is not exclusive. A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims.").

In this case, in all likelihood, claims against the Defendants are not likely to be filed until there is a confirmed plan that assigns the rights to prosecute claims to a liquidation trust. Any proposed liquidation plan will no doubt include terms specifically dealing with prosecution and settlement of claims.

### C. The Proposed Claims Against Davis, DiCarmine and Sanders Have a Sufficient Basis in Fact and Law and the Potential for a Significant Recovery for Creditors

Applying the applicable standards to the facts alleged in the Motion, the Court concludes that the Unsecured Committee has established a proper basis to proceed with claims against Davis, DiCarmine and Sanders. The allegations made in the Motion appear to assert facially-valid claims that would be sufficient to withstand a motion to dismiss for failure to state a claim. Those three individuals vigorously contest the allegations made by the Unsecured Committee, but the present Motion is not the place to resolve what will likely be disputed issues of fact and law. Because the Debtor has consented to the Unsecured Committee being granted standing to pursue the claims, the three part test described above applies.

First, the Motion meets the standard for establishing a colorable claim against the Defendants. Taking the allegations in the Motion as true, the Defendants engaged in reckless mismanagement of the Firm and breached their fiduciary duties by: (i) acting in their own self-interest to the detriment of the Firm; (ii) concealing the Firm's true financial well-being from the partners and creditors; (iii) making excessive distributions to certain partners, regardless of ownership share, while having knowledge (actual or constructive) that the Firm was on the brink of insolvency; and (iv) entering guaranteed compensation agreements with existing and new partners that were above-market and not tied to the partner's future performance. These allegations, if true, would likely entitle the estate to a monetary judgment that could be paid from the $50 million Policies covering such actions by former directors of the Firm.

14

Second, the Motion meets the two-prong test from *Commodore* because granting the Unsecured Committee standing to pursue the claims is in the best interests of the estate and is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceeding. If the allegations asserted in the Motion are proven to be true, the estate may well be able to recover for any damages caused by the Defendants' allegedly reckless behavior and breaches of fiduciary duty; any substantial recovery would benefit the estate and its creditors. The argument whether the "insured versus insured" exclusion to coverage applies under the Policies to claims prosecuted by the Unsecured Committee is important, but that issue cannot be resolved with the current Motion. The outcome of that issue would not, in any event, be determinative. The three proposed Defendants all appear to be solvent potential defendants; in the event litigation of the claims results in a settlement or judgment, a substantial recovery is possible whether or not insurance coverage is available.

The Unsecured Committee's request for authority to settle claims is often a closer question, but since prosecution of these claims is likely to be conducted by a liquidation trust pursuant to the terms of a confirmed liquidation plan, the issue of settlement authority and any requirement for court approval of any settlement will be dealt with in the context of plan confirmation. If the claims are prosecuted and settled before any plan is confirmed, court-approval of any settlement will be required, giving the Debtor or any other party-in-interest an opportunity to appear and be heard. The Court therefore concludes that the request for authority to settle is likewise appropriate under the circumstances.

### III. CONCLUSION

For the foregoing reasons, the Unsecured Committee's Motion for standing to pursue claims against the Defendants is **GRANTED**.

**IT IS SO ORDERED.**

Dated:   November 29, 2012
         New York, New York

                              _____*Martin Glenn*_____
                                MARTIN GLENN
                           United States Bankruptcy Judge