DIAMOND McCARTHY LLP
Allan B. Diamond, Esq.
Howard D. Ressler, Esq.
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel: (212) 430-5400
Fax: (212) 430-5499

- and -

Andrew B. Ryan, Esq. (*pro hac vice*)
1201 Elm Street, 34th Floor
Dallas, Texas 75270
Tel: (214) 389-5300
Fax: (214) 389-5399

*Attorneys for Alan M. Jacobs, Liquidating Trustee
for the Dewey & LeBoeuf Liquidation Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12321 (MG) |
| **DEWEY & LEBOEUF LLP,** | Chapter 11 |
| Debtor. | |
| **ALAN M. JACOBS, as Liquidating Trustee of the Dewey & LeBoeuf Liquidation Trust,** | Adversary No. _____ |
| Plaintiff, | |
| v. | |
| **STEPHEN H. DiCARMINE and JOEL I. SANDERS,** | |
| Defendants. | |

**ADVERSARY COMPLAINT
AND OBJECTION TO PROOFS OF CLAIM NUMBERS 1068 AND 1069**

Alan M. Jacobs, solely in his capacity as Liquidating Trustee ("Trustee") for and on behalf of the Dewey & LeBoeuf Liquidation Trust ("Trust"), by and through his undersigned counsel, brings this adversary proceeding and objections to proofs of claim numbers 1068 and 1069 against Stephen H. DiCarmine ("DiCarmine") and Joel I. Sanders ("Sanders"; with DiCarmine, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      The Trustee files this lawsuit for two principal reasons. First, the Trustee seeks to recover up to $21,818,582 in payments made by Dewey & LeBoeuf LLP ("Debtor") to or for the benefit of DiCarmine and Sanders in their capacity as officers and insiders of the Debtor while the Debtor was insolvent. The payments were made pursuant to employment contracts that provide for compensation far above the value of the services DiCarmine and Sanders actually rendered to the Debtor and contain atypical terms as compared to employment agreements for comparable law firm management administrators.

2.      Second, the Trustee seeks to disallow all claims of DiCarmine and Sanders against the Debtor. Having already directed millions of dollars to be paid to themselves from the Debtor while the firm was insolvent, DiCarmine and Sanders now claim that their employment contracts require the Debtor to: (i) pay them $21,889,441[1] as outstanding severance and other compensation; and (ii) fully indemnify them from any liability that may arise from their role in the Debtor's management. These claims are unfounded and expressly barred by amendments to the Bankruptcy Code that prohibit termination and severance packages for insiders of the Debtor.

---

[1]      All dollar amounts are rounded to the nearest whole dollar.

## JURISDICTION AND VENUE

3.      This adversary proceeding arises out of the bankruptcy of the Debtor and is commenced pursuant to sections 541 through 550 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3007 and 7001.

4.      This Court has jurisdiction under 28 U.S.C. §§ 157, 1334.

5.      This is a core proceeding under 28 U.S.C. § 157(b)(2).  To the extent necessary, the Trustee consents to entry of a final order or judgment by this Court.  The Defendants filed proofs of claim, claim numbers 1068 (DiCarmine) and 1069 (Sanders), against the Debtor's estate in the above-captioned main bankruptcy case and the Defendants have been active participants in this case on a number of matters considered by this Court.

6.      Venue is proper in this Court under 28 U.S.C. § 1409 because the Debtor's chapter 11 case is pending in this judicial district.

## PARTIES

7.      The Trust was created by the Second Amended Chapter 11 Plan of Liquidation of Dewey & LeBoeuf LLP, Dated January 7, 2013 ("Plan"), which the Court confirmed on February 27, 2013.  On March 22, 2013, the effective date of the Plan, the Trust was vested with all causes of action available to the Debtor, excluding those that are Secured Lender Trust assets and those released in the Plan.

8.      Defendant DiCarmine is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure. Defendant DiCarmine was at all relevant times the Debtor's Executive Administrator.

9.      Defendant Sanders is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure. Defendant Sanders was at all relevant times the Debtor's Chief Financial Officer.

3

## GENERAL FACTUAL ALLEGATIONS

### A.    The Debtor

10.    The Debtor was the product of the combination, on October 1, 2007, of two prominent law firms, Dewey Ballantine LLP ("Dewey Ballantine") and LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf Lamb").

11.    The Debtor was at all relevant times a registered limited liability partnership under the Partnership Law of the State of New York ("NYPL").

12.    The Debtor was governed by the Dewey & LeBoeuf LLP Partnership Agreement ("DLPA"), which was effective October 1, 2007, and was amended on April 12, 2010, and again on April 3, 2012.  Unless otherwise indicated, references to the DLPA are to the version of the document in effect at the time of the alleged events.

### B.    The Creation of Dewey LeBoeuf

13.    Dewey Ballantine was an elite law firm plagued with financial difficulties. Despite wide recognition as one of the most prestigious New York-based firms, it consistently failed to meet financial projections in the years prior to 2007.  Extravagant unfunded pension liabilities posed an increasing financial burden that was exacerbated by a decline in the performance of key practice groups.  As a result, Dewey Ballantine sought to merge with a larger and more financially sound firm.

14.    LeBoeuf Lamb was a New York-based firm with over 700 attorneys at the time of the combination with Dewey Ballantine.  In recent years, LeBoeuf Lamb had grown aggressively by acquiring lateral partners, practice groups, and other law firms.  Traditionally an insurance and public utilities firm, LeBoeuf Lamb sought to become a leader in mergers and acquisitions and other areas that were traditionally Dewey Ballantine's strengths.  Merger talks between

4

Dewey Ballantine and LeBoeuf Lamb began in the summer of 2007, resulting in a deal that closed in October 2007.

**C.    Partner Compensation and "Participation Targets" Under the DLPA**

15.    The DLPA provided that equity partner compensation was based on the profitability of the partnership.  Shares of net profit were allocated among the partners by the Compensation Committee.  Early each year, the Compensation Committee would meet and assign partners "Participation Targets" expressed as a dollar amount.

16.    A partner's Participation Target was not a fixed salary, and in no way guaranteed a particular distribution.  Rather, the Participation Targets were just that—a projection of a partner's share of profits if the Debtor achieved its projected net income.

17.    The Participation Targets also served as an allocation tool used in a formula to determine each partner's percentage share of the firm's profits in the event the firm failed to meet projections.  Under DLPA § 2.1, each partner's "Percentage Share" of the firm and its profits was calculated by dividing a given partner's Participation Target by the sum total of all Participation Targets.  In the event that the firm's net income did not reach the aggregate amount of all Participation Targets (*i.e.*, if the firm failed to meet profitability projections), DLPA § 6.4(a) provided that partner distributions were determined by multiplying individual partner's Percentage Shares by the Debtor's actual net income.  DLPA § 6.4(b) required that a partner return any amount received in excess of what was due under DLPA § 6.4(a).

18.    In early 2008, the firm's Compensation Committee met to determine Participation Targets for the year.  A problem quickly arose from the reconciliation of pay scales for partners from LeBoeuf Lamb and those from Dewey Ballantine.  At some pay levels, Participation Targets were higher for legacy LeBoeuf Lamb partners.  At other pay levels, the legacy Dewey

Ballantine Participation Targets were higher.  Rather than split the difference and adjust all Participation Targets toward a median amount at each pay level, the Debtor instead assigned Participation Targets based on whichever legacy target was higher.

19.    Naturally, this decision caused the aggregate Participation Target and projected net income to increase dramatically.  Although the DLPA's distribution mechanism could prevent inflated Participation Targets from resulting in over-distributions, it had the negative effect of creating over-optimistic expectations amongst partners.  In order for all of the partners' distributions to fall in line with their respective Participation Targets, the Debtor would need to immediately perform at a higher level from a fiscal standpoint.

20.    The problem was further compounded by the allocation of inflated Participation Targets to other partners.  New lateral hires were brought on with high Participation Targets that did not reflect the firm's economic reality, exacerbating the problem by creating internal competition amongst partners for equal treatment and compensation.  Some legacy partners learned of these arrangements and leveraged their own influence with management to secure similarly inflated Participation Targets.

21.    Coupled with the constricting market for legal service providers, the inflated Participation Targets set the stage for frustration and angst among the partners.  Many incorrectly viewed their Participation Target as a salary.  But the partners were equity holders, only entitled to their proportionate share of firm profits under the DLPA.  Although a given partner's distributions could reach his or her Participation Target when the firm's net income met expectations, the Debtor failed to meet the aggregate of Participation Targets from 2008 through the bankruptcy filing.  Management never reduced partners' Participation Targets in an amount necessary to bring the aggregate of all Participation Targets in line with realistic expectations for

6

net income.  As a result, individual partners' pro rata share of the firm's income was far less than their Participation Targets.

**D.    Snowballing Underperformance**

22.    The Debtor's economic woes were a result of many factors.  Having just combined in late 2007, the Debtor faced hurdles in working through the costs of the combination.  The Debtor was forced to deal with massive expenses related to the combination, including redundant overhead (such as multiple office leases in the same city, duplicative staffing, and equipment leases), all which necessarily affected the firm's bottom line while it worked toward integration.  Of course, these costs were to be expected and could have potentially been overcome.  However, the Debtor failed to accurately predict the looming economic downturn and the resulting negative impact on the firm.

23.    The Debtor was hit hard by the global economic downturn in 2008 as demand for legal services plummeted.  Some clients stopped paying altogether, and receivables were frequently stretched long past due.  From 2008 to 2009, the Debtor's audited financial statements reflected that its fee revenue decreased by a staggering $146 million.  And during that same period, receivables over 365 days past due increased by almost $14 million.  Aged work-in-progress accounts ("WIP") (*i.e.*, work performed but not yet billed) saw similar results, with WIP over 365 days old jumping approximately $10 million from 2008 to 2009 and steadily increasing by almost $24 million from 2008 to 2011.

24.    The firm's revenues continued to decrease in 2010, falling by another $49 million from the prior year.  And although the Debtor's fee revenue increased by just under $22 million from 2010 to 2011, these improved results remained over $170 million less than the revenue collected in 2008.  Moreover, collection issues continued through 2011, as reflected by an

increase of approximately $16 million in receivables over 365 days past due over the prior year.

Although future business prospects showed some promise, it was simply too late for the Debtor.

25.    As a result of reduced fee revenue, the Debtor's operations suffered.  Unable to

pay its obligations as they came due, the firm postponed payments of some obligations and

missed deadlines on others.  For instance, unfunded retirement benefits that bedeviled Dewey

Ballantine before the merger returned to haunt the combined Debtor.  At the time of the merger

in 2007, the present value of Dewey Ballantine's and LeBoeuf Lamb's future obligations to

retirees was over $60 million.  But by early 2009, the firm's cash crunch caused the Debtor to

stop making monthly payments to retirees.  Following a series of meetings during 2009, the firm

entered contracts with certain retirees in an effort to restructure the obligations and improve firm

cash flows.  But the Debtor ultimately proved unable to meet even the revised payment

schedules.  Instead, as cash flow grew more and more constricted, management favored cash

distributions to partners at the expense of retirees and other creditors.

**E.    Partner Appeasement Through "Bonuses"**

26.    When the financial reporting data was completed for fiscal year 2008 – the first

full fiscal year of the combined firm – net income fell short of projections by approximately

$140 million.  This represented a shortfall of nearly 40% based on firm projections.  This

economic reality caused the firm to make distributions to most partners for 2008 that were well

below expectations.

27.    In early 2009, Steven Davis ("Davis"), the firm's Chairman, proposed that the

Executive Committee authorize a "bonus" to partners that would attempt to make up for the

shortfall in their projected distributions from 2008.  The Executive Committee agreed, and the

Compensation Committee approved a slate of Participation Targets for 2009 that included intended bonuses based on the 2008 shortfall.

28.     But the Debtor's net profit again fell well short of projections in 2009. Management again proposed make-up bonuses payable in 2010 and 2011. But the firm's net profit never improved enough to allow the Debtor to make distributions in line with the inflated Participation Targets and related "bonus" payments. Put simply, the firm could not distribute income it did not earn or receive.

29.     By early 2010, the formal distribution system had completely collapsed. The Compensation Committee did not propose Participation Targets in the first half of the year. When the Compensation Committee met toward the end of 2010, it was already clear the firm would, yet again, fail to meet its profit target. Rather than adjust projected distributions downward, management again planned to make up for missed Participation Targets in future years. The Compensation Committee allocated to partners both a Participation Target for 2010 and a "bonus" on account of 2008 and 2009 that it planned to pay out over 2010, 2011 and 2012.

**F.     Recourse to Capital Markets**

30.     By early 2010, the Debtor had drawn down tens of millions of dollars on lines of credit from at least five different banks. Yet, the Debtor needed additional financing. The apparent solution was a bond offering in April 2010 in the aggregate face amount of $150 million.

31.     Bond offerings for law firms were and are rare, but these were exceptional times for the Debtor. After two years of coming in well below income projections, struggling with making payments to creditors, and the potential threat of mass partner departures if management

was unable to continue making distributions to partners, management needed to identify a new source of debt funding.

32.    The bonds contained terms that provided investors with certain protections, thus enhancing their marketability, despite the risks associated with the Debtor's insolvent financial condition.  Namely, the bonds:  (i) were fully secured by a lien on the firm's most valuable asset and source of cash flows – its accounts receivable; and (ii) required that the book value of the accounts receivable far exceed the amount owed on the bonds.

## G.    Insolvency and Collapse

33.    By at least January 1, 2009, the firm was insolvent, unable to pay its debts as they came due, and undercapitalized.  It remained in that condition continuously through its bankruptcy filing.

34.    From at least January 1, 2009 to its bankruptcy filing, the firm's probable liability on existing debts exceeded the present fair salable value of its assets.  The Debtor's audited financial statements reported that assets exceeded liabilities by $117 million as of December 31, 2008.  But the audited results were stated in terms of tax-basis accounting or modified cash-basis accounting, and therefore, did not take into account the net realizable value of assets.  Instead, assets remained on the Debtor's books at their historical book values, which did not reflect economic reality.  Moreover, book values overstated the present fair salable value of assets because they include assets with no marketable value (such as leasehold improvements, technology, furniture, and other fixtures).  The results also understated probable liabilities on existing debts by failing to include obligations to retirees (such as unfunded pension obligations), future property lease obligations, equipment lease obligations, and other contractual payment obligations.  In fact, the Debtor's financial statements did not even include an accrual for

10

accounts payable because the statements were prepared on an income tax cash basis.  Properly adjusted to account for the marketable value of the Debtor's assets and the existence of future cash obligations, it is clear that liabilities exceed assets as of December 31, 2008 and during all time periods from that date until the bankruptcy filing.

35.    The firm was also unable to pay its debts as they came due since at least January 1, 2009, and continuously until the firm filed for bankruptcy protection.  As cash flow grew more and more constricted, management prioritized cash distributions to partners at the expense of creditors.  The firm failed to make contractually obligated payments to retired partners.  Most vendors were paid on a cash-available basis, and some were paid many months after the due date listed on their invoices.

36.    The firm was also undercapitalized from at least January 1, 2009, and continuously until bankruptcy.  The Debtor suffered from a decreasing ability to generate cash due to the reduction in demand for legal services discussed above.  During that period, its ability to pay its debts was reduced, as indicated by its failure to pay vendors timely and make required payments on retirement obligations, as discussed above.  As a result, the Debtor's cash reserves steadily decreased year-over-year in 2009, 2010, and 2011 by $3.5 million, $74.2 million, and $10.4 million, respectively.  In fact, cash reserves plummeted from $122.4 million in 2008 to $34.3 million in 2011—a reduction of 72% of the Debtor's capital cushion.  Moreover, the Debtor faced hundreds of millions of dollars related to employee expenses and was burdened with hundreds of millions of dollars in liabilities, including debt obligations and obligations to retired partners.  The firm simply did not have the ability to generate enough cash from operations to pay its debts while remaining financially viable.

37.    The firm filed for bankruptcy on May 28, 2012 ("Petition Date").

## FACTUAL ALLEGATIONS SPECIFIC TO THE DEFENDANTS

**A.    Defendants Were Insiders of the Debtor That Were Paid Under Lucrative and Extraordinary Employment Contracts.**

38.    On or about August 29, 2007, on the eve of the looming merger combination between Dewey Ballantine and LeBoeuf Lamb, Defendant DiCarmine signed an Employment and Long Term Incentive Plan Agreement with the Debtor (the "DiCarmine Employment Contract").  Though not yet appointed as the Debtor's Chairman, Steven Davis nevertheless signed the DiCarmine Employment Contract on behalf of the Debtor.

39.    Similarly, Defendant Sanders signed an Employment and Long Term Incentive Plan Agreement with the Debtor on or about August 29, 2007 (the "Sanders Employment Contract"; together, with the DiCarmine Employment Contract, the "Employment Contracts").  As with the DiCarmine Employment Contract, Steven Davis signed the Sanders Employment Contract on behalf of the Debtor, even though he had not yet been appointed as the Debtor's Chairman.

40.    The Employment Contracts provided DiCarmine and Sanders with four types of cash compensation from the Debtor, each for a period of six years beginning on January 1, 2008: (i) Contractual Salary; (ii) Contractual Bonuses; (iii) Discretionary Bonuses; and (iv) Trust Payments.

41.    **Contractual Salary**.  Under the Employment Contracts, DiCarmine and Sanders were each to be paid a fixed base salary from 2008 to 2013.  DiCarmine's Contractual Salary was $950,000 per annum, or $5,700,000 for the six-year contract term.  Sanders's Contractual Salary was $900,000 per annum, or $5,400,000 for the six-year contract term.

42.    **Contractual Bonuses**.    Under the Employment Contracts, DiCarmine and Sanders were each to be paid a fixed bonus from 2008 to 2013.  Both DiCarmine and Sanders's Contractual Bonuses were $200,000 per annum, or $1,200,000 each for the six-year term.

43.    **Discretionary Bonuses.**    DiCarmine and Sanders were each entitled to receive bonuses "based on the economic performance of DL and the performance of the Employee," as determined "at the discretion of the chairman."   DiCarmine Employment Contract at § 2; Sanders Employment Contract at § 2.  There is no limit under the Employment Contracts to the amount of Discretionary Bonuses.

44.    **Trust Payments.**    Under the Employment Contracts, the Debtor was also required to make annual deposits of $200,000 into two irrevocable grantor trusts – one for the benefit of DiCarmine ("<u>DiCarmine Trust</u>"), and another for Sanders's benefit ("<u>Sanders Trust</u>").  These annual deposits were to be made on December 31 of each year beginning in 2008 through 2013.  Every three years – once in 2010, and again in 2013 – DiCarmine and Sanders were to receive "the amount of funds in the Trust" from the Debtor.  This adds up to an additional $1,200,000 each for the six-year term.

45.    All in, non-discretionary payments under the Employment Contracts to DiCarmine and Sanders totaled $15,900,000 over six years – with an opportunity for unlimited discretionary bonuses – an astronomically generous arrangement for law firm administrators, and far in excess of the reasonably equivalent value of the services contracted for or provided.

46.    Moreover, the circumstances surrounding the Employment Contracts indicate that the amounts to be paid to DiCarmine and Sanders were objectively unreasonable, if not arbitrary and capricious.  Without limitation, three of these circumstances are set forth below.

47.    <u>First</u>, the Employment Contracts were entered into before the Debtor came into existence – thus, the amounts to be paid to DiCarmine and Sanders were set, upon information and belief, through negotiations primarily or solely with Davis.  Davis, however, had a conflict of interest in negotiating the Employment Contracts: as discussed below, Davis benefitted from a poison pill in the Employment Contracts which purportedly obligates the Debtor to make a significant lump sum payment to DiCarmine and Sanders if Davis is replaced as Chairman of the Debtor.

48.    <u>Second</u>, upon information and belief, the Debtor failed to evaluate the reasonableness of the Employment Contracts in comparison to either the Debtor's financial plan or the prevailing market conditions.  Upon information and belief, the Debtor did not commission any compensation study to determine the proper amount to be paid to DiCarmine and Sanders.  Upon information and belief, the Debtor did not seek out any candidates comparable to DiCarmine and Sanders to determine whether such candidates would work for less than the amounts set forth in the Employment Contracts.  Accordingly, the Trustee alleges, upon information and belief and subject to any and all necessary expert testimony, that the Employment Contracts were objectively unreasonable when compared to the prevailing market for law firm administrators.

49.    <u>Third</u>, the Employment Contracts were so one-sided that DiCarmine and Sanders were not even required to work to receive millions of dollars from the Debtor.  Under the Employment Contracts, DiCarmine and Sanders could only be terminated for cause, which was narrowly defined as "the commission of fraud or any criminal act by Employee against DL." DiCarmine Employment Contract at § 1; Sanders Employment Contract at § 1.  If DiCarmine and Sanders were terminated for any reason other than cause – including, for example, a

complete and total abdication of their job responsibilities – the Employment Contracts purport to require the Debtor to pay immediately all remaining payments due under the full term of the Employment Contracts plus a penalty of two times the highest annual compensation (including Discretionary Bonuses) for any prior year – a potentially limitless number that would, at the very least, amount to several million dollars.

50.     In addition to paying DiCarmine and Sanders far more than reasonably equivalent value for their contracted-for services, the Employment Contracts are neither subjectively nor objectively within the ordinary course of the Debtor's business or the ordinary course of the legal profession.

51.     Subjectively, the Employment Contracts were not customary or recurring transactions between the Debtor and DiCarmine and Sanders.  Instead, the Employment Contracts were entered into before the Debtor was formed (and thus before the Debtor had established a customary course of dealing with DiCarmine and Sanders).

52.     Objectively, the Employment Contracts are not ordinary in the Debtor's business. Upon information and belief, law firm administrators are customarily not provided long-term, guaranteed contracts, worth millions per annum and which cost millions more to terminate for any reason other than crime or fraud against the firm.

53.     Approximately one month after the Debtor entered into the Employment Contracts, the Debtor adopted the DLPA, which confirms Defendants' status as insiders of the Debtor.

54.     Under the DLPA, the Debtor was to be managed by an Executive Committee, but the Executive Committee could (and did) delegate its powers to the firm's Chairman (Davis). See DLPA § 4.1.  As Chairman, Davis was "responsible for the day-to-day management of the

business of the Firm." DLPA § 4.6. To fulfill those responsibilities, Davis was empowered to "designate all of the initial non-legal executive and administrative positions of the Firm…" (DLPA § 4.9(a)), which he did, in part, by appointing DiCarmine as the Debtor's Executive Director and Sanders as the Debtor's CFO.

55.    Upon information and belief, the Debtor's Executive Committee permitted Davis, DiCarmine, and Sanders to manage the Debtor with little or no oversight. Under Davis, DiCarmine and Sanders exerted substantial control over the Debtor's management decisions.

56.    DiCarmine and Sanders's status as controlling insiders of the Debtor is exemplified by a particularly egregious transaction. In 2008, DiCarmine and Sanders had approximately $1.2 million each of personal loans owed to a certain third-party and related to a personal joint business venture that had nothing to do with the Debtor. DiCarmine and Sanders each transferred their loans to the Debtor, which assumed the debts. The Debtor then entered into promissory notes with DiCarmine and Sanders, on repayment terms with interest rates more favorable than their personal loans. Upon information and belief, no other employee or partner of the Debtor obtained such multi-million dollar, preferential financing from the Debtor.

57.    From January 1, 2008 and through the Petition Date, as the Debtor struggled with the impact of the global recession and the collapse in the demand for legal services, DiCarmine and Sanders received extraordinary levels of fixed and discretionary compensation.

58.    In 2008, DiCarmine received from the Debtor (either paid to him or for his benefit), Contractual Salary of $950,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $1,011,992, or approximately 88% of his base salary and fixed bonus. In addition, the Debtor funded the DiCarmine Trust with $200,000.

59.     In 2008, Sanders received from the Debtor (either paid to him or for his benefit), Contractual Salary of $900,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $1,017,617, or approximately 93% of his base salary and fixed bonus.  In addition, the Debtor funded the Sanders Trust with $200,000.

60.     In 2009, DiCarmine received from the Debtor (either paid to him or for his benefit), Contractual Salary of $950,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $1,300,000, or approximately 113% of his base salary and fixed bonus.  In addition, the Debtor funded the DiCarmine Trust with an additional $200,000.

61.     In 2009, Sanders received from the Debtor (either paid to him or for his benefit), Contractual Salary of $900,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $1,300,000, or approximately 118% of his base salary and fixed bonus.  In addition, the Debtor funded the Sanders Trust with an additional $200,000.

62.     In 2010, the same year the Debtor's cash reserves collapsed by $75 million and the Debtor had to issue bonds to raise cash to stay afloat, DiCarmine received from the Debtor (either paid to him or for his benefit), Contractual Salary of $950,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $900,000, or approximately 78% of his base salary and fixed bonus.  In addition, the Debtor funded the DiCarmine Trust with an additional $200,000.  At the end of 2010, the DiCarmine Trust disbursed to DiCarmine the $600,000 that the Debtor had deposited in 2008, 2009 and 2010.

63.     In 2010, Sanders received from the Debtor (either paid to him or for his benefit), Contractual Salary of $900,000; Contractual Bonus of $200,000; and a Discretionary Bonus of $900,000, or approximately 82% of his base salary and fixed bonus.  In addition, the Debtor

funded the Sanders Trust with an additional $200,000.  At the end of 2010, the Sanders Trust

disbursed to Sanders the $600,000 that the Debtor had deposited in 2008, 2009 and 2010.

64.    In addition to the substantial compensation paid under the Employment Contracts

during 2010, in January 2010, DiCarmine and Sanders each obtained an irrevocable standby

letter of credit from the Debtor worth $1.9 million.  According to the sworn testimony of both

DiCarmine and Sanders, the letter of credit was provided to protect them against any failure by

Dewey to pay amounts owed under the Employment Contracts.  See DiCarmine Decl. ¶ 14;

Sanders Decl. ¶ 14[2].  DiCarmine and Sanders's sworn testimony not only indicates that by

January of 2010, each had concerns about whether the Debtor could or would continue to pay the

millions purportedly owed them under the Employment Contracts, but also proves that each

extracted a financial accommodation from the Debtor which, upon information and belief, no

other person had been given.

65.    In 2011, DiCarmine received from the Debtor (either paid to him or for his

benefit), Contractual Salary of $950,000; Contractual Bonus of $200,000; and a Discretionary

Bonus of $900,000, or approximately 78% of his base salary and fixed bonus.

66.    In 2011, Sanders received from the Debtor (either paid to him or for his benefit),

Contractual Salary of $900,000; Contractual Bonus of $200,000; and a Discretionary Bonus of

$900,000, or approximately 82% of his base salary and fixed bonus.

67.    On or about May 11, 2012, DiCarmine was terminated by the Debtor.  Between

January 1, 2012, and the Petition Date, DiCarmine received $1,705,848 from the Debtor (either

paid to him or for his benefit), consisting of Contractual Salary of $357,771; Contractual Bonus

---

[2] On October 22, 2013, Sanders filed in the main bankruptcy case a declaration in support of his response to the
Trust's Twenty-Fourth Omnibus Claims Objection. See Docket No. 1775. On the same day – in the same case and
in response to the same objection – DiCarmine filed a similar declaration. See Docket No. 1777. These are the
declarations to which this paragraph of the Complaint refers.

of $200,000; and a Discretionary Bonus of $1,148,077, which is approximately 206% of his base salary and fixed bonus that year.

68.    On or about May 11, 2012, Sanders was terminated by the Debtor.  Between January 1, 2012, and the Petition Date, Sander received $1,683,126 from the Debtor (either paid to him or for his benefit), consisting of Contractual Salary of $338,895; Contractual Bonus of $200,000; and a Discretionary Bonus of $1,144,231, or approximately 212% of his base salary and fixed bonus that year.

69.    During the year preceding the Petition Date ("Preference Period"), DiCarmine received from the Debtor total payments (to him or for his benefit) of $2,799,598.  Specifically, the Debtor made payment of cash to or for the benefit of DiCarmine in the amount of $951,521 in Contractual Salary, $200,000 in Contractual Bonuses, and $1,648,077 in Discretionary Bonuses pursuant to the DiCarmine Employment Contract during the Preference Period.

70.    During the Preference Period, Sanders received from the Debtor total payments (to him or for his benefit) of $2,845,626.  Specifically, the Debtor made payment of cash to or for the benefit of Sanders in the amount of $901,395 in Contractual Salary, $200,000 in Contractual Bonuses, and $1,744,231 in Discretionary Bonuses pursuant to the DiCarmine Employment Contract during the Preference Period.

71.    All payments made to or for the benefit of DiCarmine and Sanders are summarized on a chart appearing at **Exhibit A**.

72.    A detailed listing of all transfers to or for the benefit of DiCarmine and Sanders on account of Contractual Salary, Contractual Bonus and Discretionary Bonus are attached hereto as **Exhibit B**.

73.     On February 1, 2012, Sanders exerted additional insider control of the Debtor by obtaining a written indemnification agreement (the "February 2012 Indemnification Agreement") from the Debtor for the first time in his career with the Debtor.  Specifically, Sanders obtained a signed letter from Davis purporting to indemnify Sanders for "oral and written representations and/or certifications to the Firm's lenders under the terms of the Firm's credit arrangements."  Sanders Decl. ¶ 15 & Ex. C.

74.     Just over three months later, the firm collapsed and filed for bankruptcy.

**B.  In Addition to the Millions Received Under Their Employment Contracts, Defendants Claim to Be Entitled to Millions More in Post-Termination Obligations.**

75.     On September 7, 2012, DiCarmine filed proof of claim number 1068 (the "DiCarmine Proof of Claim") and Sanders filed proof of claim number 1069 (the "Sanders Proof of Claim"; collectively, the "Proofs of Claim").   In the Proofs of Claim, Defendants allege entitlements to:  (a) Unpaid Contractual Salary and Bonuses; (b) Change of Control Penalties; (c) Termination Penalties; and (d) Indemnification Damages.

76.     Additionally, DiCarmine alleges a claim in an unliquidated amount for hostile work environment against the Debtor.

77.     Both Defendants assert a right to "setoff," and that any claims against Defendants should be reduced by the amounts asserted in the Proofs of Claim.

78.     **Unpaid Contractual Salary and Contractual Bonuses**.  Both Defendants claim entitlement to the *pro rata* share of their Contractual Salary and Contractual Bonus for 2012 (although neither worked for the Debtor after their termination on or about May 11, 2012) and the entire amount of their Contractual Salary and Contractual Bonus for 2013 (although neither worked for the Debtor during 2013 because the law firm was winding down).

79.     DiCarmine alleges the Debtor owes him $793,750 in unpaid Contractual Salary and Contractual Bonus for 2012 and $1,150,000 for 2013.  See DiCarmine Decl. at ¶ 6.

80.     Similarly, Sanders alleges the Debtor owes him $762,500 in unpaid Contractual Salary and Contractual Bonus for 2012 and $1,100,000 for 2013.  See Sanders Decl. at ¶ 6.

81.     **Change of Control Penalties**.  The Employment Contracts contained a poison pill in favor of DiCarmine and Sanders if Davis were replaced as the Firm's Chairman. Specifically, the Employment Contracts define "Change of Control," in part to "mean change in the chairman of DL." See DiCarmine Employment Contract § 1; Sanders Employment Contract § 1.  If there is a "Change in Control," the Employment Contracts purportedly require the Debtor to incur two obligations to DiCarmine and Sanders: (1) "immediately deposit into the Trust all remaining funds due to Employee from December 31 of the year of the Change of Control through December 31, 2013" and "immediately direct the trustee of the Trust to release to Employee all funds allocated to Employee under the Trust"; and (2) "continue to pay Employee each year, not less than the Employee's Highest Employee Compensation Package" – which is defined as the highest amount of money the Debtor paid DiCarmine or Sanders in any year, including all bonuses "through the period ending December 31, 2013."  DiCarmine Employment Contract § 6; Sanders Employment Contract § 6.

82.     Davis was removed as Chairman of the Debtor on or about April 3, 2012.

83.     DiCarmine and Sanders have both asserted a claim to Change of Control Penalties allegedly worth millions of dollars.  DiCarmine claims to be owed $2,442,115 in Change of Control Penalties and Sanders claims to be owed $2,400,000.  DiCarmine Decl. at ¶ 11; Sanders Decl. at ¶ 11.  Stated another way, DiCarmine and Sanders claim to be owed over $4.8 million simply because the Debtor's management replaced Davis in an effort to save the firm.

21

84.    **Termination Penalties**.  The Employment Contracts contain an extremely narrow definition of "Cause" which would permit the Debtor to terminate DiCarmine and Sanders. Specifically, the Employment Contracts define "Cause" as "the commission of fraud or any criminal act by Employee against DL."  <u>See</u> DiCarmine Employment Contract § 1; Sanders Employment Contract § 1.  If there is termination without cause, the Employment Contracts purportedly require the Debtor to incur three obligations to DiCarmine and Sanders: (1) "immediately deposit into the Trust all remaining funds due to Employee from December 31 of the year of the Termination…through December 31, 2013"; (2) "deposit into the Trust for the Employee two (2) times  the Employee's Highest Employee Compensation Package" – which is defined as the highest amount of money the Debtor paid DiCarmine or Sanders in any year, including all bonuses through the period ending December 31, 2013; and (3) "immediately direct the trustee of the Trust to release to Employee all funds allocated to Employee under the Trust." DiCarmine Employment Contract § 5; Sanders Employment Contract § 5 (the "<u>Termination Penalties</u>").

85.    The Debtor terminated DiCarmine and Sanders on or about May 11, 2012.

86.    DiCarmine and Sanders assert that the Debtor owes them millions of dollars in Termination Penalties. DiCarmine claims to be owed $4,884,230 in Termination Penalties and Sanders claims to be owed $4,800,000.  DiCarmine Decl. at ¶¶ 8-10; Sanders Decl. at ¶¶ 8-10. Stated another way, DiCarmine and Sanders claim to be owed another $9.6 million because the Debtor's management replaced them as part of their effort to save the firm.

87.    **Indemnification Damages**.    Finally, DiCarmine and Sanders have both demanded to be indemnified by the Debtor from all lawsuits filed against them in connection with their pre-petition work for the Debtor, including without limitation, the following pending

lawsuits: *Bunsow v. Davis, et al.*, Adv. No. 12-02067 (Bankr. S.D.N.Y.) (hereinafter the
"Bunsow Litigation"); *Aviva Life and Annuity Company v. Davis, et al.*, Case No. 4:12-cv-603
(S.D. Iowa) (hereinafter the "Aviva Litigation"); *ePlus Group, Inc. v. DiCarmine, et al.*, Case
No. 13 Civ. 2845 (S.D.N.Y.) (hereinafter the "ePlus Litigation"); *McMillan v. Barclays Bank
PLC, et al.*, Case No. 13 Civ. 1095 (S.D.N.Y.) (hereinafter the "McMillan Litigation").  To date,
DiCarmine and Sanders are asserting Indemnification Damages totaling less than $100,000, but
allege that the amount could escalate quickly if any of these matters became active or additional
matters were filed.

88.    In addition to the payments from the Debtor to or for the benefit of the
Defendants identified herein, this Complaint also seeks to avoid any and all of the post-
termination obligations asserted by DiCarmine and Sanders including, without limitation, the
Unpaid Salary and Contractual Bonuses, the Change of Control Penalties, the Termination
Penalties, and any Indemnification Damages.

## FIRST CLAIM FOR RELIEF

### Avoidance and Recovery of Preferential Transfers
### Pursuant to 11 U.S.C. §§ 547 & 550

89.    The Trustee repeats and re-alleges all allegations set forth in each preceding
paragraph of the Complaint as though set forth fully again in support of this claim for relief.

90.    The Debtor made payments of cash to or for the benefit of the Defendants in the
form of Contractual Salary, Contractual Bonuses, and Discretionary Bonuses during the
Preference Period.

91.    The Debtor made payments to or for the benefit of DiCarmine in the total amount
of $2,799,598 during the Preference Period.  Specifically, the Debtor made payment of cash to or
for the benefit of DiCarmine in the amount of $951,521 in Contractual Salary, $200,000 in

Contractual Bonuses, and $1,648,077 in Discretionary Bonuses pursuant to the DiCarmine Employment Contract during the Preference Period.

92.     The Debtor made payments to or for the benefit of Sanders in the amount of $2,845,626 during the Preference Period.  Specifically, the Debtor made payment of cash to or for the benefit of Sanders in the amount of $901,395 in Contractual Salary, $200,000 in Contractual Bonuses, and $1,744,231 in Discretionary Bonuses pursuant to the DiCarmine Employment Contract during the Preference Period.

93.     The amounts identified in the preceding two paragraphs are referred to as the "Preferential Transfers."

94.     The Preferential Transfers to DiCarmine and Sanders were on account of an antecedent debt – namely, the Employment Contracts.

95.     DiCarmine and Sanders were either statutory or non-statutory insiders of the Debtor.

96.     At the time the Debtor made the Preferential Transfers to the Defendants, the Debtor: (i) was insolvent or became insolvent as a result of such Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

97.     At all times during the Preferential Transfers: (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual and otherwise, as they came due; and (iii) the Debtor had unreasonably small capital in light of its reasonably anticipated obligations.

98.    DiCarmine and Sanders received more from the Preferential Transfers than each would have received if the Debtor's bankruptcy case were under chapter 7 of title 11, the Preferential Transfers had not been made, and DiCarmine and Sanders were paid in accordance with the Bankruptcy Code.

99.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 547 & 550, the Trustee is entitled to a judgment against the Defendants: (a) avoiding the Preferential Transfers; (b) directing the Preferential Transfers be set aside; and (c) requiring the Defendants, as recipients of the Preferential Transfers and/or the party for whose benefit the Preferential Transfers were made, to return the Preferential Transfers, or the value thereof, to the Trustee for the benefit of the Dewey estate.

### SECOND CLAIM FOR RELIEF

**Avoidance and Recovery of Constructively Fraudulent Transfers
Pursuant to 11 U.S.C. §§ 544 and 550 and NYDCL §§ 277-278**

100.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

101.    The Debtor had numerous lessor, trade, pension/retirement, and other creditors with unsecured claims that are allowable under Bankruptcy Code § 502 and that arose prior to the date of each of the payments to the Defendants described in this claim for relief.

102.    The Debtor was a partnership and the payments described in this claim for relief were transfers of partnership property from the Debtor partnership to a person not a partner and without fair consideration to the partnership.

103.    Within six years of the Petition Date, the Debtor made payments of cash to or for the benefit of the Defendants pursuant to their employment contracts in the form of Contractual Salary, Contractual Bonuses, Discretionary Bonuses, and Trust Payments.

25

104. Specifically, the Debtor made payment of cash to or for the benefit of DiCarmine in the amount of $4,157,771 in Contractual Salary, $1,000,000 in Contractual Bonuses, $5,260,068 in Discretionary Bonuses, and $600,000 in Trust Payments pursuant to the DiCarmine Employment Contract within six years before the Petition Date.

105. Specifically, the Debtor made payment of cash to or for the benefit of Sanders in the amount of $3,938,895 in Contractual Salary, $1,000,000 in Contractual Bonuses, $5,261,848 in Discretionary Bonuses, and $600,000 in Trust Payments pursuant to the Sanders Employment Contract within six years before the Petition Date**.**

106. The amounts identified in the preceding two paragraphs are referred to as the "Contract Cash Transfers."

107. Defendants received the Contract Cash Transfers and were therefore the initial transferee of such transfers and/or the parties for whose benefit the Contract Cash Transfers were made.

108. At the time the Debtor made the Contract Cash Transfers to Defendants, Debtor: (i) was insolvent on the date that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

109. At all relevant times: (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual

and otherwise, as they came due; and (iii) the firm had unreasonably small capital in light of its reasonably anticipated obligations.

110.    The Contract Cash Transfers were made without fair consideration because although the Contract Cash Transfers arguably were in discharge of an antecedent debt, neither DiCarmine nor Sanders exchanged fair equivalent value for the Contract Cash Transfers and the Contract Cash Transfers were not made in good faith because they were made by an insolvent partnership to an officer and/or director.

111.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 544, 550 and New York Debtor and Creditor Law §§ 277-278, the Trustee is entitled to a judgment against the Defendants: (a) avoiding the Contract Cash Transfers; (b) directing the Contract Cash Transfers be set aside; and (c) requiring the Defendants, as recipients of the Contract Cash Transfers and/or the parties for whose benefit the Contract Cash Transfers were made, to return the Contract Cash Transfers, or the value thereof, to the Trustee for the benefit of the Dewey estate.

## THIRD CLAIM FOR RELIEF

### Avoidance and Recovery of Constructively Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV) & 550

112.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

113.    Within two years of the Petition Date, the Debtor made transfers to or on behalf of DiCarmine under the DiCarmine Employment Contract totaling $4,949,598.  Specifically, the Debtor made payment of cash to or for the benefit of DiCarmine in the amount of $1,901,521 in Contractual Salary, $400,000 in Contractual Bonuses, and $2,648,077 in Discretionary Bonuses pursuant to the DiCarmine Employment Contract during the two years prior to the Petition Date.

114.    Within two years of the Petition Date, the Debtor made transfers to or on behalf of Sanders under the Sanders Employment Contract totaling $4,845,626.  Specifically, the Debtor made payment of cash to or for the benefit of Sanders in the amount of $1,801,395 in Contractual Salary, $400,000 in Contractual Bonuses, and $2,644,231 in Discretionary Bonuses pursuant to the Sanders Employment Contract during the two years prior to the Petition Date.

115.    The payments to DiCarmine and Sanders under the Employment Contracts constituted one or more transfers of property of the Debtor to the Defendants.

116.    Neither the Employment Contracts nor the transfers made under the Employment Contracts were within the ordinary course of the Debtor's business.

117.    The Debtor did not receive reasonably equivalent value for all or part of the transfers made under the Employment Contracts.

118.    DiCarmine and Sanders are insiders of the Debtor.

119.    Defendants received these payments under the Employment Contracts and were therefore the initial transferees of such transfers and/or the parties for whose benefit the transfers were made.

120.    As a result of the foregoing, pursuant to 11 U.S.C. § 548(a)(1)(B)(ii)(IV), the Trustee is entitled to a judgment against the Defendants: (a) avoiding the transfers under their Employment Contracts made within two years of the Petition Date; (b) directing the transfers under their Employment Contracts be set aside; and (c) requiring the Defendants, as recipients of the transfers under the Employment Contracts and/or the parties for whose benefit the Distributions were given, to return the transfers or the value thereof, to the Trustee for the benefit of the Dewey estate.

## FOURTH CLAIM FOR RELIEF

**Avoidance of Incurred Obligations as Constructively Fraudulent Transfers
Pursuant to 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV) and 550**

121.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

122.    Within two years of the Petition Date, the Debtor incurred obligations to DiCarmine and Sanders under their Employment Contracts related to the Unpaid Contractual Salary and Contractual Bonuses, the Change of Control Penalties, the Termination Penalties, and the Indemnification Damages.  Specifically, the Debtor incurred these obligations within two years of the Petition Date because the events triggering such obligations – for example (and without limitation), the removal of Davis as Chairman – occurred in 2012.

123.    Neither the Employment Contracts nor the obligations incurred under the Employment Contracts were within the ordinary course of the Debtor's business.

124.    The Debtor did not receive reasonably equivalent value for all or part of the obligations incurred under the Employment Contracts.

125.    DiCarmine and Sanders are insiders of the Debtor.

126.    Defendants were the parties for whose benefit the Debtor incurred the obligations under the Employment Contracts.

127.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 548(a)(1)(B)(ii)(IV), the Trustee is entitled to a judgment against the Defendants: (a) avoiding the obligations incurred under their Employment Contracts made within two years of the Petition Date; (b) directing the obligations incurred   under their Employment Contracts be set aside and/or avoided; and (c) declaring that the Debtor shall have no further obligations to the Defendants under the Employment Contracts.

## FIFTH CLAIM FOR RELIEF

**Declaratory Judgment Regarding Indemnification Damages**

128.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

129.    There is an actual case and controversy between the Debtor and Defendants regarding whether the Debtor is obligated by contract or operation of law to indemnify DiCarmine and Sanders for liability arising from acts undertaken during the course and scope of their employment with the Debtor.

130.    Specifically, DiCarmine and Sanders have demanded indemnity for the Bunsow Litigation, the Aviva Litigation, the ePlus Litigation, and the McMillan litigation.

131.    Moreover, Sanders has alleged he is entitled to indemnification from the Debtor, in part, because of the February 2012 Indemnification Agreement.

132.    The Debtor therefore seeks a declaratory judgment that: (a) it has no obligation – by virtue of contract, operation of law, or otherwise – to indemnify DiCarmine or Sanders for acts taken in the course and scope of their employment by the Debtor; (b) it has no obligation – by virtue of contract, operation of law, or otherwise, to indemnify DiCarmine or Sanders in the Bunsow Litigation, the Aviva Litigation, the ePlus Litigation, or the McMillan Litigation; or (c) additionally and in the alternative, if the Debtor is found to have any obligation to indemnify DiCarmine or Sanders, their indemnity is limited and/or satisfied by the Debtor's procurement of management liability insurance policies under which DiCarmine and Sanders are insured.

## SIXTH CLAIM FOR RELIEF

### Declaratory Judgment Regarding Interpretation
### of the Employment Contracts

133.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

134.    There is an actual case and controversy between the Debtor and Defendants regarding what amounts, if any, the Debtor owes DiCarmine and Sanders under their Employment Contracts, with DiCarmine and Sanders alleging that the Debtor owes the Unpaid Salary and Contractual Bonuses, the Termination Penalties and the Change of Control Penalties.

135.    The Debtor alleges that these obligations are unenforceable for various reasons and pleads accordingly.  Only in the event such claims are unsuccessful, however, the Debtor pleads additionally and in the alternative that this Court should enter a declaratory judgment construing the Employment Contracts as follows: (a) the Employment Contracts provide that if there is a Change of Control, DiCarmine and Sanders will continue to be employed by the Debtor "at the sole discretion of the chairman"; (b) there was a Change of Control on or about April 3, 2012; (c) after the Change of Control, DiCarmine and Sanders were employed by the Debtor "at the sole discretion of the chairman"; (d) the Debtor's ability to terminate the employment of Sanders and DiCarmine at the Debtor's discretion superseded the narrow definition of "cause" provided in the Employment Contracts; and therefore (e) the Debtor's May 2012 termination of DiCarmine and Sanders did not run afoul of the Termination Penalties contained in the Employment Contracts.

136.    The Trustee is entitled to judgment against Defendants that properly interprets the Employment Contracts, as well as attorneys' fees, costs, prejudgment interest thereon at the legal rate and with such other relief the Court deems just and proper.

## OBJECTIONS TO PROOFS OF CLAIM

137.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

138.    On September 7, 2012, Defendants filed their Proofs of Claim against the Debtor's estate in the above-captioned main bankruptcy case.  The Proofs of Claim assert claims on account of Defendants' Employment Contracts with the Debtor (for the amounts identified above).   Additionally, Defendant DiCarmine has asserted a hostile work environment claim against the Debtor.  DiCarmine's Proof of Claim number 1068 is attached hereto as **Exhibit C**. Sanders' Proof of Claim number 1069 is attached hereto as **Exhibit D**.

139.    The Trustee hereby objects to Defendants' Proofs of Claim under Bankruptcy Rule 3007(b), providing that objections may be included in an adversary proceeding.

140.    The Trustee further fully incorporates by reference and adopts all objections to the Proofs of Claim asserted in any of the Debtor's omnibus objections to claims filed in the main case, including but not limited to the Corrected Twenty-Fourth Omnibus Objection to Claims. See Docket No. 1742.

141.    **Debtor is Not Liable on Defendant's Claims.**  For the reasons stated above, the Employment Contracts are avoidable and/or cannot be enforced according to the terms urged by the Defendants, so the Debtor has no liability to Defendants on their Proofs of Claim.

142.    **Defendants' Indemnification Damages Claims Must be Subordinated as a Matter of Law**.  Under 11 U.S.C. § 510(b), even if this Court were to allow Defendants' claims for Indemnification Damages, these claims "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security."  11 U.S.C. § 510(b).

143.    **Defendants' Claims Exceed the Reasonable Value of their Services to the Debtor**.  For the reasons stated above, DiCarmine and Sanders were insiders of the Debtor.

Thus, their claims must be disallowed to the extent the amount sought exceeds the reasonable value of their services. See 11 U.S.C. § 502(b)(4).

144.    **Defendants' Claims Are Subject to Disallowance under 11 U.S.C. § 502(d).** The Trustee objects to the Proofs of Claim under Bankruptcy Code § 502(d) on the ground that the Defendants are liable for the return of property that is recoverable pursuant to 11 U.S.C. §§ 544, 547, 548, and 550, as alleged above. See 11 U.S.C. § 502(d).

## RESERVATION OF RIGHTS

145.    The Trustee hereby specifically reserves the right to bring any and all other causes of action that it may maintain against the Defendants including, without limitation, causes of action arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation by the Trustee reveals such further causes of action.

146.    The Trustee further reserves the right to bring any and all objections to the Proofs of Claim that it may have now or discover in the future upon further investigation and discovery.

## PRAYER FOR RELIEF

The Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

  a.  On the First Claim for Relief, a judgment in the amount of $5,645,224;

  b.  On the Second Claim for Relief, a judgment in the amount of $21,818,582;

  c.  On the Third Claim for Relief, a judgment in the amount of $9,795,224;

  d.  On the Fourth Claim for Relief, a judgment avoiding any and all future obligations that the Debtor may owe the Defendants under their Employment Contracts;

  e.  On the Fifth Claim for Relief, a declaration that the Debtor does not owe any Indemnification Damages to the Defendants;

  f.  On the Sixth Claim for Relief, a declaration that the Debtor does not owe any Termination Penalties to the Defendants;

g.  On the Objection to the Proofs of Claim, disallowance of the Proofs of Claim or, alternatively, subordination of the Proofs of Claim;

h.  Any and all pre- and post-judgment interest due; and

i.  Such other relief that the Court deems appropriate under the circumstances, including, but not limited to, reasonable attorneys' fees, expenses, and costs.

Dated:  New York, New York
        November 27, 2013

DIAMOND McCARTHY LLP

By:  _/s/ Andrew B. Ryan_____.
Allan B. Diamond, Esq.
Howard D. Ressler, Esq.
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel: (212) 430-5400
Fax: (212) 430-5499

- and -

Andrew B. Ryan, Esq. (*pro hac vice*)
1201 Elm Street, 34th Floor
Dallas, Texas 75270
Tel: (214) 389-5300
Fax: (214) 389-5399

*Attorneys for Alan M. Jacobs, Liquidating Trustee for the Dewey & LeBoeuf Liquidation Trust*