DIAMOND McCARTHY LLP
Allan B. Diamond, Esq.
Howard D. Ressler, Esq.
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel: (212) 430-5400
Fax: (212) 430-5499

- and -

Andrea L. Kim, Esq. (*pro hac vice*)
Christopher R. Murray, Esq. (*pro hac vice*)
909 Fannin Street, 15th Floor
Houston, Texas 77010
Tel: (713) 333-5100
Fax: (713) 333-5199

*Attorneys for Alan M. Jacobs, Liquidating Trustee*
*for the Dewey & LeBoeuf Liquidation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12321 (MG) |
| **DEWEY & LEBOEUF LLP,** | **Chapter 11** |
| Debtor. | |
| **ALAN M. JACOBS, as Liquidating Trustee of the Dewey & LeBoeuf Liquidation Trust,** | Adversary No. _____ |
| Plaintiff, | |
| v. | |
| **GEOFFREY H. COLL,** | |
| Defendant. | |

**ADVERSARY COMPLAINT**

Alan M. Jacobs, solely in his capacity as Liquidating Trustee ("Trustee") for and on behalf of the Dewey & LeBoeuf Liquidation Trust ("Trust"), by and through his undersigned counsel, brings this adversary proceeding against Geoffrey H. Coll ("Defendant"), and alleges as follows:

## INTRODUCTION

1.    The Trustee files this lawsuit to recover distributions of substantial sums of money made to the Defendant, an equity partner of Dewey & LeBoeuf LLP ("Debtor"), while the Debtor was insolvent.  The Debtor was insolvent by no later than January 1, 2009 and remained insolvent until it filed for bankruptcy on May 28, 2012 ("Petition Date").  Despite the Debtor's insolvency and inability to pay creditors, it nevertheless transferred tens, if not hundreds, of millions of dollars as distributions, draws, bonuses, and returns of capital (collectively, "Distributions") to its partners – including approximately $1,423,643 in Distributions to the Defendant during this period.  These transfers were made on account of equity, and therefore, were made for no consideration, less than fair consideration, or less than reasonably equivalent value to the Debtor.

2.    The Trustee also seeks recovery and repayment of personal income tax payments the Debtor made on the Defendant's behalf in the amount of $56,436.  The Defendant has been unjustly enriched by the Debtor's payment of the Defendant's personal tax obligations.

3.    Accordingly, the Trustee seeks judgment against the Defendant in the amount of not less than $1,480,079 plus interest, fees, and costs as allowed by law.

## JURISDICTION AND VENUE

4.    This adversary proceeding arises out of the bankruptcy of the Debtor and is commenced pursuant to sections 541 through 550 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3007 and 7001.

5.      This Court has jurisdiction under 28 U.S.C. §§ 157, 1334.

6.      This is a core proceeding under 28 U.S.C. § 157(b)(2).  To the extent necessary, the Trustee consents to entry of a final order or judgment by this Court.

7.      Venue is proper in this Court under 28 U.S.C. § 1409 because the Debtor's chapter 11 case is pending in this judicial district.

## PARTIES

8.      The Trust was created by the Debtor's Second Amended Chapter 11 Plan of Liquidation, dated January 7, 2013 ("Plan"), which the Court confirmed on February 27, 2013. On March 22, 2013, the Plan became effective and the Trust was vested with all causes of action available to the Debtor excluding those that are Secured Lender Trust assets and those released in the Plan.

9.      Defendant is an individual who may be served with process by any manner of service authorized by Rule 7004 of the Federal Rules of Bankruptcy Procedure.  Defendant was at all relevant times a partner and equity interest holder of the Debtor.

## GENERAL FACTUAL ALLEGATIONS

### A.  The Debtor

10.     The Debtor was the product of the combination, on October 1, 2007, of two prominent law firms, Dewey Ballantine LLP ("Dewey Ballantine") and LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf Lamb").

11.     The Debtor was at all relevant times a registered limited liability partnership under the Partnership Law of the State of New York ("NYPL").

12.     The Debtor's relationship with the Defendant was governed by the Dewey & LeBoeuf LLP Partnership Agreement ("DLPA"), which was effective October 1, 2007, and was

3

amended on April 12, 2010, and again on April 3, 2012.  Unless otherwise indicated, references

to the DLPA are to the version of the document in effect at the time of the alleged events.

### B.  The Creation of Dewey LeBoeuf

13.    Dewey Ballantine was an elite law firm plagued with financial difficulties.

Despite wide recognition as one of the most prestigious New York-based firms, it consistently

failed to meet financial projections in the years prior to 2007.  Extravagant unfunded pension

liabilities posed an increasing financial burden that was exacerbated by a decline in the

performance of key practice groups.  As a result, Dewey Ballantine sought to merge with a larger

and more financially sound firm.

14.    LeBoeuf Lamb was a New York-based firm with over 700 attorneys at the time of

the combination with Dewey Ballantine.  In recent years, LeBoeuf Lamb had grown aggressively

by acquiring lateral partners, practice groups, and other law firms.  Traditionally an insurance

and public utilities firm, LeBoeuf Lamb sought to become a leader in mergers and acquisitions

and other areas that were traditionally Dewey Ballantine's strengths. Merger talks between

Dewey Ballantine and LeBoeuf Lamb began in the summer of 2007, resulting in a deal that

closed in October 2007.

### C.  Partner Compensation and "Participation Targets" Under the DLPA

15.    The DLPA provided that equity partner compensation was based on the

profitability of the partnership.  Shares of net profit were allocated among the partners by the

Compensation Committee.  Early each year, the Compensation Committee would meet and

assign partners "Participation Targets" expressed as a dollar amount.

16.     A partner's Participation Target was not a fixed salary, and in no way guaranteed a particular distribution.   Rather, the Participation Targets were just that—a projection of a partner's share of profits if the Debtor achieved its projected net income.

17.     The Participation Targets also served as an allocation tool used in a formula to determine each partner's percentage share of the firm's profits in the event the firm failed to meet projections.   Under DLPA § 2.1, each partner's "Percentage Share" of the firm and its profits was calculated by dividing a given partner's Participation Target by the sum total of all Participation Targets.   In the event that the firm's net income did not reach the aggregate amount of all Participation Targets (*i.e.*, if the firm failed to meet profitability projections), DLPA § 6.4(a) provided that partner distributions were determined by multiplying individual partner's Percentage Shares by the Debtor's actual net income.   DLPA § 6.4(b) required that a partner return any amount received in excess of what was due under DLPA Section 6.4(a).

18.     In early 2008, the firm's Compensation Committee met to determine Participation Targets for the year.   A problem quickly arose from the reconciliation of pay scales for partners from LeBoeuf Lamb and those from Dewey Ballantine.   In general, former LeBoeuf Lamb partners had considerably higher distribution targets than partners from Dewey Ballantine with similar performance statistics.   But rather than adjust Participation Targets across the board to reflect performance statistics, the Participation Targets of partners from Dewey Ballantine were simply increased to match the targets for partners from LeBoeuf Lamb.

19.     Naturally, this decision caused the aggregate Participation Target and projected net income to increase.   Although the DLPA's distribution mechanism could prevent inflated Participation Targets from resulting in over-distributions, it had the negative effect of creating over-optimistic expectations amongst partners.   In order for all of the partners' distributions to

5

fall in line with their respective Participation Targets, the Debtor would need to immediately perform at a high level from a fiscal standpoint.

20.     The problem was further compounded by the allocation of inflated Participation Targets to other partners.  New lateral hires were brought on with high Participation Targets that did not reflect the firm's economic reality, exacerbating the problem by creating internal competition amongst partners for equal treatment and compensation.  Some legacy partners learned of these arrangements and leveraged their own influence with management to secure similarly inflated Participation Targets.

21.     Coupled with the constricting market for legal service providers, the inflated Participation Targets set the stage for frustration and angst among the partners.  Many incorrectly viewed the Participation Targets as a salary.  But the partners were equity holders, only entitled to their proportionate share of firm profits under the DLPA.  Although a given partner's distributions could reach his or her Participation Target when the firm's net income met expectations, the Debtor failed to meet the aggregate of Participation Targets from 2008 through the bankruptcy.  Management never reduced partners' Participation Targets in an amount necessary to bring the aggregate of all Participation Targets in line with realistic expectations for net income.  As a result, individual partners' pro rata share of the firm's income was far less than their Participation Targets.

**D.  Snowballing Underperformance**

22.     The Debtor's economic woes were a result of many factors.  Having just combined in late 2007, the Debtor faced hurdles in working through the costs of the combination.  The Debtor was forced to deal with massive expenses related to the combination, including redundant overhead (such as multiple office leases in the same city, duplicative

staffing, and equipment leases), all which necessarily affected the firm's bottom line while it worked toward integration.  Of course, these costs were to be expected and could have potentially been overcome.  However, the Debtor could not have predicted the looming economic downturn and the resulting negative impact on the firm.

23.     The Debtor was hit hard by the global economic downturn in 2008 as demand for legal services plummeted.  Some clients stopped paying altogether, and receivables were frequently stretched long past due.  From 2008 to 2009, the Debtor's audited financial statements reflected that its fee revenue decreased by a staggering $146 million.  And during that same period, receivables over 365 days past due increased by almost $14 million.  Aged work-in-progress accounts ("WIP") (*i.e.*, work performed but not yet billed) saw similar results, with WIP over 365 days old jumping approximately $10 million from 2008 to 2009 and steadily increasing by almost $24 million from 2008 to 2011.

24.     The firm's revenues continued to decrease in 2010, falling by another $49 million from the prior year.  And although the Debtor's fee revenue increased by just under $22 million from 2010 to 2011, these improved results remained over $170 million less than the revenue collected in 2008.  Moreover, collection issues continued through 2011, as reflected by an increase of approximately $16 million in receivables over 365 days past due over the prior year.  Although future business prospects showed some promise, it was simply too late for the Debtor.

25.     As a result of reduced fee revenue, the Debtor's operations suffered.  Unable to pay its obligations as they came due, the firm postponed payments of some obligations and missed deadlines on others.  For instance, unfunded retirement benefits that bedeviled Dewey Ballantine before the merger returned to haunt the combined Debtor.  At the time of the merger in 2007, the present value of Dewey Ballantine's and LeBoeuf Lamb's future obligations to

retirees was over $60 million. But by early 2009, the firm's cash crunch caused the Debtor to stop making monthly payments to retirees. Following a series of meetings during 2009, the firm entered contracts with certain retirees in an effort to restructure the obligations and improve firm cash flows. But the Debtor ultimately proved unable to meet even the revised payment schedules. Instead, as cash flow grew more and more constricted, management favored cash distributions to partners at the expense of retirees and other creditors.

### E.    Partner Appeasement Through "Bonuses"

26.    When the financial reporting data was completed for fiscal year 2008 – the first full fiscal year of the combined firm – net income fell short of projections by approximately $140 million. This represented a shortfall of nearly 40% based on firm projections. This economic reality caused the firm to make distributions to most partners for 2008 that were well below expectations.

27.    In early 2009, Steven Davis, the firm's chairman, proposed that the Executive Committee authorize a "bonus" to partners that would attempt to make up for the shortfall in their projected distributions from 2008. The Executive Committee agreed, and the Compensation Committee approved a slate of Participation Targets for 2009 that included intended bonuses based on the 2008 shortfall.

28.    But the Debtor's net profit again fell well short of projections in 2009. Management again proposed make-up bonuses payable in 2010 and 2011. But the firm's net profit never improved enough to allow the Debtor to make distributions in line with the inflated Participation Targets and related "bonus" payments. Put simply, the firm could not distribute income it did not earn or receive.

29.     By early 2010, the formal distribution system had completely collapsed.   The Compensation Committee did not propose Participation Targets in the first half of the year. When the Compensation Committee met toward the end of 2010, it was already clear the firm would, yet again, fail to meet its profit target.   Rather than adjust projected distributions downward, management again planned to make up for missed Participation Targets in future years.  The Compensation Committee allocated to partners both a Participation Target for 2010 and a "bonus" on account of 2008 and 2009 that it planned to pay out over 2010, 2011 and 2012.

### F.  Recourse to Capital Markets

30.     By early 2010, the Debtor had drawn down tens of millions of dollars on lines of credit from at least five different banks.   Yet, the Debtor needed additional financing.   The apparent solution was a bond offering in April 2010 in the aggregate face amount of $150 million.

31.     Bond offerings for law firms were and are rare, but these were exceptional times for the Debtor.  After two years of coming in well below income projections, struggling with making payments to creditors, and the potential threat of mass partner departures if management was unable to continue making distributions to partners, management needed to identify a new source of debt funding.

32.     The bonds contained terms that provided investors with certain protections, thus enhancing their marketability, despite the risks associated with the Debtor's insolvent financial condition.  Namely, the bonds:  (i) were fully secured by a lien on the firm's most valuable asset and source of cash flows – its accounts receivable; and (ii) required that the book value of the accounts receivable far exceed the amount owed on the bonds.

### G. Insolvency and Collapse

33.    By at least January 1, 2009, the firm was insolvent, unable to pay its debts as they came due, and undercapitalized.    It remained in that condition continuously through its bankruptcy filing.

34.    From at least January 1, 2009 to its bankruptcy filing, the firm's probable liability on existing debts exceeded the present fair salable value of its assets.    The Debtor's audited financial statements reported that assets exceeded liabilities by $117 million as of December 31, 2008.    But the audited results were stated in terms of tax-basis accounting or modified cash-basis accounting, and therefore, did not take into account the net realizable value of assets.    Instead, assets remained on the Debtor's books at their historical book values, which did not reflect economic reality.    Moreover, book values overstated the present fair salable value of assets because they include assets with no marketable value (such as leasehold improvements, technology, furniture, and other fixtures).    The results also understated probable liabilities on existing debts by failing to include obligations to retirees (such as unfunded pension obligations), future property lease obligations, equipment lease obligations, and other contractual payment obligations.    In fact, the Debtor's financial statements did not even include an accrual for accounts payable because the statements were prepared on an income tax cash basis.    Properly adjusted to account for the marketable value of the Debtor's assets and the existence of future cash obligations, it is clear that liabilities exceed assets as of December 31, 2008 and during all time periods from that date until the bankruptcy filing.

35.    The firm was also unable to pay its debts as they came due since at least January 1, 2009, and continuously until the firm filed for bankruptcy protection.    As cash flow grew more and more constricted, management prioritized cash distributions to partners at the

expense of creditors.   The firm failed to make contractually obligated payments to retired partners.  Most vendors were paid on a cash-available basis, and some were paid many months after the due date listed on their invoices.

36.    The firm was also undercapitalized from at least January 1, 2009, and continuously until bankruptcy.  The Debtor suffered from a decreasing ability to generate cash due to the reduction in demand for legal services discussed above.  During that period, its ability to pay its debts was reduced, as indicated by its failure to pay vendors timely and make required payments on retirement obligations, as discussed above.  As a result, the Debtor's cash reserves steadily decreased year-over-year in 2009, 2010, and 2011 by $3.5 million, $74.2 million, and $10.4 million, respectively.  In fact, cash reserves plummeted from $122.4 million in 2008 to $34.3 million in 2011—a reduction of 72% of the Debtor's capital cushion.  Moreover, the Debtor faced hundreds of millions of dollars related to employee expenses and was burdened with hundreds of millions of dollars in liabilities, including debt obligations and obligations to retired partners.   The firm simply did not have the ability to generate enough cash from operations to pay its debts while remaining financially viable.

37.    The firm filed for bankruptcy on May 28, 2012 ("Petition Date").

## FACTUAL ALLEGATIONS SPECIFIC TO THE DEFENDANT

### A.    Defendant Was a Partner in the Debtor

38.    Defendant was a partner and equity interest holder in the Debtor from at least January 1, 2009.

39.    Defendant held himself out as a partner from at least January 1, 2009.

40.    Under the DLPA, Defendant was required to make certain capital contributions.

### B.      Distributions Paid to Defendant

41.      The Debtor made cash Distributions to or for the benefit of the Defendant during calendar year 2009 in a total amount of $442,861.

42.      The Debtor made cash Distributions to or for the benefit of the Defendant during calendar year 2010 in a total amount of $315,851.

43.      The Debtor made cash Distributions to or for the benefit of the Defendant during calendar year 2011 in a total amount of $487,876.

44.      The Debtor made cash Distributions to or for the benefit of the Defendant during calendar year 2012 before the Debtor entered bankruptcy in the total amount of $177,055.

### C.  Taxes Paid for the Defendant

45.      The Debtor was a limited liability partnership and was a pass through entity for tax purposes.  As a result, individual partners, such as the Defendant, were obligated to pay taxes based on their allocated share of the Debtor's income.  Nevertheless, the Debtor made certain tax payments on behalf of its partners with the expectation of reimbursement.  However, Defendant failed to reimburse Debtor for all of the tax payments made for his benefit.

46.      As of the Petition Date, the Debtor had paid at least $56,436 in personal income tax obligations of the Defendant that the Defendant had not repaid to the Debtor.

### FIRST CLAIM FOR RELIEF

### Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548(a)(1)(B) & 550

47.      Plaintiff repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

48.      The Debtor made Distributions of cash to or for the benefit of the Defendant in the amounts and on the dates set forth in the schedule at Exhibit "A."

49.    Defendant received these payments and was therefore the initial transferee of such transfers and/or the party for whose benefit the Distributions were made.

50.    The Distributions constituted one or more transfers or property of the Debtor to the Defendant.

51.    As shown in Exhibit A, Distributions in the total amount of $861,518 were made within two years of the Petition Date.

52.    At the time the Debtor made the Distributions to Defendant, the Debtor: (i) was insolvent or became insolvent as a result of such transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

53.    At all times during the two years preceding the Petition Date: (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual and otherwise, as they came due; and (iii) the Debtor had unreasonably small capital in light of its reasonably anticipated obligations.

54.    Whether denominated as "draws," "distributions," "bonuses," "returns of capital," or otherwise, the Distributions to the Defendant were distributions of purported profits of the Debtor under the DLPA and on account of Defendant's equity interest in the Debtor.

55.    Although the Defendant performed legal and other services for the Debtor and on behalf of the clients of the Debtor, the Defendant was obligated under the DLPA and as a partner and equity interest holder of the Debtor to perform those services without remuneration beyond a

share in the profits of the Debtor.  The Defendant's efforts on behalf of the Debtor did not

provide reasonably equivalent value for the Distributions to the Defendant.

56.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 548(a)(1)(B) and

550, the Trustee is entitled to a judgment against the Defendants: (a) avoiding the Distributions;

(b) directing the Distributions be set aside; and (c) requiring the Defendant, as recipient of the

Distributions and/or the party for whose benefit the Distributions were given, to return the

Distributions, or the value thereof, to the Trustee for the benefit of the Dewey estate.

## SECOND CLAIM FOR RELIEF

### Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 548(b) & 550

57.    Plaintiff repeats and re-alleges all allegations set forth in each preceding

paragraph of the Complaint as though set forth fully again in support of this claim for relief.

58.    The Debtor was a partnership, and the Defendant was a general partner in the

Debtor within the meaning of Bankruptcy Code § 548(b).

59.    The Debtor made Distributions of cash to or for the benefit of the Defendant in

the amounts and on the dates set forth in the schedule at Exhibit "A."

60.    Defendant received these payments and was therefore the initial transferee of such

transfers and/or the party for whose benefit the Distributions were made.

61.    The Distributions constituted one or more transfers of property of the Debtor to

the Defendant.

62.    As shown in Exhibit A, Distributions in the total amount of $861,518 were made

within two years of the Petition Date.

63.    At the time the Debtor made the Distributions to Defendant, the Debtor: (i) was

insolvent or became insolvent as a result of such transfers; (ii) was engaged in business or a

transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

64.    At all times during the two years preceding the Petition Date: (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual and otherwise, as they came due; and (iii) the firm had unreasonably small capital in light of its reasonably anticipated obligations.

65.    As a result of the foregoing, pursuant to Bankruptcy Code § 548(b), the Trustee is entitled to a judgment against the Defendant: (a) avoiding the Distributions made within two years of the Petition Date; (b) directing the Distributions be set aside; and (c) requiring the Defendant, as recipient of the Distributions and/or the party for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Dewey estate.

## THIRD CLAIM FOR RELIEF

### Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers
### Pursuant to 11 U.S.C. §§ 544, 550, and NYDCL §§ 273-275, 278

66.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

67.    The Debtor had numerous lessor, trade, pension/retirement, and other creditors with unsecured claims that are allowable under Bankruptcy Code § 502 and that arose prior to the date of each of the Distributions to the Defendant.

68.    The Debtor made Distributions of cash to or for the benefit of the Defendant in the amounts and on the dates set forth in the schedule at Exhibit "A."

69.     The Debtor's total Distributions to the Defendant between January 1, 2009, and the Petition Date was $1,423,643.

70.     Defendant received these Distributions and was therefore the initial transferee of such transfers and/or the party for whose benefit the Distributions were made.

71.     The Distributions constituted one or more transfers of property of the Debtor to the Defendant.

72.     At the time the Debtor made the Distributions to Defendant, the Debtor: (i) was insolvent or became insolvent as a result of such transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

73.     At all relevant times, (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual and otherwise, as they came due; and (iii) the firm had unreasonably small capital in light of its reasonably anticipated obligations.

74.     Whether denominated as "draws," "distributions," "bonuses," "return of capital," or otherwise, the Distributions to the Defendant were distributions of purported profits of the Debtor under the DLPA on account of Defendant's equity interest in the Debtor.

75.     The Debtor did not receive fair consideration for the Distributions.  Although the Defendant performed legal and other services for the Debtor and on behalf of the clients of the Debtor, the Defendant was obligated under the DLPA and as a partner and equity interest holder of the Debtor to perform those services without remuneration beyond a share in the profits of the

Debtor.  The Defendant's efforts on behalf of the Debtor did not provide fair consideration for the Distributions to the Defendant.

76.     As a result of the foregoing, pursuant to Bankruptcy Code §§ 544 & 550 and New York Debtor and Creditor Law §§ 273-275 & 278, the Trustee is entitled to a judgment against the Defendants: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Defendant, as recipient of the Distributions and/or the party for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Dewey estate.

## FOURTH CLAIM FOR RELIEF

### Avoidance and Recovery of Distributions as Constructively Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 550, and NYDCL §§ 277-278

77.     The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

78.     The Debtor was a partnership, and the Defendant was a partner and equity interest holder in the Debtor.  The Defendant also served as a member of the Executive Committee and as the co-Chair of Dewey's Insurance Practice Group.

79.     The Debtor had numerous lessor, trade, pension/retirement, and other creditors with unsecured claims that are allowable under Bankruptcy Code § 502 and that arose prior to the date of each of the Distributions to the Defendant.

80.     The Debtor made Distributions of cash to or for the benefit of the Defendant in the amounts and on the dates set forth in the schedule at Exhibit "A."

81.     The Debtor's total Distributions to the Defendant between January 1, 2009, and the Petition Date was $1,423,643.

82.    Defendant received these payments and was therefore the initial transferee of such transfers and/or the party for whose benefit the Distributions were made.

83.    The Distributions constituted one or more transfers of partnership property from the Debtor partnership to a partner.

84.    At the time the Debtor made the Distributions to Defendant, Debtor: (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital; and/or (iii) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

85.    At all relevant times: (i) the present salable value of the Debtor's assets was lower than the probable value of its liabilities; (ii) the Debtor was unable to pay its debts, contractual and otherwise, as they came due; and (iii) the firm had unreasonably small capital in light of its reasonably anticipated obligations.

86.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 544, 550 and New York Debtor and Creditor Law §§ 277-278, the Trustee is entitled to a judgment against the Defendant: (a) avoiding the Distributions; (b) directing the Distributions be set aside; and (c) requiring the Defendant, as recipient of the Distributions and/or the party for whose benefit the Distributions were given, to return the Distributions, or the value thereof, to the Trustee for the benefit of the Dewey estate.

## FIFTH CLAIM FOR RELIEF

### Breach of Contract

87.    The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

88.     The DLPA is a valid, binding and enforceable contract between the Debtor and the Defendant.

89.     During the Defendant's affiliation with the Debtor, the Debtor made Distributions to or on behalf of the Defendant consisting of, among other things, tax payments of $56,436 that Defendant is liable to reimburse or repay to the Debtor.

90.     The Trustee is entitled to judgment against Defendant in amount no less than the amount of the unreimbursed taxes paid on Defendant's behalf, with prejudgment interest thereon at the legal rate and with such other relief the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

### Unjust Enrichment for Tax Payments

91.     The Trustee repeats and re-alleges all allegations set forth in each preceding paragraph of the Complaint as though set forth fully again in support of this claim for relief.

92.     The Debtor paid personal tax liabilities of the Defendant in the amount of $56,436.

93.     The Debtor was not obligated by law or contract to pay these taxes for the Defendant.

94.     The Defendant is obligated to reimburse the Debtor for the amounts advanced on his behalf in satisfaction of his personal tax liabilities.

95.     The Defendant has not reimbursed the Debtor for taxes the Debtor paid on his behalf.

96.     Defendant was unjustly enriched by the Debtor and at the Debtor's expense by failing to reimburse the amounts the Debtor paid for taxes on the Defendant's behalf.

97.     Equity and good conscience require that Defendant disgorge monies and/or benefits unjustly retained as described above.

19

98.    The Trustee is entitled to judgment against Defendant in an amount no less than the amount of taxes paid on his behalf by the Debtor but not reimbursed by the Defendant, with prejudgment interest thereon at the legal rate and with such other relief the Court deems just and proper.

## RESERVATION OF RIGHTS

99.    The Trustee hereby specifically reserves the right to bring any and all other causes of action that it may maintain against the Defendant including, without limitation, causes of action arising out of the same transaction(s) set forth herein, to the extent discovery in this action or further investigation by the Trustee reveals such further causes of action.

## PRAYER FOR RELIEF

The Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendant as follows:

a. On the First Claim for Relief, for avoidance of Distributions received by the Defendant during the two years prior to the Petition Date as constructive fraudulent transfers under applicable federal law in an amount no less than the amounts identified in Exhibit A;

b. On the Second Claim for Relief, for avoidance of Distributions received by the Defendant during the two years prior to the Petition Date as constructive fraudulent transfers under applicable federal law in an amount no less than the amounts identified in Exhibit A;

c. On the Third Claim for Relief, for avoidance of Distributions received by the Defendant as constructive fraudulent transfers under applicable federal and state law in an amount no less than the amounts identified in Exhibit A;

d. On the Fourth Claim for Relief, for avoidance of Distributions received by the Defendant as constructive fraudulent transfers under applicable federal and state law in an amount no less than the amounts identified in Exhibit A;

e. On the Fifth Claim for Relief, for breach of contract against the Defendant for the amount of $56,436 for unreimbursed taxes due under the DLPA;

    f.   On the Sixth Claim for Relief, for recovery against the Defendant on account of the amount by which Defendant has been unjustly enriched in an amount no less than $56,436;

    g.   Any and all pre- and post-judgment interest due; and

    h.   Such other relief that the Court deems appropriate under the circumstances, including, but not limited to, reasonable attorneys' fees, expenses, and costs.

Dated:   New York, New York           DIAMOND McCARTHY LLP
        December 2, 2013

                                       By:  /s/ Andrea L. Kim   .
                                       Allan B. Diamond, Esq.
                                       Howard D. Ressler, Esq.
                                       620 Eighth Avenue, 39th Floor
                                       New York, New York 10018
                                     Tel: (212) 430-5400
                                     Fax: (212) 430-5499

                                     - and -

                                     Andrea L. Kim, Esq. (*pro hac vice*)
                                     Christopher R. Murray, Esq. (*pro hac vice*)
                                     909 Fannin Street, 15th Floor
                                     Houston, Texas 77010
                                     Tel: (713) 333-5100
                                     Fax: (713) 333-5199

                                     *Attorneys for Alan M. Jacobs, Liquidating Trustee for the Dewey & LeBoeuf Liquidation Trust*